No. 25-1235

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY, dba TwinSpires

    Plaintiff-Appellee,

v.

MICHIGAN GAMING CONTROL BOARD,[1]

    Defendant,

and

HENRY L. WILLIAMS JR., in his official capacity as Executive Director of the Michigan Gaming Control Board; and DANA NESSEL, in her official capacity as Attorney General of Michigan,

    Defendants-Appellants.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Hala Y. Jarbou

**DEFENDANTS-APPELLANTS' MOTION TO STAY PRELIMINARY INJUNCTION AND ALL PROCEEDINGS PENDING APPEAL**

                                            James P. Kennedy
                                            Assistant Attorney General
                                            Counsel of Record

---

[1] The district court dismissed the Michigan Gaming Control Board from this action on May 9, 2025.  (Order on Defs.' Mot. to Dismiss, R. 44).

Dated: May 13, 2025

Attorney for Defendants-Appellants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210

## RELIEF SOUGHT

Defendants-Appellants, by and through counsel, Assistant Attorney General James P. Kennedy, and pursuant to Federal Rule of Appellate Procedure 8(a)(2), respectfully move this Court to enter an order suspending the district court's grant of preliminary injunctive relief while this appeal is pending. Defendants-Appellants further respectfully move this Court to enter an order staying all proceedings pending appeal because this Court's ruling will not only provide guidance on the legal issues in this case but will likely be dispositive.

## GROUNDS FOR RELIEF

In support of their motion, Defendants-Appellants state as follows:

1. In this action, Plaintiff-Appellee Churchill Downs Technology Initiatives Company (TwinSpires), a Michigan licensed third-party facilitator based in Oregon, challenges Michigan's authority to require licensure of persons soliciting interstate off-track wagers within Michigan's borders, arguing that Michigan's licensing framework is preempted by federal law. TwinSpires claims that it can conduct interstate wagering in Michigan without Michigan licensure, and that Michigan law requiring it to hold a Michigan license before accepting

wagers from people in Michigan is preempted by the Interstate Horseracing Act (IHA), 15 U.S.C. §§ 3001 to 3007, under the doctrines of both "field" and "conflict" preemption.[2] Specifically, TwinSpires contends that it is not required to comply with Michigan's licensing requirements because the IHA occupies the field of interstate wagering on horseraces and Michigan's licensing requirements conflict with the IHA.

    2.    On February 19, 2025, the district court entered a preliminary injunction agreeing in part with TwinSpires. (Op. on Pl.'s Mot. for Prelim. Inj., R. 19). The court enjoined Defendants-Appellants from enforcing the third-party facilitator licensing requirements of the Michigan Horse Racing Law, Mich. Comp. Laws, §§ 431.301 to 431.336, (MHRL)—or issuing sanctions under the MHRL—against TwinSpires for accepting wagers from individuals in Michigan on races that take place outside Michigan. (Order Grant. Prelim. Inj., R. 20).

---

[2] TwinSpires also claimed that the licensing regulations violate the dormant Commerce Clause. The district court denied TwinSpires' request for a preliminary injunction on this basis on February 19, 2025. (Op. on Pl.'s Mot. for Prelim. Inj., R. 19, PageID # 467-69), and dismissed TwinSpires' claim for relief based on the dormant Commerce Clause on May 9, 2025. (Op. on Defs.' Mot. to Dismiss, R. 43; & Order on Defs.' Mot. to Dismiss, R. 44). It also dismissed the Michigan Gaming Control Board in its May 9, 2025 opinion and order. *Id.*

3. Defendants-Appellants moved to stay the preliminary injunction and all proceedings pending appeal, and the district court denied that motion in an opinion dated April 18, 2025. (Op. on Defs.' Mot. to Stay, R. 36; & Order Den. Defs.' Mot. to Stay, R. 37). The district court denied the motion based on its interpretation that the IHA occupies the field of interstate off-track wagering on horse races. (Op. on Defs.' Mot. to Stay, R. 36, PageID # 941-48).

4. The district court did not address Defendants-Appellants' motion to stay all proceedings pending appeal in its opinion or order on that motion. Instead, it denied a stipulation by the parties to stay all proceedings pending appeal. (Order Den. Stip. to Stay, R. 34).

5. In determining whether a stay should be issued pending appeal, this Court balances the traditional factors governing injunctive relief: (1) whether the moving party has a strong or substantial likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the preliminary injunction is not stayed; (3) whether staying the preliminary injunction will substantially injure other interested parties; and (4) where the public interest lies. *Baker v. Adams Cty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002).

