No. 25-1235

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY, dba
TWINSPIRES,

*Plaintiff-Appellee*,

*v.*

MICHIGAN GAMING CONTROL BOARD,

*Defendant*,

and

HENRY L. WILLIAMS, JR., in his official capacity as Executive Director of the
Michigan Gaming Control Board; and DANA NESSEL, in her official capacity as
Attorney General of the State of Michigan,

*Defendants-Appellants*.

———————————

On Appeal From The United States District Court
For The Western District Of Michigan
No. 1:25-cv-00047

———————————

**TWINSPIRES'S OPPOSITION TO MOTION TO STAY PRELIMINARY
INJUNCTION AND ALL PROCEEDINGS PENDING APPEAL**

Patrick G. Seyferth
Derek J. Linkous
BUSH SEYFERTH PLLC
100 West Big Beaver
Ste. 400
Troy, MI 48084
(248) 822-7800
seyferth@bsplaw.com
linkous@bsplaw.com

Christine Demana
GIBSON, DUNN &
CRUTCHER LLP
2001 Ross Ave.
Ste. 2100
Dallas, TX 75201
(214) 698-3246
cdemana@gibsondunn.com

Thomas H. Dupree Jr.
John W. Tienken
Abby H. Walters
GIBSON, DUNN &
CRUTCHER LLP
1700 M St. N.W.
Washington, DC 20036
(202) 955-8500
tdupree@gibsondunn.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellee states that Churchill Downs, Inc. is a parent to Plaintiff-Appellee and that Churchill Downs, Inc. has a financial interest in the outcome. Plaintiff-Appellee further states that BlackRock, Inc. owns 10% or more of Churchill Downs, Inc.

Dated: May 23, 2025                    /s/ Thomas H. Dupree Jr.
                                       Thomas H. Dupree Jr.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................3

      A.    TwinSpires operates under the federal Interstate
          Horseracing Act. ...............................................................3

      B.    TwinSpires accepts interstate pari-mutuel wagers from
          Michiganders, as authorized by the IHA. ...................6

      C.    Michigan threatens TwinSpires with "administrative,
          civil, and criminal penalties" for offering interstate
          wagers. ..............................................................................7

      D.    The district court enjoins the Executive Director and
          Attorney General..............................................................9

      E.    Defendants delay seeking a stay of the preliminary
          injunction. ......................................................................11

ARGUMENT ....................................................................................11

   I.    Defendants fail to show a likelihood of success on the merits. ..........12

      A.    The IHA preempts the field of interstate wagering on
          horseracing. ...................................................................13

      B.    Michigan's licensing requirement is also preempted
          because it conflicts with the IHA..............................18

   II.    The remaining factors all confirm a stay is unwarranted....................20

CONCLUSION ..................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*,
    511 F. App'x 398 (6th Cir. 2013) ...................................................21

*Arizona v. United States*,
    567 U.S. 387 (2012).............................................................2, 13, 14, 18

*Att'y Gen. v. PowerPick Club*,
    783 N.W.2d 515 (Mich. Ct. App. 2010) ..............................................6

*Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*,
    2023 WL 6601863 (6th Cir. Oct. 10, 2023) .......................................21

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
    781 F.3d 264 (6th Cir. 2015) ...............................................................22

*CTIA - The Wireless Ass'n v. Kentucky 911 Servs. Bd.*,
    727 F. Supp. 3d 641 (E.D. Ky. 2024).....................................13, 18, 19

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*,
    65 F.4th 851 (6th Cir. 2023) ...............................................................19

*Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*,
    479 F.3d 1310 (11th Cir. 2007) ..........................................................20

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
    878 F.3d 524 (6th Cir. 2017) ...............................................................22

*Kansas v. Garcia*,
    589 U.S. 191 (2020)......................................................................13, 19

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023) .........................................................20, 22

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012).............................................................................13

*Maryland v. Louisiana*,
451 U.S. 725 (1981)........................................................12

*Matthews v. Centrus Energy Corp.*,
15 F.4th 714 (6th Cir. 2021) ..........................................13

*Memphis A. Philip Randolph Inst. v. Hargett*,
977 F.3d 566 (6th Cir. 2020) ..........................................12

*Merck Sharp & Dohme Corp. v. Albrecht*,
587 U.S. 299 (2019) ........................................................19

*Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*,
971 F.3d 1021 (9th Cir. 2020) ........................................20

*Murphy v. NCAA*,
584 U.S. 453 (2018)..................................................13, 14

*Mutual Pharmaceutical Co. v. Bartlett*,
570 U.S. 472 (2013)........................................................12

