No. 25-1235

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY, dba TwinSpires,

      Plaintiff-Appellee,

v.

MICHIGAN GAMING CONTROL BOARD,

      Defendant,

and

HENRY L. WILLIAMS JR., in his official capacity as Executive Director of the Michigan Gaming Control Board; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan,

      Defendants-Appellants.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Hala Y. Jarbou

**BRIEF FOR DEFENDANTS-APPELLANTS**

                                  James P. Kennedy
                                  Assistant Attorney General
                                  Counsel of Record
                                  Attorney for Defendants–
                                  Appellants
                                  Alcohol & Gambling Enforc. Div.
                                  2860 Eyde Parkway
                                  East Lansing, MI  48823

Dated:  June 11, 2025                 (517) 241-0210

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................. iii

Statement in Support of Oral Argument ................................... xi

Jurisdictional Statement ......................................................... xii

Statement of Issues Presented ................................................ xiii

Introduction ............................................................................ 1

Statement of the Case .............................................................. 3

    A.    Michigan's laws governing wagering on horse races ............. 3

    B.    The Federal Interstate Horseracing Act ................................. 8

    C.    Background and procedural history ...................................... 10

Standard of Review ................................................................ 19

Summary of Argument ........................................................... 20

Argument ............................................................................... 24

I.    TwinSpires lacks a strong likelihood of showing that the IHA preempts the MHRL ........................................................... 24

    A.    The district court did not apply the required presumption against preemption ........................................... 24

    B.    Congress has long supported each State's gambling policies ............................................................................... 27

    C.    The IHA does not occupy the field of interstate off-track wagering ...................................................................... 30

    D.    The district court misinterpreted the IHA ............................. 35

E.    The district court misconstrued Michigan's gambling laws ....................................................... 42

F.    The district court created a risk of conflicts with other federal laws ................................................ 44

G.    The MHRL does not conflict with the IHA ......................... 47

II.    TwinSpires did not satisfy any of the other requirements to obtain a preliminary injunction ..................................... 50

A.    TwinSpires did not face a reasonable threat of an irreparable injury absent a preliminary injunction. ........... 50

B.    The preliminary injunction significantly harms Michigan's horse racing industry and the public interest ................................................................ 54

Conclusion and Relief Requested ............................................. 58

Certificate of Compliance .......................................................... 60

Certificate of Service ................................................................ 61

Designation Of Relevant District Court Documents ........................... 62

# TABLE OF AUTHORITIES

Page

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*,
511 F. App'x 398 (6th Cir. 2013) ...........................................................50

*Arizona v. United States*,
567 U.S. 387 (2012) ...............................................................27, 28, 33

*Casino Ventures v. Stewart*,
183 F.3d 307 (4th Cir. 1999) .........................................................25, 26

*Churchill Downs v. Thoroughbred Horsemen's Group, LLC*,
605 F. Supp. 2d 870 (W.D. Ky. 2009).............................................31, 33

*City of Pontiac Retired Employees Ass'n v. Schimmel*,
751 F.3d 427 (6th Cir. 2014) ........................................................19, 20

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ...................................................................47

*Dayton Power & Light Co. v. FERC*,
126 F.4th 1107 (6th Cir. 2025)......................................................24, 27

*Fenner v. Gen. Motors, LLC*,
113 F.4th 585 (6th Cir. 2024)............................................................25

*Fla. Lime & Avocado Growers, Inc. v. Park*,
373 U.S. 132 (1963) ...............................................................47, 48

*Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*,
479 F.3d 1310 (11th Cir. 2007) .......................................................48

*Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*,
399 F.3d 1276 (11th Cir. 2005) .......................................................26

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .................................................................47, 48

*Horseman's Benevolent & Protective Ass'n-Ohio Div., Inc. v. DeWine*,
666 F.3d 997 (6th Cir. 2012) ........................................................ 31, 49

*Horsemen's Benevolent & Protective Ass'n-Ohio Div., Inc. v. Zonak*,
No. 2:07-cv-00057, 2008 WL 11453695 (S.D. Ohio, Sept. 23, 2008) ...................................................................................... 30, 31, 49

*Hudson v. Tex. Racing Comm'n*,
455 F.3d 597 (5th Cir. 2006) ............................................................ 44

*Huron Mountain Club v. U.S. Army Corps of Eng'rs*,
545 F. App'x 390 (6th Cir. 2013) .................................................. 50, 51

*Johnson v. Collins Entm't Co., Inc.*,
199 F.3d 710 (4th Cir. 1999) ............................................................ 26

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) ............................................................. 19

*Ky. Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*,
20 F.3d 1406 (6th Cir. 1994) ........................................................ 29, 31

*Maryland v. King*,
567 U.S. 1301 (2012) ........................................................................ 54

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) .......................................................................... 24

*Merrick v. Diageo Americas Supply, Inc.*,
805 F.3d 685 (6th Cir. 2015) ............................................................ 25

*Monarch Content Mgmt., LLC v. Ariz. Dep't of Gaming*,
971 F.3d 1021 (9th Cir. 2020) .................................................. 26, 27, 48

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .............................................................. 21, 28, 29

*Northville Downs v. Granholm*,
622 F.3d 579 (6th Cir. 2010) ............................................................ 26

iv

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.*
  *Comm'n,*
    461 U.S. 190 (1983) ...................................................................27, 28

*Rivera-Corraliza v. Morales,*
    794 F.3d 208 (1st Cir. 2015) ................................................ 26

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ............................................................. 19

*Torres v. Precision Indus., Inc.,*
    995 F.3d 485 (6th Cir. 2021) ................................... 25, 27, 28

*United States v. Atl. Research Corp.,*
    551 U.S. 128 (2007) ............................................................. 40

*United States, ex rel. Polansky v. Executive Health Resources, Inc.,*
    599 U.S. 419 (2023) ............................................................. 37

*Va. Uranium, Inc. v. Warren,*
    587 U.S. 761 (2019) ............................................................. 28

*Wells Fargo & Co. v. WhenU.com, Inc.,*
    293 F. Supp. 2d 734 (E.D. Mich. 2003) .............................. 51

*West Virginia v. Env't Prot. Agency,*
    597 U.S. 697 (2022) ............................................................. 37

*Williams v. Churchill Downs Tech. Initiatives Co.,*
    No. 25-0787-CZ (Wayne Circuit Court) ............................... 19

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ...................................................... 21, 24

## Statutes

15 U.S.C. §§ 3001–3007 ..........................................................xi, xii

15 U.S.C. § 3001(a) ................................................................ 1, 34

15 U.S.C. § 3001(a)(1) ....................................................... 8, 30, 48

15 U.S.C. § 3001(a)(2)...............................................................8, 30, 38

15 U.S.C. § 3001(a)(3)........................................................................8

15 U.S.C. § 3001(b) ......................................................................9, 56

15 U.S.C. § 3002(3),
  as amended by Pub. L. No. 106-553, tit. VI, 114 Stat. 2762A-
  108 ........................................................................................ passim

15 U.S.C. § 3002(5) .......................................................................10

15 U.S.C. § 3002(9) ...................................................................10, 39

15 U.S.C. § 3002(10) .....................................................................39

15 U.S.C. § 3002(11) .....................................................................38

15 U.S.C. § 3002(12) .....................................................................10

15 U.S.C. § 3002(20) .......................................................................9

15 U.S.C. § 3003.................................................................... passim

15 U.S.C. § 3004...........................................................................41

15 U.S.C. § 3004(a)–(b)...................................................................9

15 U.S.C. § 3004(a) .......................................................................32

15 U.S.C. § 3004(a)(1)–(2) ..........................................................38

15 U.S.C. § 3004(a)(1)(A)..............................................................49

15 U.S.C. § 3004(a)(3)...................................................................38

15 U.S.C. § 3004(c)......................................................................9, 32

15 U.S.C. §§ 3005–3006...................................................................9

15 U.S.C. §§ 3005–3007.................................................................32

15 U.S.C. § 3006............................................................................10

18 U.S.C. § 1081 ................................................................................ 44

18 U.S.C. § 1084 ......................................................................... passim

18 U.S.C. § 1084(a) .......................................................................... 44

18 U.S.C. § 1084(b) .......................................................................... 44

18 U.S.C. § 1952 ............................................................................... 29

18 U.S.C. § 1953 ............................................................................... 28

18 U.S.C. § 1955 ............................................................................... 28

28 U.S.C. § 1292(a)(1) ...................................................................... xii

28 U.S.C. § 2201 ............................................................................... xii

31 U.S.C. §§ 5361–5367 .............................................................. passim

31 U.S.C. § 5362(10)(A) ................................................................... 46

31 U.S.C. § 5362(10)(D)(i) ............................................................... 46

31 U.S.C. § 5362(10)(D)(ii) .............................................................. 46

31 U.S.C. § 5363 ............................................................................... 45

1933 Mich. Pub. Acts 199, §§ 13–14 (then codified at Mich. Comp. Laws §§ 431.13, 431.14 (repealed 1959) .................................................. 5

1959 Mich. Pub. Acts 27, §§ 12(1)–12(2) (then codified at Mich. Comp. Laws §§ 431.42(1)–431.42(2) (repealed 1980) ........................... 5

1980 Mich. Pub. Acts 327, §§ 12(1)–12(2) (then codified at Mich. Comp. Laws §§ 431.72(1)–431.72(2) (repealed 1995) ........................... 5

1986 Mich. Pub. Acts 108 (repealed 1995) ................................................ 5

1995 Mich. Pub. Acts 279 §§ 17(7), 18(1) ................................................ 6

An Act to Prevent Horse Racing, Laws of the Territory of Michigan (Detroit: Sheldon & Reed, 1820) (October 12, 1819) ....... 3, 42

Mich. Comp. Laws § 324.99919....................................................................4

Mich. Comp. Laws §§ 431.301–431.336.....................................................xi

