No. 25-1235

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY, dba TwinSpires,

     Plaintiff-Appellee,

v.

MICHIGAN GAMING CONTROL BOARD,

     Defendant-Appellant,

and

HENRY L. WILLIAMS JR., in his official capacity as Executive Director of the Michigan Gaming Control Board; and DANA NESSEL, in her official capacity as Attorney General of Michigan,

     Defendants-Appellants.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Hala Y. Jarbou

## BRIEF OF AMICUS CURIAE ARIZONA DEPARTMENT OF GAMING IN SUPPORT OF DEFENDANTS-APPELLANTS TO REVERSE
(filed with consent of the parties)

**Burch & Cracchiolo, P.A**.
James M. Stipe
1850 N. Central Avenue, Suite 1700
Phoenix, Arizona 85004
(602) 234-8779

*Attorneys for Amicus Curiae Arizona Department of Gaming*

## TABLE OF CONTENTS

I.    Statement of identity and interest of amicus .................................. 1

II.   Arizona and Michigan are similarly situated.................................. 2

III.  Settled law establishes that courts should take a narrow
      view of IHA preemption. .................................................. 4

IV.   Federal law respects a state's right to govern gambling
      within its borders. ........................................................ 11

Conclusion .................................................................... 15

Certificate per FRAP 29(a)(4)(E) ............................................ 16

Certificate of Compliance .................................................... 17

Certificate of Service ........................................................ 18

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................ 7

*Artichoke Joe's Cal. Grand Casino v. Norton,*
353 F.3d 712 (9th Cir. 2003) ................................................... 6

*Chae v. SLM Corp.,*
593 F.3d 936 (9th Cir. 2010) .................................................. 7

*Monarch Content Management LLC v. Arizona Department of
Gaming,* 971 F.3d 1021 (9th Cir. 2020) ......................................... passim

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ............ 11

*State ex rel. Reading v. W Union Tel. Co.,*
57 N.W.2d 537 (Mich. 1953) .................................................... 9

*State of California v. Iipay Nation of Santa Ysabel,*
898 F.3d 960 (9th Cir. 2018) ................................................. 10

*United States v. King*, 834 F.2d 109 (6th Cir. 1987) ........................ 11

**Statutes**

Interstate Horseracing Act, 15 U.S.C. §§ 3001-3007 ..................... *passim*

15 U.S.C. § 3001 ............................................................ 6, 7

15 U.S.C. § 3002 ........................................................... 2, 13

15 U.S.C. § 3003 .............................................................. 2

15 U.S.C. § 3004 ........................................................... 2, 6

18 U.S.C. § 1955 ................................................................. 11

31 U.S.C. § 5361 ................................................................ 14

31 U.S.C. § 5362 ........................................................... 13, 14

Arizona Revised Statutes § 5-101 ....................................... 2

Arizona Revised Statutes § 5-112 ....................................... 3

Arizona Revised Statues § 13-3301....................................... 12

## I.    Statement of identity and interest of amicus

The Arizona Department of Gaming is responsible for regulating various forms of gaming in Arizona, including enforcing laws similar to the Michigan laws concerning online horse betting at issue in this case. Arizona's laws have been on the books for years, with no suggestion that they might be preempted by the Interstate Horseracing Act ("IHA").

If allowed to stand, the district court's decision may call into question whether sensible gambling regulations are preempted unless states prohibit pari-mutuel wagering altogether. It may also mean that state residents who wager online are effectively subject to the laws of other jurisdictions.

In *Monarch Content Management LLC v. Arizona Department of Gaming*, the Ninth Circuit held that an Arizona gambling regulation related to off-track betting was not preempted, while cautioning that courts must "start with the assumption that a state's historic police powers will not be superseded absent a clear and manifest purpose of Congress." 971 F.3d 1021, 1027 (9th Cir. 2020) (cleaned up). This decision and the reasoning underlying it should guide the Court's

consideration of this case. In addition, it is essential that the Court consider the Unlawful Internet Gambling Enforcement Act ("UIGEA"). In it, Congress allows for wagering on horse races over the internet but, in referencing the IHA, explicitly establishes that no state gambling regulation is preempted.

Consent for filing this amicus brief was received from counsel for Appellants and Appellee.

## II.    Arizona and Michigan are similarly situated.

The IHA, 15 U.S.C. §§ 3001-3007, first defined "interstate off-track wager" in 1978. 15 U.S.C. § 3002(3). Since its enactment, the IHA has required consent by both the host racing commission and the racing commission in the state where the off-track wager is placed before an off-track betting system can accept wagers. 15 U.S.C. §§ 3003, 3004(a).

