No. 25-1235

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY, dba
TWINSPIRES,

  *Plaintiff-Appellee,*

v.

MICHIGAN GAMING CONTROL BOARD,

  *Defendant,*

and

HENRY L. WILLIAMS, JR., in his official capacity as Executive Director of the
Michigan Gaming Control Board; DANA NESSEL, in her official capacity as
Attorney General of the State of Michigan,

  *Defendants-Appellants.*

_____

On Appeal from the United States District Court for the
Western District of Michigan, Southern Division
Hon. Hala Y. Jarbou

_____

**BRIEF OF AMICI CURIAE DETROIT ENTERTAINMENT, LLC, d/b/a
MOTORCITY CASINO, GREEKTOWN CASINO, LLC, d/b/a
HOLLYWOOD CASINO AT GREEKTOWN, MGM GRAND DETROIT,
LLC, NOTTAWASEPPI HURON BAND OF THE POTAWATOMI, AND
SAGINAW CHIPPEWA INDIAN TRIBE IN SUPPORT OF DEFENDANTS**

[CAPTION CONTINUED ON NEXT PAGE]

HONIGMAN LLP
Andrea L. Hansen
222 N. Washington Square, Suite 400
Lansing, MI 48933
(517) 377-0709

DICKINSON WRIGHT PLLC
Jeffery V. Stuckey
123 West Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730

*Counsel for Amici Detroit Entertainment, LLC, d/b/a MotorCity Casino, Greektown Casino, LLC, d/b/a Hollywood Casino at Greektown, Nottawaseppi Huron Band of the Potawatomi, and Saginaw Chippewa Indian Tribe*

Phillip J. DeRosier
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866

*Counsel for Amicus MGM Grand Detroit, LLC*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _____25-1235_____    Case Name: _Churchill Downs Technology Initiatives Company dba TwinSpires_
v. Michigan Gaming Control Board et al

Name of counsel: _____Andrea L. Hansen_____

Pursuant to 6th Cir. R. 26.1, _Detroit Entertainment, L.L.C. d/b/a MotorCity Casino_

*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on __June 18, 2025__ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ ___Jeffery V. Stuckey___

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: __25-1235__     Case Name: Churchill Downs Technology Initiatives Company dba TwinSpires v
Michigan Gaming Control Board et al

Name of counsel: __Andrea L. Hansen__

Pursuant to 6th Cir. R. 26.1, __Greektown Casino, L.L.C., d/b/a Hollywood Casino at Greektown__
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Yes. Greektown Casino, L.L.C. is wholly owned by Greektown Holdings, L.L.C., which is wholly owned by Penn Tenant III, LLC, which is wholly owned by Penn Entertainment, Inc.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

CERTIFICATE OF SERVICE

I certify that on __June 18, 2025__ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ __Jeffery V. Stuckey__

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-1235

Case Name: Churchill Downs Technology Initiatives Company, d/b/a TwinSpires v. Michigan Gaming Control Board et al.

Name of counsel:  Jeffery V. Stuckey

Pursuant to 6th Cir. R. 26.1, MGM Grand Detroit, LLC
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Yes.  MGM Resorts International, a Delaware corporation, is MGM Grand Detroit, LLC's parent corporation.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> Yes.  MGM Grand Detroit, LLC is indirectly owned by MGM Resorts International, a Delaware corporation.

---

CERTIFICATE OF SERVICE

I certify that on _____ June 18, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Jeffery V. Stuckey

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

I.    INTEREST OF THE AMICI.................................................................... 1

II.   STATUTORY BACKGROUND .................................................................. 4

      A.    Michigan's Horse Racing Law............................................................ 4

      B.    The Interstate Horseracing Act .......................................................... 8

III.  ARGUMENT................................................................................................ 11

      A.    The district court erred in determining that the IHA preempts
            Michigan's licensing requirement for offering pari-mutuel
            wagering to Michigan residents. ...................................................... 11

            1.    There is a presumption against preemption because
                  gambling is a field that states have traditionally occupied.... 12

            2.    Contrary to the district court's conclusion, the IHA
                  contemplates, not preempts, state regulation of interstate
                  pari-mutuel wagering, including regulation by states
                  where a wager is placed. ........................................................ 15

      B.    The district court's interpretation of the IHA also disregards
            Indian tribal rights. .......................................................................... 24

IV.   CONCLUSION............................................................................................ 26

CERTIFICATE OF COMPLIANCE.................................................................. 28

CERTIFICATE OF SERVICE .......................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*California v Cabazon Band of Mission Indians*, 480 U.S. 202 (1987)...................24

*Carey v. Throwe,* 957 F.3d 468 (4th Cir. 2020)........................................13

*Casino Ventures v. Stewart*, 183 F.3d 307 (4th Cir. 1999).....................................14

*Cayuga Nation v New York State Gaming Commission*, ___ F. Supp. 3d ___ (N.D. N.Y. 2025) .......................................................................25

*Churchill Downs v Thoroughbred Horsemen's Group*, 605 F. Supp 2d 870 (W.D. Ky 2009) .......................................................................2, 10

*Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC,* 958 F.3d 532 (6th Cir. 2020) .......................................................................23

*Fenner v. Gen. Motors, LLC*, 113 F.4th 585 (6th Cir. 2024) .................................13

*Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 399 F.3d 1276 (11th Cir. 2005) .......................................................................14

*Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430 (8th Cir. 2007) .......................................................................14