6. Defendants-Appellants have a strong likelihood of prevailing on the merits of their appeal because the district court's preemption analysis is contrary to (a) field-preemption principles, (b) controlling statutory provisions within the IHA, and (c) the MHRL and Michigan's gambling laws.

7. The district court incorrectly held that the IHA occupies the field of interstate pari-mutuel wagering. Field preemption exists where Congress, acting within its proper authority, determines that conduct in a specific field must be regulated by its exclusive governance such that States are prohibited from regulating conduct in that field. *Arizona v. United States*, 567 U.S. 387, 399-401 (2012). "The core question is whether the 'scheme of federal regulation' is 'so pervasive as to make reasonable the inference that Congress left no room to supplement it.'" *Dayton Power and Light Co. v. Fed. Energy Regulatory Comm'n*, 126 F.4th 1107, 1129 (6th Cir. 2025) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983)).

8. Congress did not express an intent that the IHA should occupy the entire field of wagering on interstate horseracing, and such an intent cannot be inferred from the IHA's narrow subject matter. The

IHA, rather than create a federal regulatory scheme to oversee interstate horseracing, leaves "regulation of the horse wagering industry . . . to the respective state racing commissions[.]" *Churchill Downs v. Thoroughbred Horsemen's Group, LLC*, 605 F.Supp.2d 870, 882 (W.D. Ken., 2009).

9. The IHA begins with Congress' findings that "[t]he States should have the primary responsibility for determining what forms of gambling may legally take place within their borders[,]" and that "the Federal Government should prevent interference by one State with the gambling policies of another[.]" 15 U.S.C § 3001(a)(1), (2). Its provisions created the rules under which racetracks could legally market and facilitate interstate horse-race wagering. It requires consent from various state-level parties before any interstate wagering can occur. *See, e.g.,* 15 U.S.C. §§ 3003, 3004.

10. The IHA's framework aims to fulfill the need for "Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers," 15 U.S.C. § 3001(a)(3), and further Congress' stated policy of "regulat[ing] interstate commerce with respect to wagering on horseracing, in order to further the

horseracing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(b). Rather than displacing State regulation, Congress intended the IHA to foster State cooperation. This framework supports applying the presumption against preemption, which is guided by two cornerstones of preemption jurisprudence: (1) the Congressional intent in adopting the legislation; and (2) the assumption that the historic police powers of the States would not be supplanted by a federal act absent the clear and obvious intent of Congress to do so. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Dayton Power & Light Co.*, 126 F.4th at 1128 n.12.

11. The IHA's stated purposes are consistent with the long-recognized principle that "the regulation of gambling lies at the heart of the state's police power." *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278 (11th Cir. 2005) (quoting *Johnson v. Collins Ent'm't Co., Inc.*, 199 F.3d 710, 720 (4th Cir., 1999); *see also Rivera-Corraliza v. Morales*, 794 F.3d 208, 220 (1st Cir. 2015); *Monarch Content Management, LLC v. Arizona Dept. of Gaming*, 971 F.3d 1021, 1028 (9th Cir. 2020); *Northville Downs v. Granholm*, 622 F.3d 579, 587 (6th Cir. 2010). "[T]he IHA pointedly le[aves] intact the states' primary

responsibility for determining what forms of gambling may legally take place within their borders, thus preserving their traditional police powers." *Monarch Content Management*, 971 F.3d at 1028.

12. The district court's conclusion that the IHA preempts the MHRL runs directly contrary to the IHA's stated purposes that each State should have primary regulatory authority over gambling in its jurisdiction, and that States should not interfere with other States' gambling policies.

13. In addition to violating general preemption principles and the IHA's express purposes, the district court also misconstrued the IHA's threshold definition of "interstate off-track wager." As defined in 15 U.S.C. § 3002(3), that term means

> a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools[.]

14. The lower court viewed "legal" in the first phrase of that definition as referring to a wager that meets the IHA's requirements. (Op. on Pl's Mot. for PI, R. 19, PageID # 453). But that reading renders

9

circular the prohibition in 15 U.S.C. § 3003 against accepting interstate off-track wagers unless they comply with the IHA; the lower court reduced that statute to a prohibition against accepting wagers that comply with the IHA unless they comply with the IHA. Further, the lower court viewed the second phrase's reference to "pari-mutuel wagers, where lawful in each State involved" as referencing legality of *any* parimutuel wager, rather than legality of the *specific* parimutuel wager at issue. This interpretation led the court to conclude that, because Michigan allows *some* parimutuel wagering on horseracing, *any* parimutuel wager placed from within its borders could qualify as an "interstate off-track wager" subject to the IHA's regulation, even if the wager was illegal under Michigan law.