*New Jersey v. Trump*,
131 F.4th 27 (1st Cir. 2025)............................................22

*Nken v. Holder*,
556 U.S. 418 (2009)................................2, 3, 12, 20, 22

*Overstreet v. Lexingon-Fayette Urb. Cnty. Gov't*,
305 F.3d 566 (6th Cir. 2002) ..........................................22

*State ex rel. Reading v. W.U. Tel. Co.*,
57 N.W.2d 537 (Mich. 1953)......................................6, 17

*Sexton v. Comm'r of Soc. Sec.*,
2024 WL 1994918 (6th Cir. May 6, 2024)......................21

*Sexton v. Ryder Truck Rental, Inc.*,
320 N.W.2d 843 (Mich. 1982)........................................18

*Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*,
989 F.2d 1266 (1st Cir. 1993)..........................................14

*Thompson v. DeWine*,
976 F.3d 610 (6th Cir. 2020) .............................................................21

*Towerco 2013, LLC v. Berlin Twp. Bd. of Trustees*,
110 F.4th 870 (6th Cir. 2024) ............................................................21

*Verizon North Inc. v. Strand*,
309 F.3d 935 (6th Cir. 2002) .............................................................18

*Wyeth v. Levine*,
555 U.S. 555 (2009).............................................................................15

STATUTES

15 U.S.C. § 3001 ...................................................................................5, 14, 15

15 U.S.C. § 3002 ...................................................................................5, 16, 17

15 U.S.C. § 3003 ...................................................................................5, 14, 17

15 U.S.C. § 3004 ...................................................................................1, 14, 16

31 U.S.C. § 5362 ......................................................................................16, 17

Mich. Comp. Laws § 431.308................................................................................8

Mich. Comp. Laws § 750.331................................................................................17

CONSTITUTIONAL PROVISIONS

U.S. Const. art. VI, cl.2 .......................................................................................12

OTHER AUTHORITIES

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000)...........................................19

J. Keeler Johnson, *Pari-mutuel vs. fixed-odds wagering: How are they
different?*, TWINSPIRES,
https://www.twinspires.com/edge/racing/pari-mutuel-vs-fixed-
odds-wagering-how-are-they-different/................................................................4

## INTRODUCTION

Over three months ago, the District Court for the Western District of Michigan conducted a comprehensive analysis of the Interstate Horseracing Act of 1978 ("IHA"), finding that "Congress established an exclusive, uniform process through which off-track betting systems could accept interstate off-track wagers." R.19, PageID.460. The Executive Director of the Michigan Gaming Control Board and the Attorney General ("Defendants") now—three months after the district court granted a preliminary injunction, two months after they filed a notice of appeal, nearly one month after the district court denied their stay, and one week after they asked this Court to extend briefing deadlines by a month—belatedly seek a stay of the district court's preliminary injunction. At this late date, and considering their long delay, Defendants offer no persuasive reason for this Court to grant the extraordinary relief of a stay pending appeal.

The IHA's framework is straightforward: An off-track betting system, such as Appellee Churchill Downs Technology Initiatives Company ("TwinSpires"), may offer interstate wagering on a horserace, so long as the system obtains the "consent" of three entities: the racetrack hosting the race, the regulator with oversight over racing in the state in which the race is held, and the off-track racing commission in the state where the wagers are *accepted*. 15 U.S.C. § 3004(a). Absent from the IHA is any requirement to obtain the consent of the state where the wager is *placed*.

1

Because of the IHA's exclusive "statutory directive[]," states like Michigan may not impose "supplemental requirements" on "off-track betting systems" like TwinSpires.  R.19, PageID.460, 465 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)).

But imposing additional requirements beyond what the IHA commands is exactly what Michigan purported to do.  Under the Michigan Horse Racing Law, Michigan mandated that TwinSpires obtain an additional license before it could offer interstate wagers to Michiganders on races occurring outside Michigan's borders, merely because such wagers are placed while the customer is in Michigan.  This flouts federal law.  Finding the IHA preempts the field of interstate wagering on horseraces, the district court enjoined Defendants "from enforcing [Michigan's] licensing requirement—or issuing sanctions . . . against TwinSpires for accepting wagers from individuals in Michigan on races that take place outside Michigan." R.19, PageID.474.  Under the district court's ruling, TwinSpires may continue to accept interstate wagers on these out-of-state races without first obtaining a Michigan license—precisely as federal law permits.