Mich. Comp. Laws § 431.302(j) ...................................................................6

Mich. Comp. Laws § 431.303 .......................................................................4

Mich. Comp. Laws § 431.315(3) .................................................................13

Mich. Comp. Laws § 431.317(1) .............................................................7, 13

Mich. Comp. Laws § 431.317(6) .................................................................32

Mich. Comp. Laws § 431.317(7) .............................................................6, 13

Mich. Comp. Laws § 431.317(8) .......................................................7, 13, 42

Mich. Comp. Laws § 431.317(10) .................................................................8

Mich. Comp. Laws § 431.318(1) .........................................................5, 6, 13

Mich. Comp. Laws § 431.318(2) ...................................................................6

Mich. Comp. Laws § 431.318(8)(c) .......................................................6, 13

Mich. Comp. Laws § 431.320(5) .................................................................57

Mich. Comp. Laws § 431.320a(a) ...............................................................57

Mich. Comp. Laws § 431.322(2)(b)............................................................57

Mich. Comp. Laws § 431.322(3) .................................................................57

Mich. Comp. Laws §§ 750.314–750.315.................................................42, 55

Mich. Comp. Laws § 750.331 .........................................................3, 4, 25, 56

Mich. Pub. Acts 328 of 1931, § 331 ........................................................3, 42

Mich. Rev. Stat. of 1846 (Detroit: Bagg & Harmon, 1846) ........................3

Ohio Rev. Code § 3769.089(G)....................................................................49

Pub. L. 95-515 (1978) ................................................................. 36

## Other Authorities

146 Congressional Record—House of Representatives, Proceedings
and Debates of the 106th Congress, Second Session, H11230,
October 26, 2000 ................................................................. 39

*Congressional Authority to Adopt Legislation Establishing a
National Lottery*,
10 Op. O.L.C. 40 (1986) ....................................................... 29

S. Rep. No. 95-1117 (1978) ............................................... 30, 36

## Rules

Federal Rule of Appellate Procedure 32(a)(5) ....................................... 60

Federal Rule of Appellate Procedure 32(a)(6) ....................................... 60

Federal Rule of Appellate Procedure 32(a)(7)(B)(i) ............................... 60

Federal Rule of Appellate Procedure 32(f) ............................................ 60

Mich. Admin. Code r. 431.2050–431.2120 ........................................ 32

Mich. Admin. Code r. 431.5005 ....................................................... 33

Mich. Admin. Code r. 431.5010 ....................................................... 33

Mich. Admin. Code r. 431.5010(10) ................................................. 33

Mich. Admin. Code r. 431.5010(11) ................................................. 33

Mich. Admin. Code r. 431.5015(6)(f) ................................................ 33

Mich. Admin. Code r. 432.631–639d ................................................ 33

Mich. Admin. Code r. 432.731–739a ................................................ 33

Or. Admin. R. 462-210-0030 ........................................................... 34

Or. Admin. R. 462-220-0020 ....................................................... 35, 55

Or. Admin. R. 462-220-0030(3)(e) ............................................................ 55

Sixth Circuit Rule 28(a)(1)-(2) ................................................................ 62

Sixth Circuit Rule 28(a) ......................................................................... 62

Sixth Circuit Rule 30(b) ......................................................................... 62

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

At issue is whether the Interstate Horseracing Act, 15 U.S.C. §§ 3001–3007, preempts the Michigan Horse Racing Law, Mich. Comp. Laws §§ 431.301–431.336, which requires businesses to hold a license and comply with applicable Michigan law to accept pari-mutuel wagers from people in Michigan.

This is an issue of particular significance because (1) the district court appears to be the first court in the nation to interpret the amended definition of "interstate off-track wager" in 15 U.S.C. § 3002(3); and (2) the district court's interpretation not only hobbles Michigan's regulatory efforts but will also potentially affect the regulation of internet wagering more broadly, including by threatening the established system of lawful internet wagering that currently exists in Michigan and numerous other States.  The district court's decision also threatens Michigan's ability to proscribe out-of-state or foreign companies from offering wagering via the internet within Michigan, contrary to Michigan law.  Oral argument will assist this Court in deciding this important case regarding regulating online gambling, which has national significance.

## JURISDICTIONAL STATEMENT

Churchill Downs Technology Initiatives Company (TwinSpires) commenced this action in district court pursuant to 15 U.S.C. § 3001, *et seq*., and 28 U.S.C. § 2201.  (Compl., R. 1, Page ID # 5.)  On February 19, 2025, the district court issued an opinion and order granting TwinSpires' motion for a preliminary injunction.  (Op. on Mot. for P.I., R. 19, Page ID # 473–474; P.I. Ord., R. 20, Page ID # 475.)  On March 11, 2025, Defendants-Appellants Executive Director Henry L. Williams and Attorney General Dana Nessel, who are bound by the preliminary injunction, timely appealed from the district court's order.  (Not. of App., R. 23, Page ID # 801–802.)  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES PRESENTED

1.  Demonstrating a strong likelihood of success on the merits in a field-preemption case requires showing that Congress intended to prevent state regulation. The Interstate Horseracing Act recognizes that States are primarily responsible for gambling within their borders, defines crucial terms with reference to legality under state law, and provides no federal enforcement mechanism. Did the district court err by concluding that TwinSpires has a strong likelihood of showing that the IHA preempts Michigan's third-party facilitator licensing requirements?

2.  A preliminary injunction is an "extraordinary remedy" that may be granted only if the movant faces irreparable harm and the balance of equities favors relief. Here, TwinSpires delayed seeking relief for years and the injunction substantially harms the State of Michigan, its horse racing industry, compliant third-party facilitators, and the public. Did the district court err by granting an injunction where TwinSpires did not face irreparable harm and where the injunction substantially harms others and the public interest?

## INTRODUCTION

TwinSpires took an early lead in this case, obtaining a preliminary injunction prohibiting Michigan's horse racing regulator, Henry L. Williams, and Michigan Attorney General Dana Nessel from enforcing licensing requirements on TwinSpires or imposing penalties on it for accepting wagers from people in Michigan on out-of-state races. This injunction is based on the faulty premise that the Interstate Horseracing Act (IHA) pervasively regulates the field of interstate wagering on horse racing.  But the court reached this conclusion without examining the field of wagering regulation.  Unlike many state gambling laws, the IHA does not regulate multiple aspects of gambling, such as the age of wagerers, the amount of wagering permitted, or protections available for compulsive gamblers.  Instead, the IHA expressly declares that its aim is for States to have primary control over their own, and respect each other's, gambling policies.  *See* 15 U.S.C. § 3001(a).

The lower court disregarded this aim by misconstruing the critical definition of "interstate off-track wager" in 15 U.S.C. § 3002(3).  Instead of interpreting "legal" in that definition as referencing a wager's

compliance with state law, the court held that "legal" refers to compliance with the IHA.  (Op. on Mot. for P.I., R. 19, Page ID # 453.)  This reading, however, nullifies the IHA's general prohibition on accepting interstate off-track wagers that do not comply with the IHA.  *See* 15 U.S.C. § 3003.

The district court's holding reaches the heart of whether Michigan can regulate wagering activity within its borders.  According to the district court, once Michigan permits *any* pari-mutuel wagering, the IHA requires Michigan to allow *all* pari-mutuel wagers to be placed from inside its borders on races outside Michigan.  (Op. on Mot. for P.I., R. 19, Page ID # 456–459.)  TwinSpires receives these wagers in Oregon, and, by concluding that the IHA sets the "exclusive conditions" for accepting an interstate wager on a horse race, the district court has given Oregon authority to decide what is legal in Michigan.

TwinSpires cannot sustain its early lead, and this holding should be reversed.  Michigan has sovereign authority to regulate gambling within its borders, including wagering on horse races, whether the bets are placed in person or online.  TwinSpires' strained reading of the IHA cannot override Michigan's traditional police powers.

2

## STATEMENT OF THE CASE

### A.    Michigan's laws governing wagering on horse races

Michigan's laws regulating wagering on horse races go back to 1819, when Governor Cass first enacted a prohibition on wagering on the results of a horse race in the territory of Michigan.  The prohibition applied not only to those who raced horses for stakes or who offered and accepted wagering on such races, but also to those who placed a bet on a horse race.  *See* An Act to Prevent Horse Racing, Laws of the Territory of Michigan (Detroit: Sheldon & Reed, 1820), § 1, at p. 77 (October 12, 1819).  Despite amendments, *see* Mich. Rev. Stat. of 1846 (Detroit: Bagg & Harmon, 1846), ch. 40, § 1 at pp. 183–184; Mich. Pub. Acts 328 of 1931, § 331, this general ban on wagering on the results of a horse race has remained in place, with limited exceptions.  *See* Mich. Comp. Laws § 750.331.  Now part of Michigan's Penal Code, this law still subjects those betting on horse races to criminal penalties unless an exception applies:

> All running, trotting, or pacing of horses, or any other animals, for any bet or stakes, in money, goods, or other valuable thing, excepting such as are by special laws for that purpose expressly allowed, constitute racing within the meaning of this section, and are hereby declared to be common and public nuisances and all parties concerned

therein, either as authors, betters, stakers, stake-holders, judges to determine the speed of animals, riders, contrivers, or abettors thereof, are guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00. . . .

Mich Comp. Laws § 750.331.

This case concerns an exception to the Penal Code's general ban, the Michigan Horse Racing Law (MHRL). What is now the MHRL began to take shape in 1933, when Michigan authorized wagering on horse races, as regulated by the "Racing Commissioner," a state official granted discretionary authority to regulate pari-mutuel wagering on horse racing. *See, e.g.,* Mich. Comp. Laws § 431.303. In 2009, that position was abolished, and all functions and powers of the Racing Commissioner were reassigned to the Executive Director of the Michigan Gaming Control Board (MGCB). Mich. Comp. Laws § 324.99919. (Nevertheless, the MHRL continues to refer to the "Racing Commissioner.") The "Office of the Racing Commissioner" in the MHRL is now "the horse racing section of the horse racing, audit, and gaming technology division of the Michigan [G]aming [C]ontrol [B]oard, which operates under" the Executive Director's supervision. Mich. Comp. Laws § 431.302(n). Currently, Williams is the Executive Director of the

4

MGCB and carries out all functions of the Racing Commissioner in the MHRL.