Since Congress enacted the IHA, the Arizona Legislature has passed various laws concerning interstate off-track wagering. In Arizona, a company that offers internet wagering on horse racing (whether the races are held in-state or out-of-state) is known as an "advance deposit wagering provider" pursuant to Arizona Revised Statutes ("A.R.S.") § 5-101(3)("Provider"). Section 5-112(M) establishes

2

that the Arizona Racing Commission ("Commission") may allow a
Provider to operate so long as it annually secures the approval of a
party holding a state-issued permit authorizing live horseracing within
the state ("Permittee"). Additional Arizona provisions on interstate off-
track wagering include an age restriction on wagering (21 years
pursuant to A.R.S. § 5-112(J )), simulcast requirements (A.R.S. § 5-
112(L )), and revenue sharing requirements (A.R.S. § 5-112(N)(3-4)).
Violation of Arizona law on interstate off-track wagers is a class 6
felony. A.R.S. § 5-112(K), (Q).

The Arizona laws concerning Providers were enacted in 2014.
Since then, all Providers have complied with the requirement to have
an agreement with a Permittee. And there has been no suggestion—
other than in *Monarch*, as discussed below—that the Commission's
standards under Arizona law are preempted by the IHA. The Appellee
in this case, Churchill Downs Technology Initiatives Company
(Churchill), was approved as a Provider to begin operations in Arizona
on January 31, 2015.

At issue in this case is whether a Michigan licensing requirement,
which likewise requires that Providers have agreements with

Permittees, is preempted by the IHA. According to the district court, "Congress established an exclusive, uniform process through which off-track betting systems could accept interstate off-track wagers," such that "[t]he IHA prohibits states from adding supplemental requirements." (District Court Order, 11).

If upheld, this decision will create uncertainty surrounding states' longstanding right to regulate their residents' gambling. And a broad conception of preemption could even call into question fundamental regulations such as age restrictions on wagering. Those concerning results are neither required nor supported by law.

## III.    Settled law establishes that courts should take a narrow view of IHA preemption.

The present case involves a challenge to a Michigan regulation related to interstate off track wagering (the licensing requirement), on the basis it is preempted by the IHA's consent requirements. Previously, there has been one challenge to an Arizona regulation related to interstate off track wagering (simulcast requirements), also on the basis it was preempted by the IHA's consent requirements. The Arizona case was resolved by the Ninth Circuit's decision in *Monarch*.

4

971 F.3d 1021. Monarch was providing simulcasts (depictions of races being run in different states for use in interstate off track wagering) to live-racing tracks and off-track betting sites (OTBs), access to the betting pools of out-of-state racetracks for the races broadcast, and betting information. *Id.* at 1026. Arizona law requires that companies like Monarch offer their signals to all Permittees and OTBs, but Monarch argued that this law was preempted by the IHA's provisions on interstate wagering, and particularly the consent requirements discussed above. *Id.*

In holding that the IHA did not preempt Arizona law, the Ninth Circuit found that it was possible to comply with both the IHA and the Arizona statutes, and that the Arizona regulation did not frustrate the IHA's intent. *Id.* at 1027-29. The Court also emphasized that courts "must be cautious when a federal statute is urged to conflict with state law regulations within the traditional scope of the state's police powers and should therefore start with the assumption that a state's historic police powers will not be superseded absent a clear and manifest purpose of Congress." *Id.* at 1027 (cleaned up).

With respect to the IHA specifically, the Court "start[ed] from the premise that the IHA pointedly left intact the states' primary responsibility for determining what forms of gambling may legally take place within their borders, thus preserving their traditional police powers." *Id.* at 1028 (cleaned up); *see also, e.g., Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (noting that "the regulation of gambling lies at the heart of the state's police power") (cleaned up).

The IHA's provisions on interstate off-track wagering were passed for the limited purpose of ensuring the states' cooperation in the acceptance of interstate wagers by requiring the four statutory consents. 15 U.S.C. §§ 3001(a)(3), (b), 3004(a). In reaching its decision, the Ninth Circuit therefore correctly found that the IHA does not preempt regulations that it does not purport to cover. *Monarch*, 971 F.3d at 1027. ("[t]he IHA does not address how the states can regulate simulcasts" used in interstate wagering).

The IHA primarily concerns the consents that an off-track betting service must obtain before accepting an interstate off-track wager. And the consent requirements are meant to empower states by giving them

a say over the conduct taking place in their respective jurisdictions, which is the opposite of preempting state regulation.

By contrast, the IHA does not address any standards, licenses, or agreements required of companies providing interstate off-track wagering over the internet. As *Monarch* recognized, the IHA leaves it to the states to establish their own standards and requirements.