*Helton v. Hunt*, 330 F.3d 242 (4th Cir. 2003)........................................13

*Horsemen's Benevolent & Protective Ass'n-Ohio Div.. Inc. v. Dewine*, 666 F.3d 997 (6th Cir. 2012) .......................................................................3

*Kentucky Div, Horsemen's Benev & Protective Assoc. Inc. v. Turfway Park Racing Assoc., Inc.*, 20 F.3d 1406 (6th Cir. 1994) .....................................2, 9

*Mashantucket Pequot Tribe v Town of Ledyard*, 722 F.3d 457 (2nd Cir. 2013) .......................................................................25

*Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014) ...........................24

*Monarch Content Mgmt. LLC v. Arizona Dep't of Gaming*, 971 F.3d 1021 (9th Cir. 2020) .................................................... 9, 10, 14, 21

*Salazar v. Paramount Glob.,* 133 F.4th 642 (6th Cir. 2025) ...................................23

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996)......................................25

*Torres v. Precision Indus., Inc*., 995 F.3d 485 (6th Cir. 2021) ................. 11, 12, 13

**Statutes**

15 U.S.C. § 3001 ...................................................................................................18

15 U.S.C. § 3001(a)(1)..........................................................................................15

15 U.S.C. § 3001(a)(2)..........................................................................................20

15 U.S.C. § 3001(a)(3)..........................................................................................20

15 U.S.C. § 3001(b) ..............................................................................................19

15 U.S.C. § 3002(11) ...................................................................................... 20, 22

15 U.S.C. § 3002(13) .............................................................................................16

15 U.S.C. § 3002(3) ....................................................................................... passim

15 U.S.C. § 3004 ............................................................................................ 20, 21

15 U.S.C. § 3004(a) ..............................................................................................22

15 U.S.C. § 3004(a)(3)..........................................................................................20

15 U.S.C. § 3004(b) ..............................................................................................19

1931 Mich. Pub. Acts 199......................................................................................4

1986 Mich. Pub. Acts 108......................................................................................5

1995 Mich. Pub. Acts 279......................................................................................5

25 U.S.C. § 2702 ...................................................................................................24

25 U.S.C. § 2703(8) ..............................................................................................24

District of Columbia Appropriations Act of 2000, Pub. L. No. 106-553, § 629, 114 Stat. 2762, 2762A-108 (codified at 15 U.S.C. § 3002(3)) .............17

Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2901 *et. seq*.............. 24, 26

Interstate Horseracing Act of 1978 ("IHA"), 15 U.S.C. §§ 3001-3007 .......... passim

Mich. Comp. Laws § 431.309 ................................................................6

Mich. Comp. Laws § 431.310 ................................................................6

Mich. Comp. Laws § 431.317 ................................................................6

Mich. Comp. Laws § 431.317(1) .............................................................4

Mich. Comp. Laws § 431.317(8) .........................................................7, 18

Mich. Comp. Laws § 431.317(9) ..........................................................1, 8

Mich. Comp. Laws § 431.318 ................................................................6

Mich. Comp. Laws § 432.201 *et seq.* .....................................................6

Mich. Comp. Laws § 750.331 ................................................................5

Mich. Initiated Law 1 (1996) ...............................................................6

Michigan's Horse Racing Law of 1995 ("MHRL"), Mich. Comp. Laws §
    431.301 *et seq.* ....................................................................... passim

## Other Authorities

146 Cong. Rec. H11271 (daily ed. Oct. 26, 2000) ......................................... 17, 23

1993 Tribal-State Compacts ................................................................26

M. Shannon Bishop, *And They're Off: The Legality of Interstate Pari-
    Mutuel Wagering and Its Impact on the Thoroughbred Horse
    Industry*, 89 Ky. L.J. 711 (2001) ...................................................17

S. Rep. No. 95-1117 (1978) ................................................................22

## Constitutional Provisions

Mich. Const. art. 4, § 41 ..................................................................7

## I.  <u>INTEREST OF THE AMICI</u>[1]

On February 29, 2025, the district court granted a preliminary injunction in favor of Churchill Downs Technology Initiatives Company dba TwinSpires ("TwinSpires"), barring Michigan from enforcing its laws that require TwinSpires to be licensed in order to accept pari-mutuel wagers on horse racing from individuals located in Michigan. The district court concluded that, because Michigan law generally authorizes pari-mutuel wagering, Michigan is precluded by the federal Interstate Horseracing Act of 1978 ("IHA"), 15 U.S.C. §§ 3001-3007, from requiring TwinSpires to abide by any Michigan laws or regulatory oversight. The district court reached that conclusion even though Michigan law expressly provides that a "person that does not hold a race meeting license or third-party facilitator license that solicits or accepts wagers on the results of live or simulcast horse races from individuals in this state is guilty of a felony." Mich. Comp. Laws § 431.317(9).

Proposed amici are all gaming operators in Michigan, and each is licensed in some capacity by the Michigan Gaming Control Board ("MGCB"). The tribal amici are also regulated by their respective tribal gaming commissions and the National Indian Gaming Commission. The Michigan gaming landscape strikes a

---

[1] All parties have consented to the filing of this brief.  No party's counsel authored the brief in whole or in part, and no entity or person, aside from amici curiae, made any monetary contribution intended to fund the preparation or submission of this brief.

careful balance designed to recognize the differing and sometimes competing interests of the various commercial and tribal gaming operators.