15. In fact, the wagers that the district court enjoined Defendants-Appellants from regulating are illegal under Michigan law unless placed with an MHRL licensee. In a statute that the district court ignored, Mich. Comp. Laws § 750.331, Michigan specifically prohibits people from placing wagers on the results of horseraces. Parimutuel wagering permitted under the MHRL is an exception to that prohibition. Under the MHRL, people may place, and race-meeting

licensees may accept, pari-mutuel wagers on the results of live horse races in Michigan. Mich. Comp. Laws § 431.317(8). If the Executive Director[3] exercises his statutory authority to authorize wagering on simulcast racing, then a race-meeting licensee may accept parimutuel wagers on races being conducted at other tracks, both in Michigan and other states. Mich. Comp. Laws §§ 431.318(2) & 431.317(1). Until 2019, Michigan required all wagers on horseraces to be placed in person at a racetrack. But in 2019, Michigan authorized race-meeting licensees to contract with licensed third-party facilitators to facilitate wagering on live and simulcast racing. Mich. Comp. Laws § 431.308(1)(c). For the first time, wagers could legally be placed while away from the racetrack, but only through a licensed third-party facilitator, under terms and conditions established by the Executive Director, Mich. Comp. Laws § 431.308(d). Michigan law preserves the race-meeting licensee's duty to conduct and operate any form of pari-mutuel wagering on the results of live or simulcast horse racing by providing that "[t]he race meeting licensee is responsible for all conduct

---

[3] Pursuant to Executive Reorganization Order # 2009-31, codified at Mich. Comp. Laws § 324.99919, the Executive Director holds all the functions and powers that were previously held by the Racing Commissioner.

of its third-party facilitators." Mich. Comp. Laws § 431.317(8). Thus, the district court's ruling allows otherwise illegal wagers to be placed from within Michigan.

16. The district court did not separately analyze whether conflict preemption applies, because "TwinSpires's conflict preemption argument relies, essentially on the premise that the IHA occupies the field of regulating the acceptance of interstate off-track wagers[.]" (Op. on Pl's Mot. for PI, R. 19, PageID # 467). Regardless, there is no conflict between the IHA and the MHRL. The IHA expressly grants States the authority to establish licensing requirements in conjunction with a State's authorization to allow interstate off-track wagering. 15 U.S.C. § 3002(7). Michigan's election to utilize a licensing system to regulate interstate off-track wagering does not conflict with the IHA and, therefore, is not preempted. *Id.*

17. Under the doctrine of conflict preemption, "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Conflict preemption is appropriate "where compliance with both federal and state regulations is a physical impossibility for one engaged in

interstate commerce." *Florida Lime and Avocado Growers, Inc. v. Park*, 373 U.S. 132, 142-143 (1963). Conflict preemption also applies when the court determines that in "a particular case, state law stands as an obstacle to the accomplishment and execution of the full purpose and objective of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

Three points confirm that conflict preemption does not apply in this case. First, TwinSpires complied with both the IHA and MHRL from 2020 through 2024. (Decl. of Benjamin Murr, R. 11-1, PageID # 105, ¶¶ 31-32). Thus, compliance with both laws is not "impossible." *Florida Lime and Avocado Growers,* 373 U.S. at 142-143. Second, the IHA expressly states, as its first priority that "States should have primary responsibility for determining what forms of gambling may legally take place within their borders[.]" 15 U.S.C. § 3001(a)(1). Accordingly, the MHRL does not, in any way, "stand as an obstacle to the accomplishment or execution" of the IHA. *Hines*, 312 U.S. at 67. Third, both the Ninth and Eleventh Circuits have already recognized there is no conflict between the IHA and traditional state licensing and regulatory authority over gambling. *See Gulfstream Park Racing Ass'n*,

13

479 F.3d at 1312 n.3; and *Monarch Content Management*, 971 F.3d at 1027.

Thus, conflict preemption does not apply because it is possible to comply with both laws and the MHRL is not an obstacle to the IHA's purposes or objectives.

18. Without a stay, the Defendants-Appellants will be irreparably harmed. This appeal involves an issue of first impression on the question of whether the IHA preempts the MHRL, thus leaving Michigan unable to regulate betting by individuals located in this state, if the wager is accepted in another state. The issues presented are at the intersection of legal complexity, novelty, and preeminent importance to the regulation of gambling in states nationwide. Additionally, because these issues are central to the case as a whole, judicial economy and the parties' resources are best served by staying all proceedings in this case pending the appeal's outcome.