The standard for a stay "substantial[ly] overlap[s]" with the standard for granting a preliminary injunction.  *Nken v. Holder*, 556 U.S. 418, 434 (2009). Defendants must make a "strong showing" that they are "likely to succeed on the merits," that they will be "irreparably injured absent a stay," that a stay will not

"substantially injure" TwinSpires, and that the public interest lies in favor of a stay. *Id.* at 434 (quotation marks omitted). Each factor, however, demonstrates no stay is warranted.

As the district court exhaustively explained in three separate decisions, Michigan's licensing regime "runs contrary to the IHA's exclusive requirements." R.19, PageID.467; R.36, PageID.941–42; R.43, PageID.980–81. Defendants cannot demonstrate irreparable injury from being barred from enforcing an unconstitutional law. TwinSpires, on the other hand, does face irreparable injury from Defendants' imminent enforcement of Michigan's unconstitutional licensing requirements, including the loss of customers, their goodwill, and TwinSpires's established competitive position. *See* R.19, PageID.472. Under these circumstances, the public interest unquestionably favors leaving the district court's preliminary injunction in place and denying Defendants' motion for a stay.

## BACKGROUND

### A.    TwinSpires operates under the federal Interstate Horseracing Act.

TwinSpires is one of the largest wagering platforms for horseracing in the United States. TwinSpires is licensed by the Oregon Racing Commission as a multi-jurisdictional simulcasting and interactive wagering hub. R.11-2, PageID.117; R.11-3, PageID.231. Through its Oregon-licensed hub, TwinSpires offers advance deposit wagering ("ADW"). *See* R.11-2, PageID.117. (ADW is a form of horserace

3

wagering where a customer funds their account before they wager—i.e., in advance, rather than operating on credit.)

TwinSpires's ADW platform offers a common form of wagering known as "pari-mutuel wagering." R.11-1, PageID.98. Pari-mutuel wagering on horseracing differs from "fixed odds" sports betting. In pari-mutuel wagering, every dollar wagered on a particular bet type is pooled together, and—after a certain percentage is removed as "takeout" (for the host of wagering, the racetrack, taxes, fees, etc.)—the remainder of the pool for each bet type is distributed equally among all winning wagerers.[1]

Pari-mutuel wagering on horse racing is regulated in the United States under the Interstate Horseracing Act of 1978. Congress enacted the IHA in response to the rapid growth of wagering on horseraces across state lines in the 1970s. The rise of interstate pari-mutuel wagering had led to disputes between racetracks, horsemen's associations, and state regulators on whether to permit such interstate wagering and how to regulate it. *See* R.11, PageID.66. In the IHA, Congress explained that the federal government needed to step in "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track

---

[1] J. Keeler Johnson, *Pari-mutuel vs. fixed-odds wagering: How are they different?*, TWINSPIRES (Mar. 23, 2022), https://www.twinspires.com/edge/racing/pari-mutuel-vs-fixed-odds-wagering-how-are-they-different/.

4

betting industries in the United States." 15 U.S.C. § 3001(a)(2), (b). Congress found a "need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers" on horseraces. *Id*. § 3001(a)(3). And it determined that the "Federal government should prevent interference by one State with the gambling policies of another." *Id*. § 3001(a)(2). By providing a single federal regulatory framework, Congress enabled the proliferation of interstate pari-mutuel wagering nationwide without individual state interference.

The IHA provides the exclusive conditions for "accept[ing] an interstate off-track wager." 15 U.S.C. § 3003. The IHA authorizes "off-track betting systems"— businesses like TwinSpires, as well as brick-and-mortar off-track wagering locations—to accept interstate pari-mutuel wagers after obtaining consent from three entities:  (1) the host racing association, the entity that "conducts the horserace subject to the interstate wager," *id.* § 3002(9); (2) the host racing commission, the entity "with jurisdiction to regulate the conduct of racing within the host State," *id.* § 3002(10); and (3) the off-track racing commission in the "off-track State," the entity "with jurisdiction to regulate off-track betting in" the state in which the "interstate off-track wager is accepted," *id.* § 3002(6), (11).  That is, consent is required from (1) the track where the race is run, (2) the state entity regulating racing for that track, and (3) the entity regulating the off-track betting system that accepts the interstate wagers.  Once those three consents are acquired, the off-track betting

system may accept interstate pari-mutuel wagers nationwide on races at the host track.

What the IHA does not require is the consent of the state where the wager is placed. This makes sense given the common law rule that a wager is regulated, not where it is placed, but rather where it is accepted. *See, e.g.*, *State ex rel. Reading v. W.U. Tel. Co.*, 57 N.W.2d 537, 539 (Mich. 1953) (When "an offer to bet is telegraphed by a person in this city to another in New York, and the latter accepts by telegraph, the betting is done, not in Richmond, but in New York, because the offer, being accepted there, takes effect ther[e]." (quotation marks omitted)); *cf. Att'y Gen. v. PowerPick Club*, 783 N.W.2d 515, 533 (Mich. Ct. App. 2010) (applying traditional rule).