From 1933 until 1986, the wagers regulated by the Racing Commissioner consisted of pari-mutuel wagers on races taking place at a licensed race meeting. *See* 1933 Mich. Pub. Acts 199, §§ 13–14 (then codified at Mich. Comp. Laws §§ 431.13, 431.14 (repealed 1959)); 1959 Mich. Pub. Acts 27, §§ 12(1)–12(2) (then codified at Mich. Comp. Laws §§ 431.42(1)–431.42(2) (repealed 1980)); and 1980 Mich. Pub. Acts 327, §§ 12(1)–12(2) (then codified at Mich. Comp. Laws §§ 431.72(1)–431.72(2) (repealed 1995)).  No other type or location of wagering on regulated races was permitted.

In 1986, the Legislature delegated authority to the Racing Commissioner to allow race-meeting licensees to offer wagering on one "simulcast" horse race per live-racing day. *See* 1986 Mich. Pub. Acts 108 (repealed 1995).  The Legislature broadened that authority in 1995 when enacting the MHRL, which again authorized the Racing Commissioner to allow wagering on horse races that were conducted at racetracks other than the one where the wager was placed (simulcast wagering), but on a wider basis. *See* Mich. Comp. Laws § 431.318(1),

(2).  Rather than authorizing one simulcast race per live-racing day, the MHRL allows the Executive Director to issue a permit for "individual race" and "full card simulcasts."  A "simulcast" is "the live transmission of video and audio signals conveying a horse race held either inside or outside of this state to a licensed race meeting in this state."  Mich. Comp. Laws § 431.318(8)(c); *see also* Mich. Comp. Laws § 431.302(j) (defining "full card simulcast").

Through these changes, and subject to the Racing Commissioner's approval, people in Michigan obtained permission to wager on races they were not witnessing in-person.  But that permission was subject to three important limitations: (1) simulcast wagering was authorized only if the Racing Commissioner exercised his delegated authority to allow it; (2) only a race-meeting licensee could accept a simulcast wager; and (3) a simulcast wager could be placed only in-person at a licensed race meeting that was conducted at a licensed racetrack.  *See* 1995 Mich. Pub. Acts 279 §§ 17(7), 18(1); Mich. Comp. Laws §§ 431.317(7), 431.318(1).

Significant to this case, Michigan amended the MHRL again in 2019.  Although all forms of pari-mutuel wagering still need to be

conducted under a race-meeting license and are subject to the Racing
Commissioner's approval, Mich. Comp. Laws § 431.317(1), race-meeting
licensees may now accept wagers "in person at a licensed race meeting
*or electronically through a licensed third-party facilitator*[.]"  Mich.
Comp. Laws § 431.317(8) (emphasis added).  A race-meeting licensee
"may use [a] contracted licensed third-party facilitator," but the race-
meeting licensee is still responsible for the third-party facilitator's
conduct.  *Id.*

Thus, for the first time, the 2019 amendments allowed people in
Michigan who are not physically present at a racetrack to place pari-
mutuel wagers and allowed a race-meeting licensee to accept those
wagers (an "off-track wager").  But the amended law still imposes the
other two limitations mentioned above: off-track wagering is allowed
only when the Racing Commissioner exercises his delegated authority
to authorize it, Mich. Comp. Laws § 431.317(1), (8), and only a race-
meeting licensee may conduct it, Mich. Comp. Laws § 431.317(8).  The
MHRL expressly states that "[o]nly a race meeting licensee or its
contracted licensed third-party facilitator may process, accept, offer, or
solicit wagers on the results of live or simulcast horse races as

determined or approved by the racing commissioner." Mich. Comp. Laws § 431.317(10).

## B.    The Federal Interstate Horseracing Act

Federal legislation concerning gambling-related activities exists as well. *See, e.g.,* 18 U.S.C. § 1084 (prohibiting use of a wire communication facility to transmit bets or wagers on sporting events or contests across state lines); 31 U.S.C. §§ 5361–5367 (restricting payments in connection with unlawful internet gambling). The principal federal law at issue in this case is the IHA. The IHA begins with Congress's findings that:

- "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders," 15 U.S.C. § 3001(a)(1);

- "the Federal Government should prevent interference by one State with the gambling policies of another . . . ," 15 U.S.C. § 3001(a)(2); and

- "in the limited area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers." 15 U.S.C. § 3001(a)(3).

The IHA then expresses its policy "to regulate interstate commerce with respect to wagering on horseracing, in order to further

the horseracing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(b).  After articulating its policy, the IHA states its primary prohibition: "[n]o person may accept an interstate off-track wager except as provided in this chapter."  15 U.S.C. § 3003.

The threshold question, then, is whether a wager is an "interstate off-track wager," such that it is subject to the IHA's governance.  The IHA defines its reach by defining "interstate off-track wager" as follows:

> "[I]nterstate off-track wager" means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools.

15 U.S.C. § 3002(3).

If a wager satisfies this definition, the IHA requires an "off-track betting system" to obtain certain consents before accepting it, 15 U.S.C. § 3004(a)–(b) and regulates the "takeout," *see* 15 U.S.C. § 3002(20), that the off-track betting system may employ, 15 U.S.C. § 3004(c).  The IHA also establishes a civil action for damages against a person accepting an interstate off-track wager in violation of the IHA.  *See* 15 U.S.C. §§ 3005–3006.  This action may be brought only by the "host State" (the

state where the race at issue occurs, 15 U.S.C. § 3002(5)), the "host racing association" (a person who conducts the race at issue in the host state, with the host state's permission or licensure, 15 U.S.C. § 3002(9)), or "the horsemen's group" (a group representing the majority of owners and trainers racing at the host racing association under specified circumstances, 15 U.S.C. § 3002(12)). *See* 15 U.S.C. § 3006.

## C.    Background and procedural history

TwinSpires began accepting online pari-mutuel wagers from people in Michigan around 2010. (Mot. for P.I., R. 11, Page ID # 67.) In 2013, the Executive Director formally instructed TwinSpires to cease accepting online pari-mutuel wagers from Michigan residents. (Decl. of Murr, R. 11-1, Page ID # 103, ¶ 25; Churchill Downs' 6/13/13 response letter, R. 16-1, Page ID # 411–414.) In his letter, the Executive Director made clear that, under the MHRL, only a race-meeting licensee was permitted to accept pari-mutuel wagers from within Michigan, and only at a racetrack; thus, the Executive Director concluded that the IHA prohibited TwinSpires from accepting pari-mutuel wagers from people in Michigan. (*Id.*) TwinSpires, through its parent company Churchill Downs, disputed this interpretation, claiming in its response that the

10

Executive Director's position violated the dormant Commerce Clause. (Decl. of Murr, R. 11-1, Page ID # 103, ¶ 26; and Churchill Downs' 6/13/13 response, R. 16-1, Page ID # 411–414.)

Although law-enforcement officials did not take action against TwinSpires, the Executive Director consistently maintained that TwinSpires' acceptance of online pari-mutuel wagers from people in Michigan between 2010 and 2020 was unlawful under both state and federal law—as can be seen from a condition the Executive Director imposed on TwinSpires in 2020.

In the summer of 2020, TwinSpires applied for a third-party facilitator license, as the 2019 amendments to the MHRL allowed. (Decl. of Murr, R. 11-1, Page ID # 105, ¶ 31; Compl., R. 1, Page ID # 13, ¶ 34.)  While its application was under review, the Executive Director granted TwinSpires a conditional, temporary third-party facilitator license and, in his order, expressly required TwinSpires to agree that it would "not . . .  accept wagers in the State of Michigan without a license."  (9/3/20 Cond'l. Temp. Lic., R. 11-5, Page ID # 253; *see also* MOAHR Hr'g. Tr., R. 22-1, Page ID # 738–740 (explaining licensing order).)  Accordingly, on September 20, 2020, TwinSpires acknowledged

11

in a letter "that it w[ould] not accept pari-mutuel wagers on the results of live or simulcast horse racing from a person within the State of Michigan without a Third-Party Facilitator License." (TwinSpires' 9/3/20 letter, R. 15-3, Page ID # 363; and Decl. of Murr, R. 11-1, Page ID # 105, ¶ 31.)

Following its agreement to comply with the MHRL's licensing requirements, TwinSpires held a third-party facilitator license from 2020 to 2024. (Compl., R. 1, Page ID # 13, ¶¶ 35–36.) With that license, TwinSpires has offered "advance deposit wagering" (ADW), a means for people to place wagers remotely through an account funded in advance. (*Id.* at 6, ¶ 15.) From TwinSpires' licensure in 2020 until January 2025, TwinSpires complied with Michigan's licensing requirement so it could legally facilitate wagers accepted electronically by race-meeting licensees in Michigan. (Decl. of Murr, R. 11-1, Page ID # 105, ¶ 32.)

TwinSpires reignited its earlier disagreement with Michigan's licensing requirement in 2024 after Northville Downs, LLC, (the only race-meeting licensee in Michigan) requested an unlicensed racetrack in Hastings, Michigan, as the location for its 2025 race-meeting license and simulcast permit. (Ex. Dir.'s 12/23/24 letter, R. 11-7, Page ID

# 261.)  This was a problem for TwinSpires because, as explained above, the MHRL does not permit third-party facilitators to independently conduct or operate pari-mutuel wagering.  *See* Mich. Comp. Laws §§ 431.317(1), (7), (8).  Rather, TwinSpires' authorization to accept off-track wagers in 2025 depended on Northville Downs' ability to obtain a race-meeting license and simulcast permit.  *See* Mich. Comp. Laws §§ 431.317(1), (7), (8); 431.318(1), (8)(c).  And Northville Downs could not obtain that license and permit without a licensed racetrack.  Mich. Comp. Laws § 431.315(3).