Any other reading of the IHA effects an untenable dilution of traditional state police powers. As *Monarch* puts it, no state racing commission "is ever required to consent" to interstate off-track wagering, and "the IHA contains no 'clear and manifest purpose' to limit [a racing] Commission's veto." *Monarch* at 1029 (citing *Arizona v. United States*, 567 U.S. 387, 400 (2012)) (cleaned up); *see also Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (no preemption absent "a clear and manifest purpose of Congress"); 15 U.S.C. § 3001(a)(1), (3).

The district court agreed with this sentiment, stating that "[t]he IHA does not govern how entities give their consent to off-track betting systems for interstate off-track wagers; it only establishes which entities the off-track betting system needs consent from in order to accept such wagers." (District Court Order, 2). Yet, the court

7

nonetheless held that "if a state decides to allow pari-mutuel wagering, it cannot invade the IHA's exclusive regulatory scheme for accepting interstate off-track wagers." (District Court Decision, 27 and see 13-14).

The licensing process in Michigan and the required Permittee agreements in Arizona are the provisions by which these states tell racing commissions how to exercise their IHA consent authority. The district court's reasoning therefore puts state racing commissions in the bizarre position of having to decide whether to consent, but not being able to rely on any state law to inform any basis for that decision.

The district court avoided this issue by concluding that the IHA does not require the Michigan Gaming Control Board's consent. (District Court Decision, 23 ("[t]he off-track betting system does not need consent from the regulating entity for the state in which a bet is placed")); *see also id.* at 30, 34. In the district court's erroneous view, the *only* role Michigan has "to play in interstate off-track wagers placed in Michigan" is to make pari-mutuel wagering entirely illegal for everyone under every circumstance if it chooses to do so. *Id.* at 23-24.

To reach this conclusion, the court first mistakenly found that the "off-track racing commission" is the racing commission in the state

where the wager is "accepted," not the racing commission where it is placed. *Monarch*, by contrast, correctly recognized that the off-track wagering commission is "the racing commission in the state where the off-track wager *is placed*." *Monarch* at 1026 (emphasis added). This makes sense, as the IHA is not intended to deny a voice to the state where the actual gambling takes place—where people risk something of value for a chance to win a prize—in favor of consent by whatever arbitrary state hosts the operator.

Second, the district court determined that acceptance, in this case, happened at Churchill's Oregon "hub."[1]  In reaching this conclusion, the district court relied on a single case, *State ex rel. Reading v. W Union Tel. Co.*, 57 N.W.2d 537, 539-40 (Mich. 1953), for the proposition that a bet is made and gambling occurs where the bet is accepted, not where the participant decides to place it. (District Court Decision, 18-19).

The *Reading* case involved a third-party taking wagers and sending them by telegraph or wire to an out-of-state party, and it was decided long before the internet existed or the Wire Act or other federal

---

[1] "[T]winSpires accepts wagers at its processing hub in Oregon [and so] does not need Defendants' consent." (District Court Decision, 27).

gambling laws were enacted. Contrary to this ancient case—and consistent with common sense—gambling occurs when and where a person places their money at risk, not where a server is located or the chance event conducted. "Patrons are engaging in 'gaming activity' by initiating a bet or a wager . . . [T]he act of placing a bet or wager [over the internet] is the 'gambling in the poker hall,' not 'off-site licensing or operation of the games.'" *State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 965 (9th Cir. 2018), *quoting Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014). The Ninth Circuit in *Iipay Nation* held that patrons' act of placing a bet or wager on an Indian tribe's server-based bingo game, which allowed them to play computerized bingo over the internet while they were located in California, constituted gambling in California, not on Indian lands, in violation of the UIGEA.

But even if it were true that gambling or betting takes place where the wager is "accepted," that would still be in Michigan in this case. Churchill exists and operates in Michigan (and Arizona) through its internet sites and mobile applications. Participants interact with Churchill in Michigan (versus through an intermediary like Western

Union via telegram), transfer monies to it in Michigan, and place wagers in Michigan that are accepted there through the available software applications operating in Michigan. The idea that a wager is not accepted or gambling is not occurring until digital information (instantaneously) makes its way to a "hub" in Oregon, which is not even where the horse races people are gambling on are occurring, is a fallacy—and a dangerous one. In no event should this Court countenance the notion that the jurisdiction where the operator resides can decide what is otherwise legal or illegal in the participant's state.

## IV.   Federal law respects a state's right to govern gambling within its borders.

The regulation of gambling is generally left to the states, as evidenced by a host of federal gambling laws deferring to them. *See, e.g., Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 484 (2018) (Congress "respect[s] the policy choices of the people of each State on the controversial issue of gambling[.]"); *United States v. King*, 834 F.2d 109 (6th Cir. 1987) ("Throughout our history, the regulation of gambling has been largely left to the state legislatures[.]"); 18 U.S.C. § 1955 (Illegal Gambling Business Act makes it a federal crime to conduct

an "illegal gambling business," defined in part to mean a business that violates "the law of a State or political subdivision in which it is conducted"). Reading the IHA to effect broad preemption therefore creates conflict with various federal laws, including the Wire Act and the Unlawful Internet Gambling Enforcement Act (UIGEA).