Against this backdrop is the need for public trust in the gaming industry and the integrity of its offerings. Significant regulation is the cornerstone of that public faith and trust. Hence, the gaming industry is one of the most heavily-regulated industries in Michigan. When there is an issue with one component of the industry, it impacts the rest. The casino gaming operators all financially contribute to the state, paying significant taxes and/or fees both to the state and the localities where they operate.

Unless reversed, the district court's erroneous interpretation of the IHA, and its determination that the IHA preempts Michigan law, would effectively open the door to nationwide wagering rights for any advance deposit wagering ("ADW")[2] platform wishing to operate in Michigan, stripping Michigan of its police power to license, regulate, provide consumer protections, and/or tax ADW activity within its borders. That outcome is at odds with the IHA's text, structure, and purpose, as recognized in *Kentucky Div, Horsemen's Benev & Protective Assoc. Inc. v. Turfway Park Racing Assoc., Inc.*, 20 F.3d 1406, 1414 (6th Cir. 1994), and *Horsemen's*

---

[2] ADW is a method of pari-mutuel wagering in which a patron establishes and prefunds an account with a wagering service. The patron can then place wagers on the results of horse races by telephone or online. TwinSpires is an example of an ADW platform. *Churchill Downs v Thoroughbred Horsemen's Group*, 605 F. Supp 2d 870 (W.D. Ky 2009).

*Benevolent & Protective Ass'n-Ohio Div.. Inc. v. Dewine*, 666 F.3d 997, 1002 (6th Cir. 2012).

Fundamentally at issue in this case is whether states retain the sovereign power to regulate who can accept horse racing wagers from their residents. Under the district court's contrary decision, the IHA allows ADW operators to bypass state authority entirely. According to the court, minimally regulated hubs, such as the one TwinSpires maintains in Oregon, are permitted under the IHA to circumvent other states' licensure, taxation, and oversight requirements.

This result puts at risk the delicate balance the state of Michigan has established for operation of the gaming industry within the state. It also incentivizes operators to sidestep Michigan law, thereby avoiding not only the regulations that apply to everyone else, but also the economic requirements attendant to gaming operators—i.e., the payment of taxes and fees to relevant governmental bodies, thereby placing law-abiding gaming operators at a significant financial and competitive disadvantage. There are in fact three ADW operators currently licensed in Michigan, all of whom would have no incentive to remain licensed if this decision is upheld. Indeed, it is reasonable to expect a proliferation of unlicensed operators claiming to be ADW operators offering not only unregulated wagering throughout the state, but also providing no financial,

safety, or regulatory commitment to the state or to the protection of its citizens who place pari-mutuel wagers.

Absent intervention by this Court, Michigan will be forced to choose between allowing unregulated, non-tax paying ADW operators accepting wagers from its residents without any consumer protections or recourse, or simply prohibiting all pari-mutuel wagering on horse racing altogether, imposing the death knell on an already struggling industry in the state. That is precisely the opposite result intended by Congress when it enacted the IHA in 1978.

## II.    <u>STATUTORY BACKGROUND</u>

### A.    **Michigan's Horse Racing Law**

Gambling in Michigan is illegal except as expressly permitted by statute or the Michigan Constitution. While, over time and with careful consideration, some limited forms of gaming have been legalized, generally with close regulatory oversight, all other forms of gaming remain illegal and are actually criminal under Michigan's penal code.

The first form (and, for many years, the only form) of gaming legalized in Michigan was pari-mutuel wagering on horse racing, authorized pursuant to Public Act 199 of 1931. Such wagering remains lawful in Michigan only as permitted by Michigan's Horse Racing Law of 1995 ("MHRL"), Mich. Comp. Laws § 431.301 *et seq*. *See* Mich. Comp. Laws § 431.317(1) ("All forms of pari-mutuel wagering

must be conducted under a race meeting license preapproved by the racing commissioner by rule or written order of the commissioner."). Otherwise, it is a crime. Mich. Comp. Laws § 750.331.

Horse racing was very popular in Michigan (and nationally) through the late 1980's, but since then has been in a general state of decline. In 1989, there were eight licensed racetracks in Michigan. There is currently only one licensed racetrack in Michigan, and it has not offered any live racing for over a year.

The introduction of simulcasting in the late 1980's helped offset this decline. Simulcasting involves the broadcast of a live horserace for pari-mutuel wagering purposes from a host track to a receiving track. Simulcast wagering in Michigan was first authorized and regulated by Public Act 108 of 1986, which was an amendment to Michigan's Horse Racing Law of 1980. Public Act 108 authorized wagering on only one simulcast race per racing day.

In 1995, the Michigan Legislature repealed the Horse Racing Law of 1980 and enacted the current MHRL. *See* 1995 Mich. Pub. Acts 279. This law, MHRL, authorized "full card" simulcasting, which allowed the broadcasting of an entire racing program of one or more race meeting licensees located in Michigan, or one or more races from racetracks located outside of the state.

Under the MHRL, several parties must be licensed and otherwise regulated by the Michigan Racing Commissioner to lawfully offer pari-mutuel wagering.