19. The district court's opinion, if applied more broadly, would permit every State that allows interstate off-track wagering to interfere with every other state that allows *some* pari-mutuel wagering, based both on its reading of the definition of interstate off-track wager and on

its conclusion that a wager placed by an individual within one State is deemed to be accepted in the State where the business that accepts the wager is located, rather than in the state from which the simulcasted horserace is transmitted or from which the individual bettor places or transmits the wager. This directly infringes on each State's authority to regulate both off-track wagering and the individuals placing wagers within its borders. With the issuance of the injunction, Michigan is precluded from furthering these interests and protecting its citizens, resulting in irreparable harm.

20. In addition, Michigan's citizens are irreparably harmed as a result of the district court's decision. Because the district court has enjoined Michigan from regulating gambling, any Michigan citizen using TwinSpires' gaming services would be required to seek regulatory relief from regulators 2,000 miles away from Michigan. And the regulatory structure of interstate off-track wagering regulated by Oregon is much less robust than the regulatory structure Oregon applies on behalf of its own citizens. See Or. Admin. R. 462.210-0030, 462-210-0040, & 462-220-0030. This also demonstrates that granting the stay is in the public interest.

21. Granting the stay is also in the public interest because the district court's decision harms, rather than furthers, the horseracing industry in Michigan. The existence of Michigan's horseracing industry relies upon the fees generated from interstate off-track wagering via advance deposit wagering (ADW) through third-party facilitators. Under the concept of ADW, bettors must fund their accounts before being allowed to place bets via telephone or online access. Michigan's horseracing industry receives a share of the revenue generated through ADW. See Mich. Comp. Laws §§ 431.322(2)(b), (3); 431.320a(a); & 431.320(5).

Currently, Michigan's horseracing industry consists of Northville Downs, the only remaining race meeting licensee, and the Michigan Harness Horsemen's Association (MHHA). Before the preliminary injunction, Northville Downs derived a portion of total revenues from wagers placed via TwinSpires' third-party facilitator platform. *Id*. This money helped to "support horsemen and horseracing in Michigan." (Decl. of Murr, R. 11-1, PageID # 104, ¶ 29). The loss of this revenue is significant, as "TwinSpires is one of the largest . . . wagering platforms for horseracing in the United States." (Pl.'s Mot. for Prelim. Inj., R. 11,

PageID # 64). The preliminary injunction cut off these revenues, and it is "in no way certain . . . [that] Northville Downs [will be able to successfully] resume[] its in-state racing operations[.]" (Decl. of Murr, R. 11-1, PageID # 107, ¶ 39).

Moreover, if the other ADW providers (licensed third-party facilitators) follow the district court's interpretation of the IHA, the revenue to the Michigan horseracing industry derived from Michigan customers making interstate off-track wagers would be reduced to zero. As such, Michigan's horseracing industry will be irreparable harmed absent a stay.

22. Michigan law entrusts the Executive Director with authority to regulate and maintain jurisdiction over parimutuel wagering on horseracing in Michigan to protect the public health, safety, and welfare of its residents and to ensure that wagering on the results of horseraces is properly regulated in strict adherence to Michigan law. See Mich. Comp. Laws §§ 431.303, 431.307(1). Granting a stay also furthers the public interest by maintaining the confidence that citizens have in the State of Michigan having regulatory control over parimutuel wagering offered via the internet within Michigan. Not only does Michigan

evaluate the company accepting the wagers, it protects underage people and compulsive gamblers. The district court's ruling leaves any such protection to Oregon.

23. On multiple occasions—including most recently by email on May 2, 2025—Defendants-Appellants have given Plaintiff-Appellee reasonable notice of their intent to file this motion seeking a stay of the preliminary injunction and all proceedings pending appeal.

## CONCLUSION AND RELIEF REQUESTED

WHEREFORE, Defendants-Appellants respectfully request that this Court grant their motion to stay the preliminary injunction and all proceedings pending this appeal.

Respectfully submitted,

*/s/ James P. Kennedy*

James P. Kennedy
Assistant Attorney General
Counsel of Record
Attorney for Defendants-Appellants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210

Dated: May 13, 2025

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Page Limitation, Typeface Requirements, and Type Style Requirements

1. This motion complies with the page limitation of Fed. R. App. P. 27(d)(2)(A) because the motion contains no more than 5,200 words. This document contains 3,163 words.

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Word in 14-point Century Schoolbook.