**B.    TwinSpires accepts interstate pari-mutuel wagers from Michiganders, as authorized by the IHA.**

Consistent with the IHA, TwinSpires began operating as an "off-track betting system" licensed by the Oregon Racing Commission in 2007. R.11-1, ¶ 14. Since then, TwinSpires has provided interstate pari-mutuel wagering to customers residing in certain states across the country—including Michigan (since approximately 2010)—who establish an account to place interstate pari-mutuel wagers on horseraces via telephone; the Internet, at twinspires.com; or more recently (and popularly), on mobile apps. R.11-1, ¶¶ 22–23.

For example, TwinSpires accepted interstate wagers from customers residing in Michigan for certain horseraces run in Pennsylvania in 2024 because TwinSpires has sought and obtained all relevant consents under the IHA for accepting such wagers. R.11-1, ¶¶ 16–21; R.11-4. TwinSpires has consent from the Pennsylvania racetrack that "conducts th[ose] horseraces"; from the Pennsylvania Racing Commission, which has "jurisdiction to regulate the conduct of racing within" Pennsylvania; and, finally, from the Oregon Racing Commission, the entity "with jurisdiction to regulate off-track betting" in Oregon, where TwinSpires's hub operates and accepts wagers. R.11-1, ¶¶ 19–21. TwinSpires does *not* need Michigan's consent under the IHA because Michigan is simply the state where the wagerer happens to reside—not where wagers are accepted.

## C.    Michigan threatens TwinSpires with "administrative, civil, and criminal penalties" for offering interstate wagers.

TwinSpires has lawfully offered interstate pari-mutuel wagers to Michiganders from approximately 2010 to the present day. R.11-1, PageID.103. In 2019, the state amended the Michigan Horse Racing Law to impose a new licensing requirement for entities, like TwinSpires, that accept pari-mutuel wagers electronically. R.11, PageID.70. Because the amended law imposed requirements over and above what the IHA requires, TwinSpires has consistently communicated to the Michigan Gaming Control Board (the "Board") that TwinSpires need not

comply with the licensing requirement.  *Id*. at PageID.71.  Even so, to ensure that Michiganders had the opportunity to place wagers without disruption and to achieve positive results for the Michigan horseracing industry, TwinSpires promptly obtained a Michigan license when the licensing process began.  *Id*.

To obtain a "third-party facilitator" license, TwinSpires had to enter "a joint contract with all race meeting licensees and certified horsemen's organizations in th[e] state."  Mich. Comp. Laws § 431.308(1)(d)(i).  So TwinSpires partnered with Northville Downs, the only remaining in-state racetrack, and with the certified horsemen's associations in 2020.  R.11, PageID.71.  TwinSpires operated with a valid Michigan license and successfully renewed it through 2024.  *Id*. at PageID.72.

Despite TwinSpires's compliance with state law and the Board's assurance that TwinSpires's license would "remain in good standing," on December 23, 2024, the Board ordered TwinSpires to stop accepting interstate wagers by the end of 2024.  *Id*. at PageID.73–74.  TwinSpires's in-state partner, Northville Downs, had been in the process of relocating its racetrack, and the Board decided Northville Downs lacked a valid race meeting license under Michigan law.  So, according to Board officials, TwinSpires no longer had the necessary in-state partner (with a valid license) to accept interstate off-track wagers from Michiganders.  *Id*. at PageID.73.  Working through Christmas and New Year's Eve, TwinSpires submitted a full response to the Board on December 31, 2024, explaining what TwinSpires had

8

maintained all along:  Because the IHA preempted the state's licensing regime, the state had no authority to order TwinSpires to shut down.  *Id.* at PageID.73–74.

On January 3, 2025, Board staff responded to TwinSpires.  R.1, PageID.16 ¶ 45.  While the Board detailed its position on state law, the Board neither acknowledged nor disputed that TwinSpires met the requirements of the IHA.  *Id.* Instead, the Board resorted to threats:  If TwinSpires continued to accept wagers from Michigan residents, TwinSpires would be "subjecting [it]self to administrative, civil, and criminal penalties."  *Id.*  On January 6, the Board again demanded that TwinSpires shut off its wagering platform in Michigan with Board staff stating that "things would get worse" for TwinSpires unless it did so.  *Id.* at PageID.17, ¶ 46. On January 7, the Board announced that it had "summarily suspended" TwinSpires's license.  *Id.*

## D.    The district court enjoins the Executive Director and Attorney General.

To vindicate its rights under federal law, TwinSpires filed a complaint seeking declaratory and injunctive relief, arguing that the IHA preempts Michigan's licensing requirement.  *See* R.1.[2]  Given the drastic summary suspension order and the resulting irreparable harm if TwinSpires were forced to shut down, TwinSpires

---

[2] TwinSpires also alleged a Commerce Clause violation, but that claim is not on appeal.

moved for a preliminary injunction and to expedite consideration on January 17.
R.9. The district court agreed to expedite proceedings.