Executive Director Williams issued Northville Downs an Order Granting a 2025 Race Meeting License and 2025 Simulcast Permit on October 30, 2024, but—consistent with the MHRL—he expressly conditioned that order on Northville Downs having a track license for the new location in Hastings, Michigan.  (Ord. Granting 2024 Race Meeting License and Simulcast Permit, R. 15-1.)  The order stated that "[i]f a track license is not granted at 1350 N. M-37 Hwy., Hastings MI 49058 on or before December 31, 2024, the 2025 Race Meeting License and 2025 Simulcast Permit will not go into effect and no live racing or simulcasting (including pari-mutuel wagering contracted for through

third-party facilitators) is permitted[.]" (*Id.* at Page ID # 348–349.) Further, the Executive Director's order stated that "[t]he 2025 Simulcast Permit is granted contingent on the granting of a track license at [the Hastings location] . . . . Otherwise, this 2025 Simulcast Permit is not effective until the beginning of live racing." (*Id.* at Page ID # 351–352.)

Northville Downs did not timely fulfill this condition. On December 23, 2024—soon after it became clear that Northville Downs would not be able to timely obtain a track license and trigger the effectiveness of its 2025 race-meeting license and 2025 simulcast permit—the Executive Director notified all licensed third-party facilitators that they would need to cease facilitating pari-mutuel wagering with Michigan account holders on January 1, 2025. (Ex. Dir.'s 12/23/24 letter, R. 11-7, Page ID # 261.)

But TwinSpires did not comply with the Executive Director's instructions. On December 31, 2024, TwinSpires informed the Executive Director that it would not cease accepting wagers from Michigan accounts. (TwinSpires' 12/31/24 letter, R. 11-8, Page ID # 263–267.) On January 3, 2025, the Executive Director responded to

14

TwinSpires, advising that continuing to conduct unauthorized internet wagering violated Michigan law and subjected TwinSpires to various penalties. (Ex. Dir.'s 1/3/25 letter, R. 11-9, Page ID # 269–270.) On January 6, 2025, TwinSpires advised the Executive Director's staff that TwinSpires would continue to accept pari-mutuel wagers from people in Michigan. (Compl., R. 1, Page ID # 17, ¶ 47.)

Because TwinSpires refused to follow Michigan law and the Executive Director's instructions, the Executive Director summarily suspended TwinSpires' third-party facilitator license on January 7, 2025. (Ord. of Summary Suspension, R. 15-4, Page ID # 366.) But yet again, TwinSpires chose to disobey the Executive Director's order and continued accepting wagers placed from within Michigan. (Compl., R. 1, Page ID # 17, ¶ 47.)

On January 12, 2025, TwinSpires filed this lawsuit seeking (1) a declaration that the MHRL's third-party facilitator licensing requirement is preempted by the IHA; (2) a declaration that the MHRL's third-party facilitator licensing requirement violates the dormant Commerce Clause; and (3) a preliminary and permanent injunction to prevent the MGCB, the Executive Director, and the

Attorney General from enforcing the MHRL's third-party facilitator licensing requirements.  (Compl., R. 1, Page ID # 22–23.)  A few days later, TwinSpires requested a preliminary injunction (Mot. for P.I., R. 11), which Defendants opposed (Defs' Resp. to Mot. for P.I., R. 16).

Among other things, Defendants contended that TwinSpires had not demonstrated a likelihood of success on the merits because the IHA does not preempt the MHRL and the MHRL does not violate the dormant Commerce Clause.  (*Id*. at Page ID # 398–403.)  Defendants also argued that TwinSpires had not demonstrated irreparable harm and that an injunction would harm the public, the established system of lawful internet gambling in Michigan, as well as businesses, employees, and customers who participate in it, and the horse racing industry in Michigan.  (*Id*. at Page ID # 403–408.)

Nonetheless, the district court granted TwinSpires' motion for a preliminary injunction.  (Op. on Mot. for P.I., R. 19, Page ID # 474.)  Relevant here, the court opined that TwinSpires had demonstrated that "[t]he IHA occupies the field of interstate off-track wagers[.]"  (*Id*. at Page ID # 466.)  The court did not conclude, however, that TwinSpires is likely to succeed on the merits of its dormant Commerce Clause

16

claim.  (*Id.* at Page ID # 467–469.)  Further, the district court determined that the MGCB is immune from this suit but that the Executive Director and Attorney General are not.  (*Id.* at Page ID # 450.)

More specifically, regarding the preemption issue, the court stated that "Congress, via the IHA, established a full, exclusive set of standards governing the process by which an entity can accept interstate off-track wagers," (*id.* at Page ID # 465), and that "[o]nce a state decides that pari-mutuel wagering is permissible within its borders, the federal field covers interstate off-track pari-mutuel wagers in that state," (*id.* at Page ID # 466).  The court deemed TwinSpires' conflict-preemption argument duplicative of the field-preemption argument and did not address it separately.  (Op. on Mot. for P.I., R. 19, Page ID # 467.)  Finally, in the district court's view, TwinSpires had satisfied the remaining preliminary-injunction factors concerning irreparable harm, harm to other parties, and the public interest.  (*Id.* at Page ID # 470–73.)  Thus, the court preliminarily enjoined the Executive Director and Attorney General "from enforcing the MHRL licensing requirement—or issuing sanctions under the MHRL—against

TwinSpires for accepting wagers from individuals in Michigan on races that take place outside Michigan." (*Id.* at Page ID # 474.)

Defendants-Appellants asked the district court to stay the preliminary injunction and all proceedings in the district-court case pending the resolution of this appeal. (Defs' Mot. and Br. to Stay P.I., R. 31.) The district court denied that motion (Ord. on Defs' Mot. to Stay P.I., R. 37), as well as the parties' stipulation to stay proceedings pending this appeal (Stip. to Stay Proc. Pending App., R. 33; Ord. Denying Stip. to Stay, R. 34). On May 9, the district court issued an order granting in part and denying in part Defendants' motion to dismiss the complaint. (Ord. on Defs.' Mot. to Dismiss, R. 44.) In short, consistent with its opinion granting the preliminary injunction, the district court dismissed the MGCB as a defendant, dismissed TwinSpires' dormant Commerce Clause claim, and declined to dismiss TwinSpires' field-preemption claim. (*Id.*)

Separately, after a state administrative hearing, an administrative law judge issued a proposal for decision recommending revocation of TwinSpires' license. (MOAHR Proposal for Decision, R. 22-4, Page ID # 798.) Further, the Executive Director sued

TwinSpires for injunctive relief in state court because it had defied his summary suspension order. *Williams v. Churchill Downs Tech. Initiatives Co.,* No. 25-0787-CZ (Wayne Circuit Court). The parties stipulated to stay the administrative action and the Executive Director's suit pending this appeal. *See* Wayne Circuit Court, No. 25-0787-CZ, 4/13/25 Ord. for Stay of Proc.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy that is never awarded as of right" and serves "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (quotation omitted). Courts consider four factors to determine if a preliminary injunction should issue:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quotation omitted); *see also Kentucky v. Biden*, 57 F.4th 545, 550 (6th Cir. 2023).

19

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits [is] often . . . the determinative factor." *Schimmel*, 751 F.3d at 430 (quotation omitted, cleaned up). "Whether the movant is likely to succeed on the merits is a question of law [this Court] review[s] de novo." *Id.*

"[T]he district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief" is reviewed "for abuse of discretion." *Id.* Nonetheless, this Court can "reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact." *Id.*

## SUMMARY OF ARGUMENT

The district court's most significant errors lie in its analysis of TwinSpires' likelihood of success on the merits. TwinSpires cannot show that the IHA preempts the MHRL's third-party facilitator licensing requirements for several reasons.

*First*, the district court failed to apply the presumption against preemption that governs when Congress legislates in areas of

traditional state concern. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Gambling regulation falls squarely within Michigan's historic police powers, and the IHA does not express any clear or manifest intent to preempt state law.

*Second*, the district court's interpretation of the IHA conflicts with the longstanding federal policy of deferring to state gambling regulation. As the Supreme Court recently emphasized, Congress "respect[s] the policy choices of the people of each State on the controversial issue of gambling[,]" allowing each state to determine the scope and terms of gambling within its jurisdiction. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 484 (2018).

*Third*, contrary to the district court's view, the IHA does not occupy the field of interstate off-track wagering. It regulates only a few blades of grass on the broad turf of gambling regulation. The IHA primarily concerns the consents that an off-track betting service must obtain before accepting an interstate off-track wager; it leaves to the States the authority to set their own gambling standards for wagering and safeguards for wagerers.

21

*Fourth*, the district court misconstrued the IHA.  When properly understood, the IHA governs the process for accepting interstate pari-mutuel wagers that are otherwise legal under state law, including in the state from which the wager is placed.  The IHA does not require Michigan to allow gambling that violates both the MHRL and Michigan's Penal Code.

*Fifth*, the district court also misinterpreted Michigan's gambling laws.  It overlooked Michigan's longstanding general prohibition against placing a bet on a horse race and failed to recognize that the MHRL does not authorize pari-mutuel wagering on simulcast races; rather, the MHRL delegates power to the Executive Director to authorize wagering on simulcast races.

*Sixth*, the district court's interpretation creates a risk of conflict with other applicable federal laws—the Interstate Wire Act of 1961 (Wire Act) and the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA)—by applying different standards than those laws require, resulting in discordant federal regulation.