Gambling takes place when a person chooses to risk or give something of value for the opportunity to obtain a benefit dependent on the outcome of a game or contest of chance or skill or a future contingent event. *See, e.g.,* A.R.S. § 13-3301(6).  In Michigan, wagering is not lawful if enabled by a provider that does not meet its license requirements. Yet—under the district court's reasoning—Michigan's regulations are void if both Michigan and Oregon want to allow pari-mutuel wagering at all. (District Court, 18  ("[S]o long as pari-mutuel wagers are 'lawful in each State involved' in the transaction, the IHA governs the process by which that wager can be accepted" and "[t]hus, if pari-mutuel wagers are lawful in a state, then interstate offtrack wagers are also lawful in that state."))

This is fundamentally contrary to the longstanding approach to gambling in the U.S. and foists one state's laws on the citizens of

12

another. The pari-mutuel wagers that must be lawful are those that are "placed or transmitted by an individual in one State via telephone or other electronic media" in clear respect for the laws of the state where the gambling is taking place. 15 U.S.C. § 3002(3). In this case, unless Churchill complies with Michigan law, the wagers are not lawful under the IHA.

Under the UIGEA, "The term 'unlawful Internet *gambling' means to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet* where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(1)(A) (emphasis added). This mirrors the IHA's requirement that an "interstate off-track wager" must be "lawful in each State involved," insofar as it respects and requires compliance with the laws where the gambling (bet or wager) takes place. Applying the district court's reasoning, though, if a state otherwise allows some form of internet gambling under certain conditions, the UIGEA could arguably be read to preempt state

regulation of that gambling if a company happens to house a computer server someplace where the conduct is legal.

The district court's decision is in direct conflict with the UIGEA. Congress enacted the UIGEA in 2006 to enforce *state* gambling laws "because traditional law enforcement mechanisms are often inadequate for enforcing gambling prohibitions or regulations on the Internet" across jurisdictional boundaries. 31 U.S.C. § 5361. The UIGEA establishes that unlawful internet gambling means to place, receive or transmit a wager using the Internet where illegal under the state law where "the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). Critically, while Congress noted that the UIGEA did not otherwise prohibit "activity allowed under" the IHA, the exception for the IHA could not "be construed to preempt any State law prohibiting gambling." 31 U.S.C. § 5362(10)(D). Thus, Congress made explicitly clear in the UIGEA that, with respect to interstate off-track wagering over the Internet, the IHA did not preempt any state law where the wager is initiated or received.

Michigan law prohibits interstate off-track wagering over the internet unless the operator is licensed. The district court has

14

determined that the IHA preempts the licensing requirement, but this is directly contrary to Congress's intent as expressed in the UIGEA.

## Conclusion

Nothing in the IHA suggests any intent to force racing commissions to choose between either prohibiting pari-mutuel wagers entirely or allowing gambling that is either unregulated or that is operated in accordance with the laws of a different state. The district court's decision to the contrary misreads the IHA, and it cannot be squared with the UIGEA, the well-reasoned *Monarch* decision, or longstanding state police powers to regulate gaming. If allowed to stand, the decision may therefore have far-reaching, dangerous consequences for states that wish to allow responsible, sensibly regulated gaming.

This court should reverse.

Respectfully submitted this 17th day of June, 2025.

**Burch & Cracchiolo, P.A.**

/s/James M. Stipe

James M. Stipe
1850 N. Central Avenue, Suite 1700
Phoenix, Arizona 85004
(602) 234-8779
jstipe@bcattorneys.com
*Counsel for Arizona Department of Gaming*

15

## Certificate per FRAP 29(a)(4)(E)

I certify compliance with Fed. R. App. P. 29(a)(4)(E) that this brief is submitted by an agency of the State of Arizona, authored solely by counsel for amicus, and that no party, parties' counsel, or any person other than amicus contributed any money in connection with preparing or submitting this brief.

/s/James M. Stipe
James M. Stipe
Counsel for Amicus Curiae
Arizona Department of Gaming

## Certificate of Compliance

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 6500 words. This document contains 2838 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word in 14-point Century Schoolbook.

/s/James M. Stipe
     James M. Stipe
Counsel for Amicus Curiae
Arizona Department of Gaming

## Certificate of Service

I certify that on June 17th 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their designated address(es) of record.

/s/James M. Stipe
     James M. Stipe
Counsel for Amicus Curiae
Arizona Department of Gaming