Track owners (those that provide the track and related facilities for live horse racing and simulcasting) must be licensed under Section 9 of the act. Mich. Comp. Laws § 431.309. A track owner operates effectively as the landlord and is paid pursuant to whatever terms it has in its contract with a race meeting licensee. Race meeting licensees are responsible for race meeting operations, and they are also required to be licensed under the MHRL. Mich. Comp. Laws § 431.310. Race meeting licensees function as the promoters and organizers of live and simulcast racing events at the track. Race meeting licensees receive commissions based on the amount wagered on these events. Mich. Comp. Laws § 431.317. A race meeting license authorizes a licensee to conduct live racing as well as pari-mutuel wagering. Mich. Comp. Laws § 431.310. A race meeting license is also a precondition for simulcasting. *Id.; see also* Mich. Comp. Laws § 431.318.

In 1996, the Michigan electorate approved an initiated law to authorize three commercial casinos in the City of Detroit. *See* Mich. Initiated Law 1 (1996); Mich. Comp. Laws § 432.201 *et seq*. In addition to those three casinos, Michigan also has twenty-four tribal casinos scattered throughout its Upper and Lower Peninsulas. In the early 2000s, as the consumer appetite for casino gaming grew and the popularity of horse racing declined in Michigan, certain horse racing interests sought legislation to allow "video lottery terminals"—which are effectively slot machines—at the racetracks, in order to convert the racetracks into

casinos or "racinos."  In response to these efforts, pursuant to a state-wide ballot initiative, the voters approved a 2004 constitutional amendment that prohibits the further expansion of gaming in Michigan (except in the existing Detroit commercial and tribal casinos) absent a state and local vote of the people. Mich. Const. art. 4, § 41.

In 2019, as part of a larger legislative gaming package that authorized the existing casinos to offer internet gaming and sports betting, the MHRL was amended to permit licensed racetracks to offer ADW, including pari-mutuel wagering, through third party facilitators. Prior to the 2019 amendments, pari-mutuel ADW was prohibited in Michigan by the MHRL, which restricted pari-mutuel wagering to in-person wagering at a licensed race meeting.

The MHRL as so amended expressly provides that "[a]ny form of pari-mutuel wagering on the results of live or simulcast horse races must only be conducted or operated by a race meeting licensee, which may use its contracted licensed third-party facilitators, as determined and approved by the racing commissioner."  Mich. Comp. Laws § 431.317(8).  It is a *felony* for "[a] person that does not hold a race meeting license or third-party facilitator license [to] solici[t] or accep[t] wagers on the results of live or simulcast horse races from

7

individuals in [Michigan]." Mich. Comp. Laws § 431.317(9).[3] Thus, pari-mutuel wagering (including ADW) is only permitted (and legal) in accordance with the strict requirements of the MHRL.

### B.     The Interstate Horseracing Act

Traditionally, wagering on horse races in the United States occurred at the track where the race was taking place. There was no simulcasting, telephone account wagering, or, of course, internet wagering. In 1971, the New York Off-Track Betting Corporation ("NYOTB") offered wagering pools on the Kentucky Derby, which was the first time wagering on the race had been offered outside the commonwealth of Kentucky. Churchill Downs, where the Kentucky Derby is run, had refused to sell the rights to the NYOTB, but the NYOTB offered the pools anyway, generating a handle of more than $1 million. This was not the first time the NYOTB had taken bets on out-of-state races without the host track's permission, and the NYOTB's unilateral actions precipitated a dispute, ultimately leading to Congress's enactment of the IHA.

The IHA was thus a compromise reached after years of disagreement between racetracks, horsemen's associations, and state regulators over

---

[3] Mich. Comp. Laws § 431.317(9) provides: "A person that does not hold a race meeting license or third-party facilitator license that solicits or accepts wagers on the results of live or simulcast horse races from individuals in this state is guilty of a felony punishable by imprisonment for not more than 5 years or a fine of not more than $10,000.00, or both. Each act of solicitation or wager that is accepted in violation of this section is a separate offense."

simulcasting. This Court recognized that compromise in *Kentucky Div, Horsemen's Benev & Protective Assoc. Inc. v. Turfway Park Racing Assoc., Inc.,* 20 F.3d 1406 (6th Cir. 1994):

> When Congress enacted the Act [IHA], off-track wagering was already in place as a legal alternative to betting at the track where the race was being run. Congress recognized that the unrestricted proliferation of off-track wagering would hurt the horseracing industry by decreasing attendance at racetracks which, in turn, would reduce the number of horses needed to compete and the number of individuals employed in the industry. Moreover, unrestricted off-track wagering threatened the viability of small racetracks, which provide a marketplace for horses of lesser quality and aspiring jockeys.
>
> Though the bills first introduced in Congress sought to eliminate interstate off-track wagering in its entirety, Congress soon recognized that horseracing and off-track wagering could coexist if regulated. Congress therefore opted for the compromise found at 15 U.S.C. § 3004(a), which allows interstate off-track wagering if, and only if, the interested parties consent.
>
> Under the Act, each state may prohibit interstate off-track wagering within its borders and may prohibit a resident racetrack from contracting with an off-track wagering facility in another state. . . .

*Id*. at 1414.

In *Monarch Content Mgmt. LLC v. Arizona Dep't of Gaming*, 971 F.3d 1021 (9th Cir. 2020), the Ninth Circuit summarized how the IHA currently regulates interstate off-track wagering:

> In the IHA, Congress stressed that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). However, "in the limited area of interstate off-track wagering on horseraces," Congress found "a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of

9

> legal interstate wagers." *Id.* § 3001(a)(3); *see id.* § 3001(b) (stating legislative policy "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries"). To that end, the IHA provides that an "interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from" four parties: the host racing association, the relevant horsemen's group in the host state, the host racing commission, and the racing commission in the state where the off-track wager is placed. *Id.* § 3004(a)(1)– (3). Interstate off-track wagering is otherwise prohibited by federal law. *Id.* § 3003.