On February 19, 2025, the district court granted TwinSpires's motion for a
preliminary injunction. *See* R.19, PageID.474. The district court found that "[t]he
IHA provides the exclusive procedure to accept an interstate off-track wager." R.19,
PageID.469. "When a wager is placed in Michigan, but the wager is placed on an
out-of-state race, and the wager is accepted out-of-state, TwinSpires does not need
[Michigan's] consent." *Id*. Accordingly, the Court found Defendants' efforts "to
force TwinSpires to obtain an additional" Michigan license to be "unconstitutional."
*Id*. at PageID.469–70. The Court also found that TwinSpires "face[d] a concrete and
imminent threat of state action forcing it to cease operations in Michigan," posing
"an unconstitutional intrusion on TwinSpires's rights." *Id.* at PageID.472. And
TwinSpires demonstrated it would lose "customer goodwill and its competitive
market share" if forced to shut down in Michigan. *Id*.

Because TwinSpires faced "certain and immediate irreparable harm" and the
two remaining preliminary injunction factors also favored equitable relief, the
district court preliminarily enjoined "the Executive Director and the Attorney
General from enforcing" Michigan's licensing requirement "or issuing sanctions
under [Michigan's Horse Racing Law] against TwinSpires for accepting wagers

from individuals in Michigan on races that take place outside Michigan." *Id.* at
PageID.474.

### E.    Defendants delay seeking a stay of the preliminary injunction.

After the expedited preliminary injunction proceedings, Defendants did not
immediately seek a stay.  Instead, they noticed an appeal three weeks later.  R.23.  It
would be nearly a month after the district court's decision before they sought a stay
in that court.  R.31.

The district court denied Defendants' motion for a stay in another considered
opinion on preemption.  *See* R.36, PageID.941–49.  The court explained that the
IHA preempts Michigan's "requirements seek[ing] to add an additional layer of
consent" to accept interstate pari-mutuel wagers.  R.36, PageID.941, 948.  The court
later denied Defendants' motion to dismiss in a third opinion on the merits.  *See*
R.43.

Defendants waited nearly another month after the district court's denial of
their stay motion before seeking relief in this Court.  Three months have now passed
since the district court granted TwinSpires's motion for a preliminary injunction.

## ARGUMENT

In considering whether to grant a motion to stay pending appeal, the Court
must consider "(1) whether the stay applicant has made a strong showing that [it] is
likely to succeed on the merits; (2) whether the applicant will be irreparably injured

11

absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quotation marks omitted). Defendants "bear the burden of showing that a stay is warranted under the circumstances." *Memphis A. Philip Randolph Inst. v. Hargett*, 977 F.3d 566, 568 (6th Cir. 2020).[3]

## I.    Defendants fail to show a likelihood of success on the merits.

The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl.2. "Accordingly, it has long been settled that state laws that conflict with" or otherwise interfere with federal law, *Mut. Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 479–80 (2013) (citation omitted), are "without effect," *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

Absent an express preemption provision, federal law preempts state law in two circumstances. First, if "Congress, acting within its proper authority, has determined" that an area "must be regulated by its exclusive governance," federal law preempts any state law in that area. *Arizona*, 567 U.S. at 399. In such cases, the

---

[3] Defendants also ask this Court to stay all pre-trial proceedings pending appeal of the preliminary injunction. Motion for Stay at 14. The parties stipulated to that limited stay below, R.33, but the district court denied it and entered a case management order. R.34, R.38. Discovery is now ongoing.

"framework of regulation [is] so pervasive that Congress left no room for the States to supplement it," or Congress otherwise established that it considered the federal interest "so dominant" as to "preclude enforcement of state laws on the same subject." *Id.*; *see also Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012). This is field preemption.

Second, federal law preempts any state law that "imposes restrictions that conflict with the federal law." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018). In other words, "federal law pre-empts state-law" when the "two are in logical contradiction." *Kansas v. Garcia*, 589 U.S. 191, 214 (2020) (Thomas, J., concurring); *see also CTIA - The Wireless Ass'n v. Kentucky 911 Servs. Bd.*, 727 F. Supp. 3d 641, 654 (E.D. Ky. 2024) (applying logical contradiction test). This is known as conflict preemption.