*Finally*, the MHRL does not conflict with the IHA.  From 2020 until 2025, TwinSpires complied with both laws, demonstrating that

22

parallel compliance is entirely possible.  Nor is the MHRL an obstacle to the IHA's purpose.  Accordingly, no conflict preemption arises.

In addition to its errors concerning the merits, the district court also erred by finding that the other preliminary-injunction factors weigh in TwinSpires' favor.  The preliminary injunction significantly harms the State, its horse racing industry, and compliant third-party facilitators—disrupting the regulatory balance that ensures fairness, consumer protection, and the integrity of Michigan's gambling markets. The injunction also undermines the public interest by overriding Michigan's carefully crafted statutory scheme in favor of a party that refused to comply with lawful licensing requirements.  Finally, TwinSpires did not face any imminent or irreparable harm because it delayed seeking injunctive relief for over a decade.

Because TwinSpires failed to meet its burden for obtaining a preliminary injunction, and because the district court's contrary findings rest on legal errors, this Court should reverse and vacate the preliminary injunction.

## ARGUMENT

### I.   TwinSpires lacks a strong likelihood of showing that the IHA preempts the MHRL.

This Court should vacate the preliminary injunction because TwinSpires' claim runs against the strong presumption that a federal law does not preempt state regulation in an area of traditional state authority; it disregards Congress's historic respect for each state's gambling policies; and it is inconsistent with the IHA, the MHRL, and other federal laws.  Consequently, TwinSpires cannot prevail on the merits of its preemption claim.

### A.   The district court did not apply the required presumption against preemption.

In all preemption cases, especially where Congress has legislated in a field the States have traditionally occupied, courts must presume that the States' police powers were not preempted by the federal act unless "that was the clear and manifest purpose of Congress."  *Wyeth*, 555 U.S. at 565 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see also Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1128 n.12 (6th Cir. 2025).

The foundational presumption against preemption exists "[b]ecause the States are independent sovereigns in our federal system[,]" *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (quotation omitted), and " '[w]hen Congress acts to preempt state law—especially in areas of longstanding state concern—it treads on the states' customary prerogatives in ways that risk upsetting the traditional federal-state balance of authority,' " *id.* (quoting *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015)). "This presumption is at its zenith when federal law impinges upon core state police powers." *Casino Ventures v. Stewart*, 183 F.3d 307, 310 (4th Cir. 1999); *see also Merrick*, 805 F.3d at 694 (stating that the presumption is "strong" and "operates with special force" in fields the States have traditionally occupied). "[P]reemption can trammel upon state sovereignty." *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021).

Michigan has historically prohibited or strictly regulated wagering on horse races. *See, e.g.,* Mich. Comp. Laws § 750.331. Courts have long recognized that wagering is a field of regulation traditionally occupied by the States pursuant to their police powers. In fact, "[t]he

regulation of gambling lies at the 'heart of the state's police power' "
because gambling regulations protect the public's health, welfare, and
safety. *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*,
399 F.3d 1276, 1278 (11th Cir. 2005) (quoting *Johnson v. Collins Entm't
Co., Inc.*, 199 F.3d 710, 720 (4th Cir. 1999)); *see also Rivera-Corraliza v.
Morales*, 794 F.3d 208, 220 (1st Cir. 2015); *Monarch Content Mgmt.,
LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1028 (9th Cir. 2020); *see
also Northville Downs v. Granholm*, 622 F.3d 579, 587 (6th Cir. 2010).
"Congress has explicitly recognized the preeminent state interests in
controlling gambling and has sought to extend, not curb, state police
power in this field." *Casino Ventures*, 183 F.3d at 311 (recognizing the
State's interest in controlling gambling and concluding that a federal
law did not preempt the state gambling prohibition at issue).

Because the IHA concerns an area within the traditional scope of
Michigan's police powers and does not clearly state an intent to preempt
state gambling laws, the district court should have started from a
perspective to sustain valid state regulations. The "IHA pointedly
le[aves] intact the states' primary responsibility for determining what
forms of gambling may legally take place within their borders, thus

preserving their traditional police powers." *Monarch Content Mgmt.,*
971 F.3d at 1028 (cleaned up).

## B.    Congress has long supported each State's gambling policies.

When analyzing an implied field-preemption challenge, "[t]he core
question is whether the 'scheme of federal regulation' is 'so pervasive as
to make reasonable the inference that Congress left no room to
supplement it.'" *Dayton Power & Light*, 126 F.4th at 1129 (quoting
*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190, 204 (1983)).  If Congress properly determines that conduct
in a specific field must be governed exclusively by federal law, the
States cannot regulate conduct in that field.  *Arizona v. United States*,
567 U.S. 387, 399 (2012).

But "defining the scope of the relevant 'field' matters." *Torres*,
995 F.3d at 491.  Thus, courts carefully examine the field of regulation
to determine pervasiveness.  For example, in *Arizona*, the Court
surveyed the historical federal regulation of immigration matters and
the important federal interests at stake before concluding that the field
of alien registration had been occupied by the federal government.

27

567 U.S. at 394–401. And in *Pacific Gas & Electric*, the Court recognized a distinction between what subjects the federal government had traditionally regulated in the area of nuclear power (radiological safety) and what subjects the States had traditionally governed (the need for power facilities, economic and land use considerations, among other non-safety issues) before rejecting the preemption challenge at issue. 461 U.S. at 205; *see also Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 771 (2019) (plurality opinion); *Torres*, 995 F.3d at 491–92, 494 (holding that a federal law concerning "hiring and continued employment of unauthorized aliens" did not occupy the field of employment regulation of foreign nationals).

Such a review of gambling regulation reveals "a coherent federal policy" of "respect[ing] the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484. Several federal statutes recognized in *Murphy* evidence this deference; Congress limited each enactment's applicability to situations where gambling activity violates state or local law. As *Murphy* observed, 18 U.S.C. § 1955 prohibits operating a gambling business only if that activity violates a State's or political subdivision's laws; 18 U.S.C. § 1953

prohibits transmitting wagering paraphernalia only if the underlying gambling contravenes state law; 18 U.S.C. § 1084 prohibits interstate transmission of certain wagering information only if the wagering is prohibited by the State; and 18 U.S.C. § 1952 bars traveling in interstate commerce to further a gambling business that state law prohibits. *Murphy*, 584 U.S. at 484.

Moreover, Congress's authority over gambling is limited. *Murphy* recognized that Congress could not prohibit the States from authorizing sports wagering, 584 U.S. at 480, and the Office of Legal Counsel once concluded that "Congress lacks the power to establish a national lottery and, thus, to override the anti-gambling laws of the states," *Congressional Authority to Adopt Legislation Establishing a National Lottery*, 10 Op. O.L.C. 40 (1986). Congress can regulate interstate gambling through its Commerce Clause powers, *Ky. Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1414 (6th Cir. 1994), but the States determine whether gambling is legal within their borders, including whether to "prohibit interstate off-track wagering within [their] borders," *id.*

29

The IHA echoes this viewpoint, expressing that the States are primarily responsible for deciding what forms of gambling to allow, 15 U.S.C § 3001(a)(1), and that "the Federal Government should prevent interference by one State with the gambling policies of another," 15 U.S.C. § 3001(a)(2). *See also* S. Rep. No. 95-1117, at 1 (1978) (stating in the Senate Judiciary Committee's report on the IHA the "prevailing view" that gambling matters "are generally of State concern and that the States' prerogatives in the regulation of gambling are in no way preempted by this or other federal law").

## C.    The IHA does not occupy the field of interstate off-track wagering.

The district court opined that the IHA expresses "a full, exclusive set of standards governing the process by which an entity can accept interstate off-track wagers." (Op. on Mot. for P.I., R. 19, Page ID # 465.) In reaching this opinion, the district court relied in part on *Horsemen's Benevolent & Protective Ass'n-Ohio Div., Inc. v. Zonak*, No. 2:07-cv-00057, 2008 WL 11453695, at *5 (S.D. Ohio, Sept. 23, 2008). (Op. on P.I., R. 19, Page ID # 465–466). But, on appeal in that case, the Sixth Circuit did not adopt *Zonak*'s field preemption analysis of the IHA.

Instead, the Sixth Circuit examined the challenged law only under conflict preemption. *See Horseman's Benevolent & Protective Ass'n-Ohio Div., Inc. v. DeWine*, 666 F.3d 997, 1000–01 (6th Cir. 2012).

Contrary to *Zonak* and the district court's opinion here, the IHA does not create a pervasive or extensive regulatory scheme. Rather, the IHA "constitutes economic legislation regulating a very narrow subject matter." *Turfway Park*, 20 F.3d at 1413. Through the IHA, Congress aimed to keep the burgeoning off-track wagering industry from hurting the horse racing industry by lowering track attendance, industry employment, and small-track viability. *Id.* at 1414. In the IHA, Congress "balanc[ed] the interests of the horseracing industry against those of the interstate off-track wagering industry," *id.* (cleaned up), and "created the rules under which racetracks could legally market and facilitate inter-state horse race wagering," *Churchill Downs v. Thoroughbred Horsemen's Group, LLC*, 605 F. Supp. 2d 870, 882 (W.D. Ky. 2009).

The IHA fosters interstate industry relationships through its minimal regulatory framework consisting of three main restrictions and a civil remedy. First, the IHA prohibits an off-track betting system

31

from accepting interstate off-track wagers without consent from the host racing association (which must have an agreement with the horsemen's group that races at that site), the host racing commission, and the off-track racing commission.  15 U.S.C. §§ 3003, 3004(a).  Second, the IHA requires an off-track betting *office* to also obtain approval from nearby racetracks before accepting such wagers, with certain exceptions for states with higher-volume racing.  15 U.S.C. § 3004(b).  Third, the IHA limits the amount of money off-track betting systems may take out of interstate off-track wagers.  15 U.S.C. § 3004(c).  Finally, the IHA establishes a civil action that a host state, host racing association, or horsemen's group can bring against someone accepting an interstate off-track wager in violation of the IHA. 15 U.S.C. §§ 3005–3007.