*Id*. at 1026. Beyond its requirement of consent from interested parties, the IHA "neither creates nor envisions any other supervision or regulatory scheme," leaving "regulation of the horse racing wagering industry . . . to the respective state racing commissions[.]" *Churchill Downs v. Thoroughbred Horsemen's Group*, LLC, 605 F. Supp. 2d 870, 882 (W.D. Ky. 2009).

Of particular note as it pertains to this case is the Ninth Circuit's recognition that consent for interstate off-track wagering must be obtained from *"the racing commission in the state where the off-track wager is placed." Monarch*, 971 F.3d at 1026 (emphasis added). As discussed further below, the district court concluded otherwise, without ever addressing *Monarch*. That was just one of several foundational errors in the district court's interpretation of the IHA that requires reversal of its determination that the IHA preempts Michigan's licensing requirement for off-track betting operations like TwinSpires.

### III.  <u>ARGUMENT</u>

**A.    The district court erred in determining that the IHA preempts Michigan's licensing requirement for offering pari-mutuel wagering to Michigan residents.**

The district court enjoined Defendants from enforcing Michigan's licensing requirement against TwinSpires after concluding that TwinSpires was likely to succeed on the merits of its claim that the IHA preempts that requirement. Opinion, RE 19, Page ID ## 465-467.  While recognizing that the IHA has no express preemption provision, the district court nevertheless held that "Michigan's licensing requirement is impermissible" under a theory of implied preemption.  *Id.*, Page ID # 466.

"Implied preemption has two types, field and conflict." *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021).  "The former applies when federal law is so 'pervasive' in one particular field that it exclusively occupies that field." *Id.* (citation omitted).  "The latter applies when federal and state laws conflict in a way that would make compliance with both impossible, or when the state laws 'interfere[ ] with the operation of the federal program.'" *Id.* (citation omitted).

According to the district court, the IHA "occupies the field of interstate off-track wagers" and only requires that TwinSpires obtain "consent from the entity conducting the horserace outside of Michigan (the host racing association), the regulatory entity in that state (the host racing commission), and the regulatory

11

entity in Oregon (the off-track racing commission)." Opinion, RE 19, Page ID ## 466-67.[4] Thus, in the district court's view, Defendants' "attempt to force TwinSpires to hold a Michigan license in order to accept wagers . . . is akin to adding an additional consent requirement, one that runs contrary to the IHA's exclusive requirements." *Id*., Page ID # 467. The district court's analysis and conclusions are erroneous and require reversal.[5]

> **1.    There is a presumption against preemption because gambling is a field that states have traditionally occupied.**

States are, of course, "'precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.'" *Torres*, 995 F.3d at 491 (citation omitted). "That determination 'can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (citation omitted).

---

[4] As discussed below, amici contend that Michigan's racing commissioner must give consent for purposes of the IHA both under this section and per the definition of an off-track interstate wager.

[5] Having found field preemption to apply, the district court did not address TwinSpires' claim of conflict preemption. As discussed below, neither applies here.

Relatedly, "[a] state law is 'conflict' preempted only 'to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.'" *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (citation omitted); *see also Torres*, 995 F.3d at 491.

Regardless of which form of preemption is claimed, there is a "strong presumption" against preemption when "Congress has legislated . . . in a field which the States have traditionally occupied.'" *Torres*, 995 F.3d at 491; *Fenner*, 113 F.4h at 594 (citation and some quotation marks omitted).  Courts apply that presumption "'with special force'" in such cases "'[b]ecause preemption can trammel upon state sovereignty.'" *Fenner*, 113 F.4th at 594 (citation omitted); *Torres*, 995 F.3d at 491.  *See also Carey v. Throwe,* 957 F.3d 468, 481 (4th Cir. 2020) ("It is a cardinal rule of statutory interpretation that Congress does not ordinarily intend to upset the Constitution's 'healthy balance of power between the States and the Federal Government.'") (citation omitted).

Regulation of gambling is one field that states have traditionally occupied. *See Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) ("'[B]ecause the regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens[,]' the regulation of gambling 'lies at

the heart of the state's police power.'") (citation omitted).[6]  Indeed, "Congress has

explicitly recognized the preeminent state interests in controlling gambling and has

sought to extend, not curb, state police power in this field."  *Casino Ventures v.

Stewart*, 183 F.3d 307, 311 (4th Cir. 1999).

Consistent with that longstanding recognition, "the IHA pointedly left intact

the states' 'primary responsibility for determining what forms of gambling may

legally take place within their borders,' thus preserving their traditional police

powers." *Monarch*, 971 F.3d at 1028 (quoting 15 U.S.C. § 3001(a)(1)).  While the

IHA does regulate pari-mutuel wagering to an extent, it is "for the 'limited'

purpose of ensuring the states' *cooperation* in the acceptance of interstate wagers."

*Id.* (emphasis added).[7]

---

[6] *See also Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278 (11th Cir. 2005) (same); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007) ("No one would question that [the State] has the power to regulate gambling in the interest of the public health, safety, and general welfare.") (citation and quotation marks omitted).

[7] The district court gave this provision a peculiar meaning, effectively concluding that, once Oregon became a multinational hub, other states may no longer regulate the applicable wagering activity within their borders in any respect, even to protect their own citizens.