These categories are not "rigidly distinct," and both apply here. *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021).

A.    **The IHA preempts the field of interstate wagering on horseracing.**

As the district court correctly found, the text and structure of the IHA establish that "Congress occupied the field of regulating interstate off-track wagering." R.19, PageID.465. The IHA provides a "comprehensive" "statutory framework" for interstate off-track wagering. *Arizona*, 567 U.S. at 401. The IHA expressly prohibits any person from "accept[ing] interstate off-track wager[s] except as provided in this

chapter." 15 U.S.C. § 3003.  The IHA then provides that interstate off-track wagers "may be accepted by an off-track betting system *only if* consent is obtained" from three entities: (1) the racetrack running the race, (2) the state racing authority governing that race, and (3) the off-track betting authority regulating wagering in the state where the wager is accepted. *Id.* § 3004(a) (emphasis added).

"The plain language of [the IHA] makes clear that the IHA exclusively regulates interstate wagering."  R.19, PageID.466 (quotation marks omitted).  The IHA alone establishes the "absolute condition precedent to off-track wagering across state lines." *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*, 989 F.2d 1266, 1270–71 (1st Cir. 1993).  By setting out the "only" means for accepting interstate wagers (as Congress otherwise banned them, 15 U.S.C. § 3003), Congress "foreclose[d] any state regulation in th[is] area, even if it is parallel to federal standards." *Murphy*, 584 U.S. at 479 (quoting *Arizona*, 567 U.S. at 401)). After all, "[i]f states could add additional consent requirements, it would defeat Congress's pronounced purpose to 'prevent interference by one State with the gambling policies of another.'"  R.19, PageID.460 (quoting 15 U.S.C. § 3001(a)).

By preempting the field through the IHA, Congress granted off-track betting systems like TwinSpires "a federal right to be free from any other [state] requirements." *Murphy*, 584 U.S. at 479.  As the district court correctly found, Michigan is neither (1) the host racing association, nor (2) the host racing

14

commission, nor (3) the off-track racing commission.  R.19, PageID.460.  The IHA thus grants Michigan no say in how TwinSpires accepts interstate off-track wagers in Oregon for races run outside Michigan.  *Id.*

Defendants offer only two arguments against the district court's exhaustive field preemption analysis.  Neither is persuasive.

*First*, Defendants argue that Congress did not intend to preempt state regulation of interstate wagering on horseraces because the IHA recognizes state authority over gambling.  But the IHA is clear that state regulatory authority extends only to *intrastate* wagering.  *See* 15 U.S.C. § 3001(a)(1) ("the States should have the primary responsibility . . . *within their borders*" (emphasis added)).  The IHA does not recognize state authority over *interstate* wagering—let alone over races and wagers outside that state's borders.  *See* R.36, PageID.942 (explaining that Congress "explicitly establishes, in a clear and manifest manner, that the IHA's regulatory scheme supersedes state powers in the limited area of *interstate* off-track wagers"); *accord Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  Congress explained that it restricted states' authority in the "limited area of interstate off-track wagering on horseraces" because it determined "the Federal Government should prevent interference by one State with the gambling policies of another."  *Id.* § 3001(a)(2)–(3).

15

*Second*, Defendants argue that the definition of "interstate off-track wager" in 15 U.S.C. § 3002(3) makes an interstate wager impermissible unless it is "legal" or "lawful" under Michigan law.  But when Congress said the wagers must be "lawful in each State involved," *id*. § 3002(3), it was referring to "each State involved" in providing the requisite consents—*i.e.*, the state where the wager is accepted (the consent of the off-track racing commission), and the state where the horserace is conducted (the consents of the host racing association and host racing commission).  The IHA does not require the consent of the state where the wager is placed, so that state is not "involved" within the meaning of § 3002(3).  *Id.*  Congress would not have enacted a fourth consent requirement by burying it in a definitional section.  If Congress had wanted to require the consent of the state in which the wagerer resides, it would have said so explicitly, by adding it as one of the necessary consents in 15 U.S.C. § 3004(a), rather than making an elliptical reference to "lawful" wagers in the definitional section.  For example, in the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), "unlawful Internet gambling" includes wagers made unlawful "under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made."  31 U.S.C. § 5362(10)(A).  Put simply, the UIGEA provides that the state where the wager is *placed* will have a say-so in regulating internet gambling.  But Congress

16

did not include such a provision in the IHA.  In fact, Congress exempted IHA wagers from the UIGEA's restrictions.  31 U.S.C. § 5362(10)(B)(iii).