In contrast to these bare-bones federal regulations, States, including Michigan, strictly regulate gambling.  Noticeably absent from the IHA are laws governing the actual wagering, such as:

- The legal age for placing a wager; *see* Mich. Comp. Laws § 431.317(6).

- The permitted types of wagers and how they are conducted; *see* Mich. Admin. Code r. 431.2050–431.2120.

- Disclosures on responsible wagering and how to obtain assistance for problem gambling; *see* Mich. Admin. Code r. 431.5015(6)(f).

- An application and regulatory review to ensure suitability of those conducting gambling; *see* Mich. Admin. Code r. 431.5010.

- Auditing and compliance checks to ensure proper management of player funds; *see* Mich. Admin. Code r. 431.5005; *see also* Mich. Admin. Code r. 432.631–639d; and Mich. Admin. Code r. 432.731–739a.

- Technical standards for computers and software used in conducting wagering to ensure security against cheating; Mich. Admin. Code r. 431.5005, 5010(10), (11); *see also* Mich. Admin. Code r. 432.631–639d; and Mich. Admin. Code r. 432.731–739a.

- Cybersecurity standards to protect players' personal and financial data; *id.*

Further, no federal agency administers the IHA, in sharp contrast with areas where Congress has adopted detailed, comprehensive regulatory frameworks that are administered by federal agencies. *See, e.g., Arizona*, 567 U.S. at 397 (recognizing the significant role federal agencies play in immigration enforcement). Congress chose instead to leave "regulation of the horse wagering industry . . . to the respective state racing commissions[,]" instead of creating an all-inclusive federal regulatory scheme to oversee interstate horse racing. *Churchill Downs,*

605 F. Supp. 2d at 882. The IHA does not even provide a mechanism for the federal government to enforce its requirements.

The district court's opinion illustrates the lack of federal governance in that the court did not require Michigan to give way to *federal* gambling regulation. Instead, the district court's opinion has the odd effect of eliminating respect for Michigan's gambling regulations while imposing *Oregon's* laws onto wagers placed from Michigan. This runs against two of the IHA's stated purposes: States should have primary responsibility over pari-mutuel wagering within their borders, and the federal government should prevent out-of-state interference with in-state gambling policies. 15 U.S.C. § 3001(a), (b).

Examining Oregon's regulatory framework demonstrates the problem this causes. Oregon restricts "account wagering centers" to establishing accounts only for persons whose principal residence address is in Oregon. Or. Admin. R. 462-210-0030. But Oregon allows a "multi-jurisdictional simulcasting and interactive wagering totalizator hub," (hereafter, "multi-jurisdictional simulcast-wagering licensee") such as TwinSpires, to establish accounts with people whose principal address is outside Oregon if "(a) Wagering on that same type of live

34

racing is lawful in the jurisdiction which is the natural person's
principal residence or the hub utilizes geo-location [sic] technology or
methodology that has been approved by the commission, that confirms
wagers are placed from jurisdictions where wagering is legal;" and "(b)
the hub complies with the [IHA]."  Or. Admin. R. 462-220-0020.  If
Michigan law is excluded from consideration under the IHA, the
question whether the wager may be legally placed from Michigan is left
up to Oregon, not the federal government.

### D.    The district court misinterpreted the IHA.

The IHA's narrow focus is also reflected in the definition of
"interstate off-track wager" in 15 U.S.C. § 3002(3), establishing the only
wagers to which the IHA applies.  *See* 15 U.S.C. § 3003.  Because the
wagers TwinSpires wants to accept violate Michigan law if TwinSpires
does not hold a third-party facilitator license, the wagers are not
regulated by the IHA.

The definition of "interstate off-track wager" consists of two parts,
the first of which was in the original enactment: " 'interstate off-track
wager' means a legal wager placed or accepted in one State with respect
to the outcome of a horserace taking place in another State . . . ."  *See*

35

Pub. L. 95-515 (1978).  The report of the Senate Judiciary Committee

recommending passage of the IHA stated that, under the original

definition of "interstate off-track wager," "the regulations and

exceptions in the bill would not apply to illegal handbook or parimutuel

operations which are already covered by existing criminal statutes."

S. Rep. No. 95-1117, at 1 (1978); *see*, *e.g.*, 18 U.S.C. § 1084.

Through an amendment in 2000, Congress added the second part

of the definition: ". . . and includes pari-mutuel wagers, where lawful in

each State involved, placed or transmitted by an individual in one State

via telephone or other electronic media and accepted by an off-track

betting system in the same or another State, as well as the combination

of any pari-mutuel wagering pools."  15 U.S.C. § 3002(3), as amended by

Pub. L. No. 106-553, tit. VI, 114 Stat. 2762A-108.

The district court erroneously construed "legal" in the first part of

the definition (the original language) as referring to wagers that are

legal because they satisfy the IHA's procedures.  (Op. on Mot. for P.I.,

R. 19, Page ID # 453.)  But that interpretation disregards that the

subsequent section of the IHA, 15 U.S.C. § 3003, prohibits a person

from "accept[ing] an interstate off-track wager except as provided in

36

this chapter." For that provision to make sense and have effect, the definition of "interstate off-track wager" cannot mean wagers that satisfy the IHA's procedures. If "legal" has that meaning, section 3003 becomes circular, meaning that no one can accept a wager that complies with the IHA unless it complies with the IHA. *See United States, ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 432 (2023) (stating that statutory words should have meaning); *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (stating that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

The second part of the definition concerns a subset of "legal wagers"—"pari-mutuel wagers"—but it references only certain "pari-mutuel wagers"—those "lawful in each State involved" that are "placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State . . . ." 15 U.S.C. § 3002(3). The IHA defines "parimutuel" (so spelled throughout the IHA other than in the language added to the definition of "interstate off-track wager") as "any system whereby wagers with respect to the outcome of a horserace are placed

with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator."  15 U.S.C. § 3002(13).  Thus, to be considered "pari-mutuel wagers, where lawful in each State involved," the wager must be placed with or in a pool conducted by someone authorized by state law.  The wager must meet the IHA's definition of "pari-mutuel" *in each State*.

The district court discerned a surplusage problem from reading both the original language and added language as referencing the legality of the wagers under state law.  (Op. on Mot. for P.I., R. 19, Page ID # 453.)  But no such problem arises.  The original language involves two States—the State where the wager was "placed or accepted" and the State where the race occurred.  The wager must be legal under the law of both of those states to be subject to the IHA—and for the required consents to be obtained (the consents from the off-track racing commission, *see* 15 U.S.C. § 3004(a)(3), and the host racing association and host racing commission, *see* 15 U.S.C. § 3004(a)(1)–(2)).  The definition of each of those consenting parties incorporates approval under state law.  *See* 15 U.S.C. § 3002(11) (defining "off-track racing

38

commission"); 15 U.S.C. § 3002(9) (defining "host racing association"); 15 U.S.C. § 3002(10) (defining "host racing commission"). If the wagers were not legal under state law, there would be no one to give consent in those two States.

But the amended language, which contemplates legality of pari-mutuel wagers in "*each* State involved" (as opposed to *both* States involved) reflects that the amendment clarifies the wagers subject to the IHA by encompassing wagers placed on the internet or telephone. *See* 146 Congressional Record—House of Representatives, Proceedings and Debates of the 106th Congress, Second Session, H11230, October 26, 2000 (Representative Wolf stating that under the pre-amendment version, pari-mutuel gambling on the internet was considered illegal and that the amendment would "legalize interstate pari-mutuel gambling over the Internet"). The amended language recognizes that, because wagers could be placed through those methods across state lines, the wagerer might not be in either the host state or the off-track state. Thus, the two locations expressly referenced in the amended language are the State where the wager is "placed or transmitted" and the State where the off-track betting system accepts the wager, whether

39

that is "the same or another State." *See* 15 U.S.C. § 3002(3). (The wager remains an *interstate* off-track wager because the race occurs in a state other than where the off-track betting system is located.) Through the reference to "each" State involved, rather than *both* States, the definition acknowledges that three States could be involved: the State where the race is occurring, the State where the wagerer is located, and the State where the wager is received via the telephone or the internet. But just as the wagers in the original language must be "legal" in the two States involved, those encompassed in the amended language likewise have to be "lawful in each State involved," including in the State from which they are transmitted.

In short, two references to state legality do not create a surplusage problem. The two references were enacted at different times, and each clarifies where the wagers discussed in each part of the definition must be legal. Regardless, surplusage does not have to be avoided "at all costs. It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render [an] entire provision a nullity." *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007).

The district court also improperly construed "where lawful in each State involved" as applying to pari-mutuel wagers in general, as opposed to the specific wager being accepted.  (Op. on Mot. for P.I., R. 19, Page ID # 454–455.)  This reading is inconsistent with the initial part of the definition, which examines each wager's legality (" 'interstate off-track wager' means *a* legal wager . . . ." (emphasis added)) and the prohibition on accepting "an" interstate off-track wager without complying with the IHA, 15 U.S.C. § 3003, which requires each wager accepted to comply with the IHA.  This construction also conflicts with the definition of "parimutuel" because someone authorized to conduct a wagering pool under state law would not be authorized to accept illegal wagers.

Moreover, contrary to the district court's view, requiring state licensure to qualify for state legality does not add a "consent" for TwinSpires to obtain, in addition to the consents listed in 15 U.S.C. § 3004.  Satisfying Michigan's licensure requirement, which limits wagerers to placing bets with licensed parties, merely brings a wager within the scope of the IHA's definition of "interstate off-track wager."