14

**2.    Contrary to the district court's conclusion, the IHA contemplates, not preempts, state regulation of interstate pari-mutuel wagering, including regulation by states where a wager is placed.**

Viewed through this lens, the district court's decision that the IHA preempts the MHRL's licensing requirement cannot stand, whether under a theory of field or conflict preemption.  Far from leaving "no room" for state regulation, both the text and legislative history of the IHA demonstrate Congress's intent that states where a wager *is placed* have a significant and primary role in the regulation of interstate pari-mutuel wagering.  And, as further explained below, the MHRL does that without conflicting in any way with the IHA.  Nor does the MHRL make it impossible to comply with both laws, as demonstrated by the uncontested fact that TwinSpires has been complying with both laws for several years, following legalization of ADW in Michigan.

Beginning with the text, the IHA recognizes states as having "the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1).  To that end, the IHA confirms that each state involved in the wagering process maintains regulatory rights with respect to that process. By way of example, the act defines "parimutuel" as a system whereby "wagers with respect to the outcome of a horserace are *placed with . . . a person licensed or otherwise permitted to do so under State law*."  15

15

U.S.C. § 3002(13) (emphasis added). Additionally, the IHA requires a pari-mutuel wager "placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State" to be both a "legal wager" and *lawful in each State involved*." 15 U.S.C. § 3002(3) (emphasis added). Read together, these provisions reflect Congress's clear intent that a pari-mutuel wager must be lawfully permitted in the state where it is placed, and that this determination is a prerequisite to any further application of the IHA.

The IHA's legislative history confirms the regulatory role of states in which the person placing a wager resides. As originally enacted in 1978, the IHA contained the following definition of "interstate off-track wager":

> "interstate off-track wager" means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State.

15 U.S.C. § 3002(3).

In 2000, Congress amended that definition to add the following "clarifying" provision concerning "pari-mutuel wagers":

> Sec. 629. Section 3(3) of the Interstate Horseracing Act of 1978 (15 U.S.C. 3002(3)) is amended by inserting "and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools" after "another State."

16

*See* District of Columbia Appropriations Act of 2000, Pub. L. No. 106-553, § 629, 114 Stat. 2762, 2762A-108 (codified at 15 U.S.C. § 3002(3)).

As particularly relevant here, the legislative commentary that accompanied the 2000 amendment shows that it was intended to clarify that compliance with the laws of the state in which the wager is placed *must* occur. As explained in the Congressional Record:

> The amendment clarifies that the Interstate Horseracing Act permits wagers made by telephone or other electronic media to be accepted by an off-track betting system in another state *provided that such types of wagers are lawful in each state involved and meet the requirements, if any, established by the legislature or appropriate regulatory body in the state where the person originating the wager resides*.

146 Cong. Rec. H11271 (daily ed. Oct. 26, 2000) (emphasis added).

The 2000 amendment and its accompanying commentary should have eliminated any doubt about what Congress intended—that "each State involved" in interstate pari-mutuel wagering would have regulatory authority regarding how that wagering occurs, including the state where the person originating the wager resides. *See also* M. Shannon Bishop, *And They're Off: The Legality of Interstate Pari-Mutuel Wagering and Its Impact on the Thoroughbred Horse Industry*, 89 Ky. L.J. 711, 733 (2001) ("The new language of the IHA evinces Congressional intent that the wager must be legal under the state law of both the sending and receiving states. The very language of the amendment, which defines a legal interstate off-

17

track wager as one 'where lawful in each State involved,' seems to require both states' consent.").[8]

In concluding otherwise, the district court engaged in a statutory analysis that simply does not hold up.  The court began by concluding that the term "legal wager" as used in 15 U.S.C. § 3002(3) "refers to a wager that complies with the process as outlined in the IHA," and not whether a wager is "legal" under state law. Opinion, RE 19, Page ID # 453. To interpret it otherwise, the court reasoned, "would render the subsequent phrase 'where lawful in each State involved' superfluous." *Id*. The amendment to 15 U.S.C. § 3002(3) shows that this is incorrect:  both phrases (the first as originally enacted in 1978 and the second added in 2000) plainly refer to state law.

The court also found it significant that the IHA gives states only "primary," as opposed to "sole or exclusive," responsibility to regulate gambling, concluding that states "wield this primary authority" only "with respect to the procedures for intrastate gambling." *Id.*, Page ID # 452 (citing 15 U.S.C. § 3001).  The court then gave "close examination" to the definition of "interstate off-track wager" in 15

---

[8] To the extent the district court attempted to distinguish between placing and accepting wagers under Michigan's penal code (*see* Opinion, RE 19, Page ID ## 456-459), that effort is misplaced here, given that the IHA expressly contemplates regulation of interstate pari-mutuel wagering by "each State involved." Separate and apart from Michigan's penal code, the MHRL expressly prohibits all "pari-mutuel wagering on the results of live or simulcast horse races" unless "conducted or operated by a race meeting licensee."  Mich. Comp. Laws § 431.317(8).

U.S.C. § 3002(3), interpreting it to mean that, so long as pari-mutuel wagering is "lawful" generally, that is the end of a state's regulatory authority. *Id*., Page ID ## 453-459. Thus, in the district court's view, once the Michigan Legislature "flipped on the master switch, making pari-mutuel wagers lawful," it had no further role in determining how, or under what conditions, such wagering could be conducted by Michigan residents. *Id*., Page ID # 456 n. 9.