This interpretation hardly makes § 3003 "circular" as Defendants contend. Motion for Stay 9–10.  That provision states that "[n]o person may accept an interstate off-track wager except as provided in this chapter."  Accordingly, § 3003 establishes that for those wagers defined in § 3002(3), the IHA is "[t]he exclusive means of regulation rather than a floor from which states may implement supplemental regulation."  R.19, PageID.459.  As the district court explained, "the plain language of § 3003 makes clear that the IHA exclusively regulates interstate wagering."  *Id.* (quotation marks omitted).

Defendants fault the district court for not discussing Mich. Comp. Laws § 750.331.  *See* Motion for Stay at 10.  That statute—which makes unauthorized horseraces *in Michigan* a public nuisance and also makes it a misdemeanor for a person, "contrary to law," to "contribute[] or collect[] any money, goods, or things in action, for the purpose of making up a purse, plate, or valuable thing, to be raced for by any animal"—has no bearing on out-of-state races and out-of-state wagers. To apply this statute to such out-of-state races or wagers would give Michigan law an impermissible extraterritorial reach.  *See Reading*, 57 N.W.2d at 539–40.  And, as the district court already explained, Defendants "do not illustrate the 'clear legislative intent' of this extraterritorial application, as is required" by the Michigan

17

courts.  R.36, PageID.948 (citing *Sexton v. Ryder Truck Rental, Inc.*, 320 N.W.2d 843, 854–55 (Mich. 1982)).

**B.    Michigan's licensing requirement is also preempted because it conflicts with the IHA.**

Michigan's licensing requirement is also preempted as a matter of conflict preemption.  That is because the licensing requirement both "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399, and plainly contradicts it, *CTIA - The Wireless Ass'n*, 727 F. Supp. 3d at 654.

State law is preempted "if it interferes with the methods by which the federal statute was designed to reach [its] goal." *Verizon North Inc. v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002) (quotation marks omitted).  That is particularly true when the state and federal law "conflict in the method of enforcement," as "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy."  *Arizona*, 567 U.S. at 406.  Here, Congress made the deliberate decision to provide that only certain entities in certain "involved" states could either consent or object to interstate off-track wagering.  An additional veto for the state in which an individual resides when placing a wager "is not the system Congress created." *Id.* at 408.  Thus, Michigan's efforts to regulate interstate wagers on out-

of-state races conflicts with the IHA in a manner that state laws regulating *intrastate* exercises of "licensing and regulatory authority" do not.

In addition, Michigan's licensing requirement stands "in logical contradiction" with the IHA. *Kansas*, 589 U.S. at 214 (Thomas, J., concurring); *CTIA - The Wireless Ass'n*, 727 F. Supp. 3d at 654. As Justice Thomas has explained, when "federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 319 (2019) (Thomas, J., concurring); *see also* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 261 n.107 (2000) (explaining that "additional [state] conditions" must give way when "federally recognized conditions" are exclusive). And that is exactly the case here. The IHA has established a ceiling for regulation of interstate pari-mutuel wagers on horseraces. Michigan cannot go above it without contradicting federal law's commands.

In response, Defendants argue there is no conflict because it was possible for TwinSpires to comply with both federal and state law. But the fact compliance is possible does not save Michigan's licensing requirement from preemption. State laws still impermissibly conflict with federal law when they "rebalance the [federal] objectives" and "skew" what federal law would otherwise require. *In re Ford Motor*

*Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 864 (6th Cir. 2023). That is what Michigan has done by interposing its own licensing regime when federal law otherwise granted Michigan no role in regulating interstate wagers. Defendants cite to the IHA's recognition of states' authority "within their borders," but that says nothing about the conflict Michigan law imposes on the IHA's framework for interstate wagering on racing *outside* its borders. Defendants also cite cases in the Ninth and Eleventh Circuits. But both courts addressed state laws concerning the simulcasting of races at locations *within* the relevant state—not state efforts to regulate outside their borders. *Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1027 (9th Cir. 2020) (Arizona); *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 479 F.3d 1310, 1312 (11th Cir. 2007) (Florida).

## II. The remaining factors all confirm a stay is unwarranted.

TwinSpires has shown "a substantial likelihood of success on the merits of its constitutional claim," so Defendants "face[] a high hurdle" to show that injunctive relief should be stayed pending appeal. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Defendants cannot overcome that hurdle, as the other three factors all weigh decisively in favor of denying a stay. *Nken*, 556 U.S. at 434.