41

### E.    The district court misconstrued Michigan's gambling laws.

The court below also misconstrued Michigan's gambling laws. Although it recognized that Michigan generally prohibits winning and losing at gambling, Mich. Comp. Laws §§ 750.314–750.315, it incorrectly noted that Michigan does not have "consumer-side prohibitions" on the act of placing a wager.  (Op. on Mot. for P.I., R. 19, Page ID # 456–457.)  As discussed above, Michigan has long prohibited placing wagers on the results of a horse race in its Penal Code.  *See* Mich. Comp. Laws § 750.331; Mich. Pub. Acts 328 of 1931, § 331; Mich. Rev. Stat. of 1846, ch. 40, § 1; Mich. Terr. Laws, "Act to Prevent Horse Racing," § 1 (1819).

In light of the Penal Code prohibition, a person in Michigan may wager on the results of a horse race only as allowed by an exception to that prohibition, such as the MHRL.  The MHRL makes pari-mutuel wagering legal only to the extent that the wager is received by a licensee; if a wager is not placed at a licensed race meeting, then the wager is legal only if it is placed through a licensed third-party facilitator.  Mich. Comp. Laws § 431.317(8).

Thus, the court incorrectly opined that the MHRL made pari-mutuel wagering lawful in Michigan "even when no entities have the license to accept these wagers." (Op. on Mot. for P.I., R. 19, Page ID # 456.) Specifically, the district court improperly suggested that, if no one holds a license to conduct pari-mutuel wagering in Michigan, the Executive Director has improperly exercised legislative power, contrary to the separation of powers. (*Id*. at 455.) There are multiple significant flaws in this portion of the district court's reasoning.

First, the MHRL does not authorize pari-mutuel wagering or simulcast wagering. It authorizes the Executive Director to issue licenses to people to conduct pari-mutuel wagering and simulcast wagering, through a race-meeting license and simulcast permit, respectively. *See* Mich. Comp. Laws § 431.318(1) (giving the racing commissioner discretion to issue licenses). Northville Downs needed to request that the Executive Director issue a race-meeting license *and* a simulcast permit for 2025 because Michigan law does not authorize either type of wagering without those approvals.

Second, because a State can altogether prohibit wagering on horse races, it also has the power to allow it in a limited manner by

43

"condition[ing] a license to engage in legalized racing upon compliance with any regulation that is reasonably appropriate . . . to protect the integrity of the sport, and to protect the betting public[.]"  *Hudson v. Tex. Racing Comm'n*, 455 F.3d 597, 601–02 (5th Cir. 2006).

## F.    The district court created a risk of conflicts with other federal laws.

Two other federal statutes are relevant to this case—the Wire Act and UIGEA—because the district court created the risk of conflict by disregarding their terms.  The Wire Act prohibits businesses engaged in betting or wagering from using "a wire communication facility" which includes the internet, *see* 18 U.S.C. § 1081, to transmit bets or information assisting in placing bets on sporting events or contests across state lines.  18 U.S.C. § 1084(a).  The Wire Act contains a safe harbor allowing the interstate transmission of information assisting in placing wagers on sporting events that applies if the wager would be legal both in the state where the information originates and the state where it is received.  18 U.S.C. § 1084(b).  But the Wire Act does not contain a safe harbor for transmitting wagers themselves across state

lines, even if they comply with the gambling laws of both the sending and receiving States.

The ability to legally send horse racing wagers across state lines via the internet came in 2000, with the amendment to the definition of "interstate off-track wager." If the district court's interpretation prevails, TwinSpires would be allowed to accept an interstate wager that is illegal under Michigan law, but TwinSpires would be prohibited by the Wire Act from transmitting information assisting in placing that wager, given that the wager was not legal in both the sending and receiving States.

UIGEA, enacted in 2006, also must be considered. UIGEA prohibits gambling businesses from knowingly accepting payments related to "unlawful Internet gambling." 31 U.S.C. § 5363. Generally, "unlawful Internet gambling" "means to place, receive, or otherwise knowingly transmit a bet or wager" through means involving the Internet "where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C.

§ 5362(10)(A).  Although UIGEA excludes activities that are lawful under the IHA from its definition of "unlawful Internet gambling," 31 U.S.C. § 5362(10)(D)(i), the immediately following subsection states that "nothing in this subchapter may be construed to preempt any State law prohibiting gambling," 31 U.S.C. § 5362(10)(D)(ii).  If Congress had already preempted state laws on interstate pari-mutuel wagering through the IHA, this subsection would be meaningless.  Further, because UIGEA requires considering the law of where the wager was initiated, the district court created inconsistency in the federal scheme.

In short, the district court improperly concluded that the IHA preempts the field of interstate off-track wagering.  Far from creating a comprehensive regulatory scheme, the IHA preserves substantial room for state regulation to ensure that each State retains primary authority over gambling within its jurisdiction.  The district court's decision not only misreads the IHA's scope and Michigan law but improperly elevates Oregon's regulatory preferences above Michigan's sovereign interests, in direct contradiction to the IHA's stated purposes.

Consequently, TwinSpires has not demonstrated a likelihood of success on the merits of its field-preemption claim, and this Court should vacate the preliminary injunction.

### G.    The MHRL does not conflict with the IHA.

Under the doctrine of conflict preemption, "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Conflict preemption is appropriate where compliance with both federal and state regulators is a physical impossibility for one to engage in interstate commerce. *Fla. Lime & Avocado Growers, Inc. v. Park*, 373 U.S. 132, 142–43 (1963).  Conflict preemption also applies when the court determines that in "a particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purpose and objective of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (cleaned up).

The district court did not separately analyze whether conflict preemption applies because "TwinSpires's conflict preemption argument relies, essentially on the premise that the IHA occupies the field of regulating the acceptance of interstate off-track wagers[.]"  (Op. on Mot.

47

for P.I., R. 19, Page ID # 467.)  But before passing over conflict preemption, three points confirm that it does not apply in this case.

First, TwinSpires complied with both the IHA and MHRL from 2020 through 2024.  (Decl. of Murr, R. 11-1, Page ID # 105, ¶¶ 31–32.) Thus, compliance with both laws is not "impossible." *Fla. Lime & Avocado Growers*, 373 U.S. at 142–43.

Second, the IHA expressly states, as its first priority, that "States should have primary responsibility for determining what forms of gambling may legally take place within their borders[.]"  15 U.S.C. § 3001(a)(1).  Accordingly, the MHRL does not, in any way, "stand as an obstacle to the accomplishment or execution" of the IHA.  *Hines*, 312 U.S. at 67.

Third, both the Ninth and Eleventh Circuits have already recognized that there is no conflict between the IHA and traditional state licensing and regulatory authority over gambling.  *See Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 479 F.3d 1310 (11th Cir. 2007); *Monarch Content Mgmt.*, 971 F.3d at 1027.

Further, this case is distinguishable from cases concerning conflict preemption and the consents required under the IHA.  For example, the

statute at issue in *Zonak*, 2008 WL 11453695, at *2, and *DeWine*, 666 F.3d at 1000, allowed Ohio to determine whether a horsemen's organization had "unreasonably" withheld consent and, if so, to authorize interstate simulcasting over the horsemen's objection. That created an irreconcilable conflict with the IHA, which requires that a host racing association's consent be given pursuant to a written agreement with the horsemen's group that sets forth the "terms and conditions" of that consent. 15 U.S.C. § 3004(a)(1)(A). By contrast, the MHRL does not interfere with the consents required by the IHA. The MHRL's licensing requirement instead concerns whether the wagers at issue are "interstate off-track wagers" that are subject to the IHA's requirements. Accordingly, the MHRL avoids the conflict that mandated preemption of Ohio Rev. Code § 3769.089(G) in *DeWine*.

Thus, if this Court reaches this issue, it should find there is no conflict preemption because it is possible to comply with both laws and the MHRL is not an obstacle to the IHA's purposes or objectives.

## II.  TwinSpires did not satisfy any of the other requirements to obtain a preliminary injunction.

Having delayed seeking relief for over a decade, TwinSpires failed to demonstrate that it would suffer an irreparable injury.  Moreover, the preliminary injunction substantially harms Michigan's declining horse racing industry by eliminating TwinSpires' monetary contributions to Northville Downs and raising the possibility that other third-party facilitators will follow suit.  The preliminary injunction also harms Michigan's ability to protect wagerers, forcing them to seek assistance from Oregon and depriving them of protections such as those for compulsive gamblers.

### A.  TwinSpires did not face a reasonable threat of an irreparable injury absent a preliminary injunction.

When evaluating whether a plaintiff will suffer an irreparable injury absent an injunction, the court must consider whether the plaintiff has unreasonably delayed seeking the requested injunctive relief.  *See Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013); *see also Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013).  "An unreasonable delay in filing for injunctive relief will weigh

50

against a finding of irreparable harm." *Id.*; *see also Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 755 (E.D. Mich. 2003) (denying a preliminary injunction requested after a five-month delay). For example, in *Huron Mountain Club*, the plaintiff waited for six years to seek a preliminary injunction after initially becoming aware of a potential federal claim. 545 F. App'x at 397. The Sixth Circuit found that this delay of six years was "a factor weighing against injunctive relief" because it undermined the plaintiff's argument that it would suffer irreparable harm absent a preliminary injunction. *Id.*

The same reasoning applies to this case. As previously noted, from 2010 to 2019, TwinSpires accepted wagers from people in Michigan without Michigan's permission or any licensure. (Mot. for P.I., R. 11, Page ID # 67.) TwinSpires "consistently maintained in communications to Michigan regulators that it did not need a state license to accept interstate wagers from Michiganders." *Id.* Specifically, TwinSpires' parent company argued in a 2013 letter to the Executive Director that the MHRL "violates the United States Constitution[.]" (Churchill Downs' 6/13/13 response letter, R. 16-1, Page ID # 411–414; *see also* Mot. for P.I., R. 11, Page ID # 71; and Decl.

51

of Murr, R. 11-1, Page ID # 103, ¶ 26).  Thus, TwinSpires has known

about its constitutional dispute over Michigan's laws for at least 12

years.