Instead, the district court reasoned, the only "regulatory entities" having a say in the matter are "(1) the host racing association; (2) the host racing commission; and (3) the off-track racing commission" where the wager is "accepted" (which, according to the district court is Oregon, because that is where the "processing hub" is located), and not where the wager is "placed" (Michigan). *Id*., Page ID ## 460-463 (citing 15 U.S.C. § 3004(b)). In the court's view, these are the only entities that are required to "consent" to an "off-track betting system" (such as that of TwinSpires) accepting an "interstate off-track wager." *Id.*

The district court interpreted the IHA in a manner that contradicts both its text and its history. To be sure, the IHA reflects Congress's intent to regulate interstate pari-mutuel wagering. *See* 15 U.S.C. § 3001(b) ("[I]t is the policy of the Congress in this chapter to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States."). Congress's stated reasons for that are to (1)

19

"prevent interference by one State with the gambling policies of another," and (2) "to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers." 15 U.S.C. § 3001(a)(2) and (3). So, for example, a state cannot allow for off-track wagering on races conducted in some states but not others.

But none of that suggests that Congress did not contemplate state regulation over how off-track wagering is to be conducted within state borders, including in the state where the wager is placed. Indeed, that is *precisely* what Congress intended when it amended the IHA in 2000 to clarify that pari-mutuel wagering must be "lawful in each State involved." 15 U.S.C. § 3002(3). Although the district court interpreted that phrase to *exclude* a state's ability to regulate the manner in which "lawful" wagers are placed, the legislative history clearly provides otherwise.

The district court's interpretation of the "consent" requirement of 15 U.S.C. § 3004 is similarly flawed. Focusing on the requirement of consent from the "off-track racing commission," 15 U.S.C. § 3004(a)(3), which the IHA defines as the "person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in that State," 15 U.S.C. § 3002(11), the district court concluded that this refers only to the "regulatory entity for the state in which a bet is *accepted*." Opinion, RE 19, Page ID ## 461-462 (emphasis in

original).   The court continued: "The off-track betting system does not need consent from the regulating entity for the state in which a bet is *placed*.  Unless the wager is *accepted* in Michigan, MGCB is not the off-track commission that must consent to the wager."  *Id.*, Page ID # 462 (emphasis in original).[9]

The statutory text, however, does not support such a limitation. The "consent" required under 15 U.S.C. § 3004 is for an "interstate off-track wager," i.e., a "legal wager" that is  "*placed* or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, *placed* or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State." 15 U.S.C. § 3002(3) (emphasis added). These references to the state where an off-track wager is "placed"— thereby rendering it one of the "involved" states—demonstrate Congress's intent that the racing commission in that state is among the regulatory entities from whom consent must be obtained.  As the Ninth Circuit observed in *Monarch*, 971 F.3d 1021:

> [T]he IHA provides that an "interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from" four parties: the host racing association, the relevant horsemen's

---

[9] The district court's conclusion in this regard rests on TwinSpires locating its "processing hub" in Oregon.  According to the court, therefore, the only relevant regulatory body is Oregon, for wagers placed anywhere throughout the United States (and maybe beyond).

21

> group in the host state, the host racing commission, *and the racing commission in the state where the off-track wager is placed.*

*Id*. at 1026 (citing 15 U.S.C. § 3004(a)) (emphasis added). And even if there were any doubt about that, the IHA in any event requires each pari-mutuel wager to be a "legal wager" in the state where the person placing the wager resides. Either way, the IHA does not permit, let alone require, the laws of the state in which the wager is placed to be disregarded.

Instead of viewing the statutory text in context, the district court found the isolated term "that State" in 15 U.S.C. § 3004(a) to be "ambiguous," and proceeded to consult a limited and outdated portion of the IHA's legislative history. Opinion, RE 19, Page ID # 461. Citing a 1978 Senate report discussing the expectation that a final consent agreement would be presented to "'the racing commissions of the host state and the off-track state for final approval,'" *id.* (quoting S. Rep. No. 95-1117, at 7-8 (1978)), the district court concluded that "the 'off-track racing commission' refers to the regulating entity of the 'off-track state,'" i.e., the "'State in which an interstate off-track wager is accepted[.]' 15 U.S.C. § 3002(6).'" *Id.*

There are at least two problems with the district court's analysis. First, the meaning of "in that State" as that term is used in 15 U.S.C. § 3002(11), when considered in context, is not ambiguous at all; it clearly refers to any state "involved" in the placement *or* acceptance of an "interstate off-track wager." 15

U.S.C. § 3002(3).  *See Salazar v. Paramount Glob.,* 133 F.4th 642, 651 (6th Cir.

2025) ("[T]he plain meaning of any word 'is informed by its surrounding context'

and the other words in the statute.") (citation omitted).

Second, the district court's resort to the 1978 Senate report was misplaced

given the 2000 amendment to the IHA, which, as explained in the legislative

history relating to that amendment, was intended to clarify that an interstate off-

track wager must *"meet the requirements, if any, established by the legislature or*

*appropriate regulatory body in the state where the person originating the wager*

*resides*." 146 Cong. Rec. H11271 (daily ed. Oct. 26, 2000) (emphasis added).