As demonstrated above, Michigan's licensing requirement is unconstitutional and therefore Defendants suffer no harm from a preliminary injunction enjoining its

enforcement. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (state suffers irreparable harm only if law is constitutional). And Defendants will not be irreparably harmed in any event. Three months ago, the district court granted a preliminary injunction, and Defendants waited nearly a month after the district court denied a stay before seeking a stay from this Court. Waiting "for weeks 'undercuts the sense of urgency that ordinarily accompanies'" such relief and undermines any claim of "irreparable injury." *Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, 2023 WL 6601863, at *3 (6th Cir. Oct. 10, 2023) (citation omitted); *see also Sexton v. Comm'r of Soc. Sec.*, 2024 WL 1994918, at *5 n.3 (6th Cir. May 6, 2024) (noting courts have viewed "delay" "as dispositive and [] alone sufficient to deny a request for injunctive relief"); *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013) ("[A]n an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm.").

Defendants make the surprising argument that the district court's order is causing the state a "significant" decrease in revenue. Motion for Stay 16–17. But Defendants brought about this decrease by ordering TwinSpires to shut down operations by December 31, 2024. Moreover, lost revenue is the paradigmatic example of an alleged financial injury that is *not* irreparable. *Towerco 2013, LLC v. Berlin Twp. Bd. of Trustees*, 110 F.4th 870, 889 (6th Cir. 2024). It is TwinSpires, not Defendants, that "stands to face irreparable harm . . . should the Court lift the

preliminary injunction." R.36, PageID.954. Defendants make no argument to the contrary. *See New Jersey v. Trump*, 131 F.4th 27, 39 (1st Cir. 2025) (argument raised for the first time in reply in support of a motion to stay is waived). Nor could they. The imminent enforcement of an unconstitutional law poses irreparable injury. *Overstreet v. Lexingon-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Moreover, "[i]t is appropriate to use a preliminary injunction to avoid harms to goodwill and competitive position," as TwinSpires faces here, because those injuries are not "calculable and compensable through monetary damages." *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015); *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017). As the district court found, without a preliminary injunction, TwinSpires will "lose access to its 18,000 Michigan users," the "customer goodwill" it has built with them, and its "competitive position" in the market—and it had already experienced harm to "its reputation." R.19, PageID.470–71. Without question, a stay of the preliminary injunction would "substantially injure" TwinSpires. *Nken*, 556 U.S. at 434.

This Court should also deny a stay because of the public's paramount interest in a constitutional and "correct application of the law." *Kentucky*, 57 F.4th at 556. None of Defendants' arguments can displace that interest. Defendants argue that the injunction "harms, rather than furthers, the horseracing industry in Michigan" and the public is harmed by a "less robust" regulatory regime. Motion for Stay at 15–

22

16.  But these unsubstantiated interests are, at bottom, policy disagreements with the regulatory framework established by the IHA and the role it grants states.  As such, Defendants' true complaint is not with the district court.  Rather, it is with Congress.

## CONCLUSION

For the foregoing reasons, Defendants' motion for a stay should be denied.

Dated:  May 23, 2025                                    Respectfully submitted,


                                                   /s/ Thomas H. Dupree Jr.
                                                   Thomas H. Dupree Jr.
                                                   John W. Tienken
                                                   Abby H. Walters
                                                   **GIBSON, DUNN & CRUTCHER LLP**
                                                   1700 M St N.W.
                                                   Washington, DC 20036
                                                   (202) 955-8500
                                                   TDupree@gibsondunn.com
                                                   JTienken@gibsondunn.com
                                                   AWalters@gibsondunn.com

                                                   Christine Demana
                                                   **GIBSON, DUNN & CRUTCHER LLP**
                                                   2001 Ross Ave., Ste. 2100
                                                   Dallas, TX 75201
                                                   (214) 698-3246
                                                   CDemana@gibsondunn.com

                                                   Patrick G. Seyferth (P47575)
                                                   Derek J. Linkous (P82268)
                                                   **BUSH SEYFERTH PLLC**
                                                   100 West Big Beaver, Ste. 400
                                                   Troy, MI 48084
                                                   (248) 822-7800

23

seyferth@bsplaw.com
linkous@bsplaw.com

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,081 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 2025.


Dated:  May 23, 2025                    /s/ Thomas H. Dupree Jr.
                                       Thomas H. Dupree Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2025, I caused a true and correct copy of this brief to be electronically filed through the Court's CM/ECF system, which will send a notice of filing to all registered users.


Dated:  May 23, 2025                    /s/ Thomas H. Dupree Jr.
                                        Thomas H. Dupree Jr.