And yet, in 2013, when TwinSpires received a cease-and-desist

letter from the Executive Director, TwinSpires did not seek an

injunction.  Nor in 2019, when Michigan amended the MHRL, did

TwinSpires seek injunctive relief in federal court claiming that the

MHRL is unconstitutional.  Instead, TwinSpires "promptly sought a

third-party facilitator license pursuant to Michigan's new licensing

regime when the application became available in 2020."  (Decl. of Murr,

R. 11-1, Page ID # 104, ¶ 29.)  In order to obtain a Michigan license,

TwinSpires even formally stated that "it [would] not accept pari-mutuel

wagers . . . from a person within the State of Michigan without a Third-

Party Facilitator License."  (TwinSpires' 9/3/20 letter, R. 15-3, Page ID

# 363.)

It is only now, in 2025, when TwinSpires is subject to disciplinary

penalties for accepting wagers that are prohibited by Michigan law and

for disregarding the Executive Director's instructions to temporarily

stop facilitating pari-mutuel wagering, that TwinSpires has finally sought injunctive relief.

The district court stated that TwinSpires did not delay seeking relief.  (Op. on Mot. for P.I., R. 19 at Page ID # 471–472.)  Rather, according to the court, TwinSpires "waited until harm was imminent and concrete," after the Executive Director summarily suspended its license.  (*Id.* at 472.)  But the court viewed the harm from the wrong perspective.  The harm that TwinSpires complains of in this matter is the harm of being subjected to a licensing scheme that it believes is unconstitutional.  It voluntarily submitted to that scheme for four years before bringing this action.  (Compl., R. 1, Page ID # 13, ¶¶ 35–36.)  Based on TwinSpires' lengthy and unreasonable delay, the district court erred by finding a likelihood of irreparable harm.  Such a prolonged delay fatally undermines TwinSpires' claims that it faced irreparable harm without injunctive relief.  Accordingly, this Court should reverse the preliminary injunction.

**B.    The preliminary injunction significantly harms Michigan's horse racing industry and the public interest.**

The preliminary injunction has caused—and continues to cause—significant harm to Defendants-Appellants, the general public, Michigan's horse racing industry, and compliant third-party facilitators.

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quotation omitted).  The Executive Director exercises jurisdiction over pari-mutuel wagering to protect the public health, safety, and welfare of Michigan residents.  Such governance engenders public confidence in the integrity of the wagering industry.  The preliminary injunction gives the impression that the Executive Director does not have regulatory authority over wagers placed from Michigan across state lines.

For example, because the district court has enjoined Michigan from regulating gambling, any Michigan resident using TwinSpires' gaming services would be required to seek regulatory relief from regulators 2,000 miles away from Michigan.  And the regulatory

structure Oregon applies to off-track wagering from other jurisdictions is much less robust than the regulatory structure Oregon applies on behalf of its own residents. Oregon has thorough regulatory requirements that multi-jurisdictional simulcast-wagering licensees must satisfy when establishing and operating an account for Oregon residents. *See* Or. Admin. R. 462-220-0020 (generally incorporating standards from 462.210-0010–462-210-0040). By contrast, Oregon merely requires a multi-jurisdictional simulcast-wagering licensee to describe in its license application its requirements for establishing and operating accounts for persons who principally reside outside Oregon. Or. Admin. R. 462-220-0030(3)(e). Thus, Michigan cannot confirm from consulting Oregon law whether its wagerers receive the same level of protection as Oregon wagerers.

The preliminary injunction also harms Michigan's residents by depriving them of the protections Michigan law provides to underage people and compulsive gamblers. The court's decision removes barriers to gambling that are intended to protect the public. And those who place wagers with TwinSpires can still be subject to penalties for winning or losing at gambling, Mich. Comp. Laws §§ 750.314, 750.315,

because that aspect of the transaction remains illegal under Michigan law. Moreover, because TwinSpires is not currently following the MHRL, wagers on horse races that are placed with TwinSpires by persons in Michigan are not excepted from Michigan's general criminal prohibition against wagering on horse races. Mich. Comp. Laws § 750.331.

The district court's preliminary injunction also frustrates the IHA's goal of furthering the horse racing industry. *See* 15 U.S.C. § 3001(b) (stating the IHA's goal to "further the horseracing and legal off-track betting industries in the United States"). As TwinSpires acknowledges, Michigan's horse racing industry has long been in decline: racetrack attendance peaked at 3.8 million in 1975 but fell to 1.1 million by 2007. (Mot. for P.I., R. 11, Page ID # 68–70.) In 2020, "there was only one racetrack operating in Michigan—Northville Downs in Northville, Michigan." (Decl. of Murr, R. 11-1, Page ID # 104, ¶ 30.) In February 2024, Northville Downs ceased operations after 80 years when its property was sold for redevelopment. (Mot. for P.I., R. 11, Page ID # 73; Decl. of Murr R. 11-1, Page ID #106, ¶ 34.)

Before the preliminary injunction, Northville Downs derived a portion of total revenues from wagers placed via TwinSpires' third-party facilitator platform. This money helped to "support horsemen and horseracing in Michigan." (Decl. of Murr, R. 11-1, Page ID # 104, ¶ 29.) The loss of this revenue is significant, as "TwinSpires is one of the largest . . . wagering platforms for horseracing in the United States." (Mot. for P.I., R. 11, Page ID # 64.) The preliminary injunction cut off these revenues from Northville Downs. *See* Mich. Comp. Laws §§ 431.322(2)(b), (3); 431.320a(a); 431.320(5)).

The injunction also harmed the other licensed third-party facilitators who acted in good faith by temporarily halting online pari-mutuel wagering, as instructed. While these operators bore the burdens of compliance, TwinSpires kept running. *Id.* The preliminary injunction rewarded TwinSpires' noncompliance, which undermines fair competition and public confidence. If the other third-party facilitators follow the district court's interpretation of the IHA, revenue to the Michigan horse racing industry derived from Michigan customers making interstate off-track wagers would be reduced to zero.

In short, the injunction harms not only Michigan, but the State's horse racing industry, other third-party facilitators, and the public interest in maintaining the integrity, fairness, and safety of lawful gambling that is offered in Michigan.

Accordingly, because TwinSpires failed to establish irreparable harm and the injunction imposes greater harm on Michigan's horse racing industry, other lawful operators, and the public, the district court abused its discretion by granting TwinSpires' motion.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, Defendants-Appellants Executive Director Henry L. Williams and Michigan Attorney General Dana Nessel respectfully request that this Court reverse the district court's order granting the preliminary injunction and vacate the preliminary injunction in its entirety.

Respectfully submitted,

/s/ James P. Kennedy
Assistant Attorney General
Counsel of Record
Attorney for Defendants –
Appellants
Alcohol & Gambling Enforc. Div.
2860 Eyde Parkway

East Lansing, MI  48823
Dated:  June 11, 2025                                   (517) 241-0210

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 13,000 words.  This document contains 11,194 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

/s/ James P. Kennedy
Assistant Attorney General
Counsel of Record
Attorney for Defendants –
Appellants
Alcohol & Gambling Enforc. Div.
2860 Eyde Parkway
East Lansing, MI  48823
(517) 241-0210

# CERTIFICATE OF SERVICE

I certify that on June 11, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

/s/ James P. Kennedy
Assistant Attorney General
Counsel of Record
Attorney for Defendants –
Appellants
Alcohol & Gambling Enforc. Div.
2860 Eyde Parkway
East Lansing, MI  48823
(517) 241-0210

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellants, per Sixth Circuit Rule 28(a), 28(a)(1)-(2),

30(b), hereby designate the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Complaint | 01/12/2025 | R. 1 | 1-23 |
| Motion for Preliminary Injunction | 01/17/2025 | R. 11 | 52-94 |
| Declaration of Benjamin Murr | 01/17/2025 | R. 11-1 | 95-110 |
| TwinSpires' 9/3/20 Conditional Temporary License | 01/17/2025 | R. 11-5 | 252-253 |
| Executive Director's 12/23/24 letter | 01/17/2025 | R. 11-7 | 260-261 |
| TwinSpires' 12/31/24 letter | 01/17/2025 | R. 11-8 | 262-267 |
| Executive Director's 1/3/25 letter | 01/17/2025 | R. 11-9 | 268-270 |
| Order Granting Northville Downs' 2024 Race Meeting License and Simulcast Permit | 01/31/2025 | R. 15-1 | 348-354 |
| TwinSpires' 9/20/20 letter | 01/31/2025 | R. 15-3 | 363 |
| Order of Summary Suspension | 01/31/2025 | R. 15-4 | 364-366 |

| Defendants' Response to Motion for Preliminary Injunction | 02/04/2025 | R. 16 | 367-410 |
|---|---|---|---|
| Churchill Downs' 6/13/13 response letter | 02/04/2025 | R. 16-1 | 411-415 |
| Opinion on Motion for Preliminary Injunction | 02/19/2025 | R. 19 | 440-474 |
| Preliminary Injunction Order | 02/19/2025 | R. 20 | 475 |
| Transcript of 1/21/2025 MOAHR Hearing | 03/03/2025 | R. 22-1 | 673-775 |
| MOAHR's 2/12/2025 Proposal for Decision | 03/03/2025 | R. 22-4 | 783-800 |
| Notice of Appeal | 03/11/2025 | R. 23 | 801-802 |
| Defendants' Motion and Brief to Stay Preliminary Injunction | 03/15/2025 | R. 31 | 882-912 |
| Stipulation to Stay Proceedings Pending Appeal | 03/28/2025 | R. 33 | 916-919 |
| Order Denying Stipulation to Stay Proceedings Pending Appeal | 03/31/2025 | R. 34 | 920 |
| Order Denying Defendants' Motion to Stay the Preliminary Injunction | 04/18/2025 | R. 37 | 955 |
| Order on Defendants' Motion to Dismiss | 05/09/2025 | R. 44 | 984 |