In short, nothing in the IHA's text or legislative history supports the district

court's determination that "Michigan's licensing requirement is impermissible," or

that "TwinSpires does not need Defendants' consent."  Opinion, RE 19, Page ID #

466.  In fact, the text and history show the opposite:  the IHA was enacted to

protect against the proliferation of off-track wagering and to preserve the states'

police powers over gaming within their borders by first requiring the wager to be

legal in "each state involved."

Because TwinSpires is therefore unlikely to succeed on the merits, this Court

should vacate the district court's preliminary injunction for that reason alone.  *See*

*Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC,* 958 F.3d 532, 539

(6th Cir. 2020) ("'[A] finding that there is simply no likelihood of success on the

merits is usually fatal' to a plaintiff's quest for a preliminary injunction.") (citation omitted).

**B.    The district court's interpretation of the IHA also disregards Indian tribal rights.**

In addition to disregarding Congress's intent, the district court's flawed interpretation of the IHA also creates a conflict with the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2901 *et. seq*.  The IGRA was enacted following the Supreme Court's decision in *California v Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that states lack regulatory authority over gaming on Indian lands.  The IGRA was enacted to support an Indian nation's sovereignty and self-governance, with the central goal to independently determine whether and how gaming would occur on their lands.  25 U.S.C. § 2702.  The statutory text, structure, and legislative history collectively establish that Congress expressly intended to create enforceable rights for Indian nations, including a cause of action to prevent states or third parties from authorizing unlawful Class III gaming on Indian land without an Indian nation's approval. *Id*.

The IGRA divides gaming into three classes—I, II, and III—and provides a different regulatory scheme for each class.  Class III includes "all forms of gaming that are not class I or class II gaming." 25 U.S.C. § 2703(8). This category "includes casino games, slot machines, and horse racing." *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 785 (2014) (citations omitted).  Class III gaming

is the most heavily regulated of the three classes and is lawful only if all of the following prerequisites are satisfied:

> (1) authorized by an ordinance or resolution that (a) is adopted by the governing body of the Indian tribe, (b) satisfies certain statutorily prescribed requirements, and (c) is approved by the National Indian Gaming Commission; (2) located in a State that permits such gaming for any purpose by any person, organization, or entity; and (3) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect."

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 48-49 (1996) (citations omitted).

Class III gaming on Indian lands can only be conducted if these prerequisites are satisfied, whether by an Indian tribe or otherwise. *See, e.g., Cayuga Nation v New York State Gaming Commission*, ___ F. Supp. 3d ___ (N.D. N.Y. 2025) (finding that the IGRA's restrictions on Class III gaming apply to any Class III gaming activity conducted on Indian lands, including gaming activity conducted by the state); *Mashantucket Pequot Tribe v Town of Ledyard*, 722 F.3d 457, 469-70 (2nd Cir. 2013) (noting that the IGRA "'was intended to expressly preempt the field in the governance of gaming activity on Indian lands'") (citation omitted).

There are twelve federally-recognized tribes in Michigan, all of whom have entered into tribal-state compacts with the state of Michigan and have enacted comprehensive gaming laws, regulations, and licensing requirements for gaming conducted on Indian lands. Pursuant to those compacts and strict regulatory schemes, the tribes operate twenty-four casinos collectively throughout the state.

With a state lottery, three commercial casinos, twenty-four tribal casinos, and horse racing, the state of Michigan has a negotiated and delicate balance of gaming interests.

Accepting the district court's interpretation of the IHA would shatter that balance and conflict with the IGRA. It would allow an unlicensed, unregulated ADW operator to solicit and accept wagers on Indian lands without obtaining tribal consent (and despite tribal opposition). It would also violate the tribal-state compacts by allowing wagering within the exclusive economic zone of tribes. Only the tribes have the authority to determine whether and to what extent gaming is conducted on their lands. Indeed, pursuant to the 1993 Tribal-State Compacts, each game allowed to be played must be expressly set forth therein to be authorized. Neither horse racing nor pari-mutuel wagering is set forth in these compacts and can only be added by mutual consent of the tribes and the state of Michigan pursuant to Section 3(b) of the compacts. The district court's contrary opinion thus disregards the tribes' sovereignty, violates their compacts with the state of Michigan, and interferes with Michigan's role in these compacts and the IGRA.

## IV.   <u>CONCLUSION</u>

Amici respectfully request that the Court vacate the district court's preliminary injunction by recognizing that state licensure requirements are not only

compatible with the IHA, but also essential to its cooperative structure to allow for states like Michigan to regulate gaming for the protection of residents within their borders.

Respectfully submitted,

HONIGMAN LLP

*/s/ Andrea L. Hansen*
By: _____
    Andrea L. Hansen
222 N. Washington Square, Suite 400
Lansing, MI 48933
(517) 377-0709

*Counsel for Amici Detroit Entertainment,*
*LLC, d/b/a MotorCity Casino, Greektown*
*Casino, d/b/a Hollywood Casino at*
*Greektown, Nottawaseppi Huron Band of*
*the Potawatomi, and Saginaw Chippewa*
*Indian Tribe*


Dated:  June 18, 2025

DICKINSON WRIGHT PLLC

*/s/ Jeffery V. Stuckey*
By: _____
    Jeffery V. Stuckey
123 West Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730

Phillip J. DeRosier
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866

*Counsel for Amicus MGM Grand*
*Detroit, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because it contains 6,353 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s Jeffery V. Stuckey*

Dated:  June 18, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to registered users.

By: */s/  Jeffery V. Stuckey*