No. 25-1235

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY, dba
TWINSPIRES,

*Plaintiff-Appellee*,

*v.*

MICHIGAN GAMING CONTROL BOARD,

*Defendant*,

and

HENRY L. WILLIAMS, JR., in his official capacity as Executive Director of the
Michigan Gaming Control Board, and DANA NESSEL, in her official capacity as
Attorney General of the State of Michigan,

*Defendants-Appellants*.

On Appeal From The United States District Court
For The Western District Of Michigan
No. 1:25-cv-00047

**BRIEF FOR APPELLEE TWINSPIRES**

Patrick G. Seyferth
Derek J. Linkous
BUSH SEYFERTH PLLC
100 West Big Beaver
Ste. 400
Troy, MI 48084
(248) 822-7800
seyferth@bsplaw.com
linkous@bsplaw.com

Christine Demana
GIBSON, DUNN &
CRUTCHER LLP
2001 Ross Ave.
Ste. 2100
Dallas, TX 75201
(214) 698-3246
cdemana@gibsondunn.com

Thomas H. Dupree Jr.
John W. Tienken
Abby H. Walters
GIBSON, DUNN &
CRUTCHER LLP
1700 M St. N.W.
Washington, DC 20036
(202) 955-8500
tdupree@gibsondunn.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellee TwinSpires states that Churchill Downs Incorporated is a parent of Plaintiff-Appellee and that Churchill Downs Incorporated has a financial interest in the outcome.  Plaintiff-Appellee further states that BlackRock, Inc. owns 10% or more of Churchill Downs Incorporated.


Dated: July 11, 2025                   /s/ Thomas H. Dupree Jr.
                                        Thomas H. Dupree Jr.

# TABLE OF CONTENTS

**Page**

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................................x

STATEMENT OF JURISDICTION..................................................................x

STATEMENT OF THE ISSUES.....................................................................xi

INTRODUCTION ............................................................................................1

STATEMENT OF THE CASE...........................................................................4

        A.     The Interstate Horseracing Act ..........................................4

        B.     Michigan's Horse Racing Law ...........................................9

        C.     TwinSpires' Michigan Operations...................................11

        D.     The Licensing Dispute .....................................................13

        E.     Proceedings Below............................................................14

SUMMARY OF ARGUMENT .........................................................................16

STANDARD OF REVIEW .............................................................................19

ARGUMENT .................................................................................................20

     I.     TwinSpires Is Likely To Succeed On The Merits.............................21

        A.     The IHA Preempts The Field Of Interstate Off-Track Wagering On Horseraces. ......................................................22

        B.     Michigan's Licensing Requirements Are Also Preempted Because They Conflict With The IHA. ...................................25

        C.     The Attorney General's Arguments Are Meritless...................30

     II.     The Irreparable Harm And Public Interest Factors Strongly Support A Preliminary Injunction.......................................................42

A.    TwinSpires Will Suffer Irreparable Harm Absent A Preliminary Injunction. ............................................................43

B.    The Remaining Equitable Factors Favor a Preliminary Injunction. ...................................................................46

CONCLUSION ..........................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
46 F.4th 489 (6th Cir. 2022) ..............................................................43

*Arizona v. United States*,
567 U.S. 387 (2012)......................................................22, 23, 25, 27

*Att'y Gen. v. PowerPick Club*,
783 N.W.2d 515 (Mich. Ct. App. 2010)............................................9

*Bryan v. United States*,
524 U.S. 184 (1998)..........................................................................35

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ...........................................................19

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
781 F.3d 264 (6th Cir. 2015) ...........................................................44

*Coventry Health Care of Mo., Inc. v. Nevils*,
581 U.S. 87 (2017)............................................................................23

*CTIA - The Wireless Ass'n v. Kentucky 911 Servs. Bd.*,
727 F. Supp. 3d 641 (E.D. Ky. 2024)...............................................25

*D.T. v. Sumner Cnty. Schs.*,
942 F.3d 324 (6th Cir. 2019) ...........................................................45

*Dahl v. Bd. of Trustees v. W. Mich. Univ.*,
15 F.4th 728 (6th Cir. 2021) ............................................................47

*Doe v. Univ. of Cincinnati*,
872 F.3d 393 (6th Cir. 2017) ...........................................................20

*Egelhoff v. Egelhoff ex rel. Breiner*,
532 U.S. 141 (2001)..........................................................................37

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)....................................................................35, 37

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005).........................................................................36

*Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*,
    479 F.3d 1310 (11th Cir. 2007) .........................................................29

*Hamilton's Bogarts, Inc. v. Michigan*,
    501 F.3d 644 (6th Cir. 2007) .............................................................20

*Horseman's Benevolent & Protective Ass'n v. DeWine*,
    666 F.3d 997 (6th Cir. 2012) ........................................................24, 26

*Horsemen's Benevolent & Protective Ass'n, Inc. v. Zonak*,
    2008 WL 11453695 (S.D. Ohio Sept. 23, 2008) ...............................24

*Huron Mountain Club v. U.S. Army Corps of Eng'rs*,
    545 F. App'x 390 (6th Cir. 2013) ......................................................46

*Kansas v. Garcia*,
    589 U.S. 191 (2020).....................................................................24, 25

*Kentucky Div., Horsemen's Benev. & Protective Ass'n, Inc. v.
    Turfway Park Racing Ass'n, Inc.*,
    20 F.3d 1406 (6th Cir. 1994) ..............................................6, 29, 35

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ...................................................43, 44, 47

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
    543 U.S. 50 (2004) ............................................................................36

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012).........................................................................22

*Life Techs. Corp. v. Promega Corp.*,
    580 U.S. 140 (2017).........................................................................34

*Maryland v. Louisiana*,
    451 U.S. 725 (1981).........................................................................21

*Matthews v. Centrus Energy Corp.*,
    15 F.4th 714 (6th Cir. 2021) .............................................................21

v

*McNeil v. Cmty. Prob. Servs., LLC*,
    945 F.3d 991 (6th Cir. 2019) ...............................................................20

*Merck Sharp & Dohme Corp. v. Albrecht*,
    587 U.S. 299 (2019)...............................................................................30

*Mik v. Fed. Home Mortg. Corp.*,
    743 F.3d 149 (6th Cir. 2014) ...............................................................29

*Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*,
    971 F.3d 1021 (9th Cir. 2020) .......................................................29, 30

*Murphy v. NCAA*,
    584 U.S. 453 (2018).................................................................23, 25, 40

*Mut. Pharmaceutical Co. v. Bartlett*,
    570 U.S. 472 (2013)...............................................................................21

*Ohio v. Becerra*,
    87 F.4th 759 (6th Cir. 2023) ...............................................................47

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ...............................................................44

*Patio Enclosures, Inc. v. Herbst*,
    39 F. App'x 964 (6th Cir. 2002)...........................................................47

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
    52 F.3d 1373 (6th Cir. 1995) ...............................................................44

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
    822 F.2d 1390 (6th Cir. 1987) .............................................................47

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)...............................................................................21

*Pulsifer v. United States*,
    601 U.S. 124 (2024)...............................................................................32

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)...............................................................................41

vi

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976)..................................................................41

*State ex rel. Reading v. W.U. Tel. Co.*,
    57 N.W.2d 537 (Mich. 1953)..............................................8, 34, 42

*Sackett v. EPA*,
    598 U.S. 651 (2023)..................................................................31

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)..................................................................34

*Schwegmann Brothers v. Calvert Distillers Corp.*,
    341 U.S. 384 (1951) .................................................................35

*Sexton v. Ryder Truck Rental, Inc.*,
    320 N.W.2d 843 (Mich. 1982)...................................................43

*Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*,
    989 F.2d 1266 (1st Cir. 1993)....................................................23

*Tennessee v. U.S. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ...................................................19

*United States v. Hunter*,
    12 F.4th 555 (6th Cir. 2021) .....................................................41

*United States v. Locke*,
    529 U.S. 89 (2000)....................................................................38

*United States v. Sammons*,
    55 F.4th 1062 (6th Cir. 2022) ...................................................36

*United States v. Truesdale*,
    152 F.3d 443 (5th Cir. 1998) ....................................................34

*Verizon North Inc. v. Strand*,
    309 F.3d 935 (6th Cir. 2002) ...............................................25, 28

*Virginia Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019)..................................................................22

*York Risk Servs. Grp., Inc. v. Couture*,
   787 F. App'x 301 (6th Cir. 2019) .......................................................45

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. VI, cl. 2 .....................................................................21

**STATUTES**

15 U.S.C. § 3001 ................................. 1, 2, 3, 7, 17, 23, 24, 27, 37, 38, 40

15 U.S.C. § 3002 ................................. 2, 5, 8, 9, 18, 31, 32, 34, 39, 41

15 U.S.C. § 3003 ................................................1, 3, 7, 17, 22, 23

15 U.S.C. § 3004 ................................. 1, 8, 9, 17, 23, 26, 30, 32, 34, 37, 46

15 U.S.C. § 3005 ....................................................................28

15 U.S.C. § 3006 .................................................................28, 32

15 U.S.C. § 3007 ....................................................................32

28 U.S.C. § 1292 .....................................................................x

28 U.S.C. § 1331 .....................................................................x

31 U.S.C. § 5362 ...............................................................33, 40, 41

Mich. Comp. Laws § 431.308 .................................................10, 11, 12

Mich. Comp. Laws § 431.317 ....................................................10, 42

Mich. Comp. Laws § 431.318 ........................................................10

Mich. Comp. Laws § 750.331 ........................................................42

**REGULATIONS**

Or. Admin. R. 462-220-0020 ........................................................39

**RULES**

Fed. R. App. P. 4 .....................................................................x

**OTHER AUTHORITIES**

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000)............................27

House Fiscal Agency, *Fiscal Focus: Horse Racing in Michigan—A Primer* (June 2017) ....................................................................9, 10

Pari-Mutuel Wagering & Off-Track Betting in Kentucky, Play Kentucky .........................................................................................40

Statement on Signing the Departments of Commerce, Justice, State, the Judiciary, and Related Agencies Appropriations Act, 2001 (Dec. 21, 2000) ...................................................................36

Steve Cady, *Betting on Derby Opens Here Today*, N.Y. Times, Apr. 28, 1971..................................................................................5, 6

Steve Cady, *OTB Payoff is $59*, N.Y. Times, May 2, 1971 .....................5

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

TwinSpires requests oral argument. This case presents important questions about the preemptive scope of the Interstate Horseracing Act and the limited authority of states to regulate interstate pari-mutuel wagering on horseraces.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, because this case presents federal questions arising under the United States Constitution and the Interstate Horseracing Act of 1978, 15 U.S.C. § 3001 *et seq*. Complaint, R.1, PageID.5.

The district court entered its opinion and order granting TwinSpires' motion for a preliminary injunction on February 19, 2025. Opinion, R.19, PageID.474; Order, R.20, PageID.475. Defendants Henry L. Williams, Jr., in his official capacity as the Executive Director of the Michigan Gaming Control Board, and Dana Nessel, in her official capacity as Attorney General of the State of Michigan, timely noticed their appeal on March 11, 2025. Notice of Appeal, R.23, PageID.801; *see also* Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether TwinSpires is likely to succeed in showing that the Interstate Horseracing Act of 1978 preempts Michigan's licensing requirements.

2.      Whether TwinSpires would suffer irreparable injury without a preliminary injunction and whether the public interest would be served by an injunction.

## INTRODUCTION

Congress enacted the Interstate Horseracing Act of 1978 (IHA) to provide an exclusive and uniform national framework for interstate pari-mutuel wagering on horseraces.  In this "limited area," Congress sought to "prevent interference by one State with the gambling policies of another."  15 U.S.C. § 3001.  To that end, Congress mandated that no interstate wager may be accepted "except as provided" in the IHA.  *Id*. § 3003.

Congress created a simple framework.  A betting platform, such as appellee TwinSpires, can accept interstate pari-mutuel wagers on horseraces provided it obtains consent from three entities:

- the racetrack where the horserace is run,

- the state racing commission regulating that track, and

- the state racing commission in the state where the wager is accepted.

15 U.S.C. § 3004.  Thus, for example, TwinSpires may accept wagers for certain horseraces run in Pennsylvania, because it has consent from the Pennsylvania racetrack that "conducts th[ose] horseraces"; from the Pennsylvania State Horse Racing Commission, which has "jurisdiction to regulate the conduct of racing within" Pennsylvania; and from the Oregon Racing Commission, the entity "with jurisdiction to regulate off-track betting" in Oregon, where TwinSpires' hub is

licensed and accepts wagers.  R.11-1, PageID.100-101; 15 U.S.C. §§ 3002(10)-(11), 3004(a).

This appeal arises from Michigan's effort to add a *fourth* required consent— the consent of the state from which the wager is placed.  In the view of the Michigan Attorney General, a betting platform must obtain not only the three consents required by the IHA, but must also obtain a state license from the Michigan Gaming Control Board—and partner with an in-state brick-and-mortar racetrack—before it may accept interstate pari-mutuel wagers placed from Michigan.  Chief Judge Jarbou of the Western District of Michigan correctly held that Michigan's licensing requirements are preempted by the IHA and preliminarily enjoined their enforcement.

Congress enacted the IHA "to protect identifiable national interests" and "in order to further the horseracing and legal off-track betting industries in the United States."  15 U.S.C. § 3001(a)(2), (b).  It did so in response to the growing popularity of interstate pari-mutuel wagering on horseraces—a type of betting in which all bets are pooled and the bettor who picks the winning horse is paid from the pool.  Pari-mutuel wagering has a long and rich history in the United States dating back over a century.  Today, wagerers can place pari-mutuel wagers on horseraces through a website or with a mobile app on their phone.  This means that such wagers are often interstate:  A betting platform located in State A may accept wagers from persons in

States B, C, and D on a horserace occurring in State E. Congress determined that federal action was necessary because this type of interstate wagering led to confusion and disputes over which state's law governed. Was it the state in which the betting platform that accepted the wager was located? Was it the state where the horserace was conducted? Was it the state where the person placing the wager resided? What if there were 1,000 wagerers from 40 different states wagering on the same race? Would the law of a single state govern, or the laws of multiple states? And what to do if state laws were in conflict?

Congress answered these questions through the IHA by enacting the three-consent framework. So long as the betting platform obtains the three consents, it may accept interstate wagers. Michigan's attempt to add an additional consent through its licensing requirements is preempted.

By enacting the IHA, Congress occupied the "limited" field of "interstate off-track wagering on horseraces." 15 U.S.C. § 3001. Congress expressly provided that its three-consent framework was the *only* way that such interstate wagers could be accepted. *See id*. § 3003 ("No person may accept an interstate off-track wager except as provided in this chapter."). Because Congress expressly barred any state regulation of when an interstate off-track wager may be accepted, Michigan's licensing requirements are preempted as a matter of field preemption.

3

The licensing requirements are also preempted as a matter of conflict preemption because they indisputably conflict with the federal scheme. Congress said that a betting platform that obtains the three consents may accept interstate wagers. Michigan, however, says that the three consents are not enough—a betting platform must *also* obtain a license from Michigan before it may accept interstate wagers. Michigan's licensing requirements conflict with federal law because they prohibit wagers that are expressly authorized by federal law.

The district court correctly held that TwinSpires was likely to succeed on the merits of its preemption challenge—and that the remaining equitable factors cut in favor of a preliminary injunction. TwinSpires would suffer irreparable harm if forced to go dark in Michigan. And the public interest supports keeping open the most popular horserace-wagering platform in Michigan rather than shutting it down based on unconstitutional state licensing laws.

The district court did not abuse its discretion in granting a preliminary injunction and its judgment should be affirmed.

## STATEMENT OF THE CASE

### A.    The Interstate Horseracing Act

Pari-mutuel wagering on horseraces has a long and storied history in the United States. "Pari-mutuel" is French for "We wager among ourselves." Congress has defined pari-mutuel as "any system whereby wagers with respect to the outcome

of a horserace are placed with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator."  15 U.S.C. § 3002(13).

In pari-mutuel wagering, every dollar wagered is pooled together by bet type, and—after a certain percentage of each pool is removed as "takeout" (for the entity accepting the wager, the host racetrack, fees, etc.)—the remainder is distributed equally among all winning wagerers.  Instead of trying to beat odds set by a bookmaker, a pari-mutuel wagerer is betting that his pick will do better than other wagerers' picks.  The organizer of a pari-mutuel pool does not have a vested interest in any specific outcome of any particular bet.  The racetrack and other entities that facilitate wagering earn more when there are more wagers from more wagerers, leading to a bigger total wagering "handle" and, accordingly, a bigger takeout.

Historically, pari-mutuel wagering was a purely intrastate activity.  The wagering was done at the racetrack itself.  Bettors would place their bets and then watch the race from the grandstand.

That changed on May 1, 1971, when New York's Off-Track Betting Corporation offered pari-mutuel wagering pools in New York for the Kentucky Derby.  *See* Steve Cady, *Betting on Derby Opens Here Today*, N.Y. Times, Apr. 28, 1971, at 53; Steve Cady, *OTB Payoff is $59*, N.Y. Times, May 2, 1971, at S1.  New York's off-track betting on the race reportedly earned so much that a winning wager

5

"paid three times as much" in New York as that exact same wager paid "on track" at Churchill Downs in Louisville. *See* Cady, *Betting on Derby Opens Here Today*, at 53. This test-case success, coupled with the fact that the potential upside of pari-mutuel wagering increases for all constituents as the size of the wagering pool and number of wagerers increase, demonstrated the vast potential of interstate "off-track" wagering.

The success of interstate wagering on the 1971 Derby kicked off a near decade-long dispute between racetracks, horsemen's associations, and state regulators on whether and how to permit and regulate interstate pari-mutuel wagering. *See Kentucky Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1414 (6th Cir. 1994). Which state or states should have a say in the process? The state from which the wagerer places his bet? The state where the wager is accepted? The state where the horserace is held? Should the group that hosts the horserace have a say? What if the wager was allowed in one state but prohibited in another? Regulating gambling that occurred entirely within a single state at a brick-and-mortar racetrack was one thing. But regulating *interstate* gambling where wagers flow electronically across state lines was quite different. States took very different approaches to gambling and their laws often conflicted with one another, with one state authorizing what another state forbade.

6

In 1978, Congress enacted and President Jimmy Carter signed the Interstate Horseracing Act of 1978 ("IHA") to establish the rules for interstate pari-mutuel wagering on horseraces. Congress stated its purpose upfront: The federal government needed to step in "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(a)(2), (b). Congress found a "need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers" on horseraces. *Id.* § 3001(a)(3). And it determined that the "Federal government should prevent interference by one State with the gambling policies of another." *Id.* § 3001(a)(2). Congress thus created a single federal regulatory framework for *inter*state wagering on horseraces—while leaving the regulation of *intra*state wagering to the states.

The IHA provides the exclusive conditions for accepting an interstate wager on a horserace. It states: "No person may accept an interstate off-track wager except as provided in this chapter." 15 U.S.C. § 3003. The IHA defines "interstate off-track wager" as "a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track

7

betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools."  15 U.S.C. § 3002(3).

The IHA authorizes "off-track betting systems"—those that accept wagers at places other than the track where the race is run—to accept interstate pari-mutuel wagers, so long as the off-track betting system acquires consent from three entities. 15 U.S.C. §§ 3002(7), 3004(a).  Those entities are: (1) the host racing association, the entity that "conducts the horserace subject to the interstate wager," *id.* § 3002(9); (2) the host racing commission, the state entity "with jurisdiction to regulate the conduct of racing within the host State," *id.* § 3002(10); and (3) the off-track racing commission in the "off-track State," the entity "with jurisdiction to regulate off-track betting in" the state in which "the interstate off-track wager is accepted," *id.* § 3002(6), (11).  That is, consent is required from (1) the track where the race is run, (2) the state entity that regulates racing for that track, and (3) the state entity that regulates the off-track betting system that accepts the wagers.  Once those three consents are received, "[a]n interstate off-track wager may be accepted by an off-track betting system."  *Id.* § 3004(a).

The IHA tracks the common law rule that a wager is deemed to occur in the state where the wager is *accepted*—not the state from which the wager is *placed*. *See State ex rel. Reading v. W.U. Tel. Co.*, 57 N.W.2d 537, 539 (Mich. 1953) ("[A]n offer to bet is telegraphed by a person in [Richmond] to another in New York, and

the latter accepts by telegraph, the betting is done, not in Richmond, but in New York, because the offer, being accepted there, takes effect ther[e]." (quotation marks omitted)); *see also Att'y Gen. v. PowerPick Club*, 783 N.W.2d 515, 533 (Mich. Ct. App. 2010) (applying traditional rule).  The common-law rule is reflected in the IHA's third consent requirement—"the off-track racing commission" must give consent.  15 U.S.C. § 3004(a)(3).  The "'off-track racing commission' means that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in that State."  *Id*. § 3002(11).  The reference to "that State" means the "off-track State," which is defined as "the State in which an off-track wager is accepted."  *Id*. § 3002(6).  Thus, consistent with the common law, the IHA requires consent from the state in which the wager is accepted, not the state where the wagerer resides or the state from which the wager is placed.

### B.    Michigan's Horse Racing Law

For much of the state's early history, Michigan banned all forms of gambling. That changed in 1933 when Michigan authorized pari-mutuel wagering on horseracing, making it the first form of legal gambling in the state.  *See* House Fiscal Agency, *Fiscal Focus: Horse Racing in Michigan—A Primer*, at 2, (June 2017), https://tinyurl.com/3rsynxee.  The first race meet with pari-mutuel wagering occurred at the State Fairgrounds in Detroit on September 2, 1933.  *Id.*

9

For the next 40 years, pari-mutuel wagering would be the only form of legal gambling in the state. *Fiscal Focus* at 3. But attendance at horseraces in Michigan gradually declined. That led the legislature in 1986 to authorize racetracks to simulcast and accept pari-mutuel wagers on out-of-state horseraces. *See* P.A. 1986, No. 108.

In 1995, Michigan repealed its existing laws regulating horseracing and enacted the Horse Racing Law to govern horseracing and pari-mutuel wagering at Michigan racetracks. *See* P.A. 1995, No. 279. The Law authorized state officials to issue "[r]ace meeting licenses . . . to conduct live horse racing, simulcasting, and pari-mutuel wagering on the results of live and simulcast horse races . . . in this state." Mich. Comp. Laws § 431.308(1)(b). It also authorized state officials to issue "[t]rack licenses" "to maintain or operate a racetrack at which 1 or more race meeting licensees may conduct licensed race meetings." Mich. Comp. Laws § 431.308(1)(c). And it allowed "full card" simulcasting, authorizing in-state racetracks to televise and accept wagers on a full day's slate of out-of-state races. Mich. Comp. Laws § 431.318(2).

In 2019, Michigan amended its Horse Racing Law to provide that: "Only a race meeting licensee or its contracted licensed third-party facilitator may process, accept, offer, or solicit wagers on the results of live or simulcast horse races as determined and approved by the racing commissioner." Mich. Comp. Laws

§ 431.317(10).  For the first time, the legislature required that out-of-state off-track betting systems—"third-party facilitators," in the words of the statute—obtain a license from Michigan in order to accept wagers from Michigan residents.  And in order to obtain a license, the third-party facilitator "must have a joint contract with all race meeting licensees and certified horsemen's organizations in this state."  *Id.* § 431.308(1)(d)(i).  In short, Michigan required the third-party facilitator to partner with all in-state brick-and-mortar racetracks and horsemen's organizations before it could accept wagers from Michigan residents.

### C.    TwinSpires' Michigan Operations

Named for the iconic twin spires on the grandstand at Churchill Downs racetrack, TwinSpires—a business unit of Churchill Downs Incorporated—is one of the largest and most successful wagering platforms in the United States.  R.11-1, PageID.97; R.11-2, PageID.115-20.  Wagerers on the TwinSpires platform fund an account from which they place interstate pari-mutuel wagers on horseraces via telephone; the Internet, at twinspires.com; or more recently (and popularly) on mobile apps.  R.11-1, PageID.101-02.  The TwinSpires platform also offers live streaming of horseraces, replays, and an assortment of horseracing-related information.  R.11-2, PageID.117.

TwinSpires has been licensed since 2007 by the Oregon Racing Commission as a multi-jurisdictional simulcasting and interactive wagering hub residing in the

state of Oregon.  R.11-3, PageID.231; R.11-1, PageID.99.  Through its Oregon hub, TwinSpires offers advance deposit wagering to wagerers in states around the country.  With advance deposit wagering, customers fund their account first—*i.e.*, in advance, before they wager—rather than operate on credit.  *See* R.11-1, PageID.100.

TwinSpires began offering interstate pari-mutuel wagering to Michiganders around 2010.  R.11-1, PageID.101, 103.  When Michigan amended the Horse Racing Law in 2019, TwinSpires promptly obtained a "third-party facilitator" license. TwinSpires had consistently maintained in communications to Michigan regulators that it did not need a state license to accept interstate wagers from Michiganders. R.11, PageID.71.  Nonetheless, TwinSpires obtained a license in order to support the Michigan horseracing industry and ensure that Michiganders had the opportunity to continue placing wagers without disruption.

TwinSpires thus entered "a joint contract with all race meeting licensees and certified horsemen's organizations in th[e] state."  Mich. Comp. Laws § 431.308(1)(d)(i).  TwinSpires partnered with the only racetrack remaining in Michigan—Northville Downs—and the certified horsemen's associations.  R.11-1, PageID.104-05.  In exchange for Northville Downs agreeing to serve as TwinSpires' in-state partner, TwinSpires contractually agreed to give Northville Downs a share of all money wagered by Michiganders on the TwinSpires platform.  *Id.*

12

TwinSpires obtained a third-party facilitator license from Michigan in 2020 and successfully renewed it through 2024, with Northville Downs as its in-state partner.  R.11-1, PageID.72.  Throughout this time, TwinSpires has been the most popular platform for online horseracing wagering in Michigan.  In 2024, nearly 18,000 Michigan residents were active users of the platform, wagering more than $48.5 million.  R.11-1, PageID.103.  Michigan residents have trusted their wagers with TwinSpires, as the company has consistently outperformed competing betting platforms and earned significant customer goodwill.  *Id.*

### D.     The Licensing Dispute

This dispute arose in late 2024 as TwinSpires was anticipating the renewal of its third-party facilitator license.  The Michigan Gaming Control Board advised TwinSpires that so long as TwinSpires submitted its renewal application by the end of November, its "license w[ould] remain active until a decision is made on the 2024 renewal application" and TwinSpires would remain in "good standing" in Michigan.  R.11-6, PageID.255.   TwinSpires accordingly submitted its application on November 26.

Despite the Board's assurances, the Board informed TwinSpires on December 23 that—even though TwinSpires' renewal application was timely filed and pending—TwinSpires must shut down its Michigan operations and stop accepting wagers from Michiganders.  R.11-1, PageID.73-74.  The Board stated that Northville

Downs, which was in the process of relocating its racetrack, no longer had a valid race meeting license under Michigan law. *Id.* Thus, the Board concluded, because TwinSpires no longer had the necessary in-state partner, "on January 1, 2025 at 12:00am, all account wagering with Michigan account holders must cease." *Id.*

TwinSpires responded to the Board on December 31, explaining that because the IHA preempted Michigan's licensing requirements, the Board had no authority to order TwinSpires to shut down. R.11-1, PageID.73-74.

On January 3, 2025, the Board replied. R.1, PageID.16 ¶ 45. It did not dispute that TwinSpires satisfied the IHA's requirements for offering interstate pari-mutuel wagers on horseraces. *Id.* Instead, the Board stated that if TwinSpires continued to operate in Michigan, it would be "subjecting [it]self to administrative, civil, and criminal penalties." *Id.* On January 6, the Board again demanded that TwinSpires shut off its wagering platform in Michigan, concluding with the threat that "things would get worse" for TwinSpires unless it complied. *Id.* at PageID.17, ¶ 46. On January 7, the Board announced that it had "summarily suspended" TwinSpires' license. *Id.*

### E.    Proceedings Below

On January 12, TwinSpires sued in the Western District of Michigan. TwinSpires argued that the IHA preempts Michigan's licensing requirements (and

also brought a claim under the dormant Commerce Clause that is not at issue in this appeal). *See* R.1.

On February 19, the district court granted TwinSpires a preliminary injunction, enjoining "the Executive Director and the Attorney General from enforcing" Michigan's licensing requirements "or issuing sanctions under [Michigan's Horse Racing Law] against TwinSpires for accepting wagers from individuals in Michigan on races that take place outside Michigan." R.19, PageID.474.

The court held that "[t]he IHA provides the exclusive procedure to accept an interstate off-track wager." R.19, PageID.469. "When a wager is placed in Michigan, but the wager is placed on an out-of-state race, and the wager is accepted out-of-state, TwinSpires does not need [Michigan's] consent." *Id*. The court explained that "Congress established an exclusive, uniform process through which off-track betting systems could accept interstate off-track wagers" and "[t]he IHA prohibits states from adding supplemental requirements." *Id*. Because "[b]y establishing this complete, exclusive regulatory structure, Congress occupied the field of regulating interstate off-track wagering" and Michigan's licensing requirements were therefore preempted. *Id*.

The court also found that TwinSpires "face[d] a concrete and imminent threat of state action forcing it to cease operations in Michigan," posing "an

unconstitutional intrusion on TwinSpires's rights."  R.19, PageID.472.  And TwinSpires demonstrated it would lose "customer goodwill and its competitive market share" if forced to shut down in Michigan.  *Id.*  And as to the remaining public interest factor, here too the court concluded that "the balance weighs in TwinSpires's favor."  *Id*.

The Attorney General waited for nearly a month before asking the district court to stay the preliminary injunction.  *See* R.31.  The court denied a stay in an opinion that again rejected the Attorney General's arguments on IHA preemption.  *See* R.36, PageID.941-49 ("the IHA establishes the exclusive regulatory framework for the limited area of interstate off-track wagers on horse races, and [Michigan] cannot supplement or supplant it").  The court later denied the Attorney General's motion to dismiss in a third opinion that, once again, rejected these arguments.  *See* R.43, PageID.981 (stating that the Attorney General's "attempted enforcement of the [licensing requirements] is akin to adding an additional consent requirement, one that runs contrary to the IHA's exclusive requirements" (citation omitted)).

## SUMMARY OF ARGUMENT

The district court correctly held that TwinSpires is likely to succeed on the merits, that it will suffer irreparable harm absent relief, and that the public interest weighs in favor of a preliminary injunction.  This Court should affirm.

16

**I.**    The IHA preempts Michigan's licensing requirements, both as a matter of field preemption and conflict preemption.  The Attorney General's reading of the IHA is mistaken.

**A.**    The IHA occupies the field of interstate off-track wagering on horseraces.  Congress enacted a comprehensive framework specifying the exclusive way that interstate pari-mutuel wagers may be accepted.  Congress prohibited acceptance of such wagers "except as provided in [the IHA]" and provided that such wagers "may be accepted by an off-track betting system *only if* consent is obtained" from three entities:  the racetrack hosting the horserace, the state racing commission that regulates that track, and the state racing commission in the state where the wager is accepted.  15 U.S.C. §§ 3003, 3004 (emphasis added).  The text of the statute leaves no room for state regulation in this "limited area" where Congress found a "need for Federal action."  *Id*. § 3001(a)(3).

**B.**    Michigan's licensing requirements conflict with the IHA and are preempted for this reason as well.  The licensing requirements stand in logical contradiction to the IHA; they pose an obstacle to the congressional purpose; and they interfere with the methods Congress chose to achieve its objectives.  Congress gave betting platforms a precise path for lawfully accepting interstate wagers on horseraces—get the requisite three consents and you're good—but Michigan's licensing requirements block that path by superimposing the additional requirement

17

of a Michigan license.  Because the two schemes conflict, the state law must give way.

C.    The Attorney General's defense of the licensing requirements misreads the IHA.  Congress did not secretly embed a fourth consent requirement in the definitional section of the statute by defining an interstate wager as a "legal" wager or a pari-mutuel wager that is "lawful in each State involved."  15 U.S.C. § 3002(3).  The "State[s] involved" are simply the states whose consent is required under the IHA—and Congress did *not* "involve[ ]" the state from which the wager is placed by giving it a consent right.  And even if the IHA could be read to require that the type of wager be legal in the state from which the wager is placed, pari-mutuel wagering is legal in Michigan.  The Attorney General further errs in emphasizing Michigan's interest in regulating gambling.  To be sure, Michigan has broad authority to regulate *intra*state pari-mutuel wagering, but as to *inter*state pari-mutuel wagering, Congress gave consent rights to the state where the horserace is run and the state where the wager is accepted, consistent with the common law rule that wagers are deemed made in the state where they are accepted.  Finally, the district court did not create conflicts with other federal statutes and correctly stated Michigan law.

**II.**    The remaining factors weigh strongly in favor of a preliminary injunction.

18

A.    The district court did not clearly err in finding that TwinSpires would suffer irreparable harm absent a preliminary injunction.  TwinSpires would be forced to immediately shut down in Michigan, destroying its goodwill with customers and eliminating its market share.  It would also sustain a violation of its rights under federal law caused by an unconstitutional statute.  The Attorney General argues that TwinSpires waited too long to seek a preliminary injunction, but as the district court found, TwinSpires moved within 10 days of receiving a shutdown order—the moment its harm became certain and immediate.

B.    The district court did not clearly err in finding that the public interest supports a preliminary injunction.  The public interest weighs against enforcement of an unconstitutional law, and in favor of allowing thousands of Michiganders to continue using the state's most popular platform for wagering on horseraces.

## STANDARD OF REVIEW

This Court reviews a "district court's ultimate decision whether to grant a preliminary injunction for abuse of discretion." *Tennessee v. U.S. Dep't of Educ.*, 104 F.4th 577, 607 (6th Cir. 2024).  Under this standard, the Court "review[s] the district court's legal conclusions de novo and its factual findings for clear error." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (citation omitted).  This is a "highly deferential" standard of review.  *Id*. (citation omitted).  "[O]nly if the district court relied upon clearly

19

erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard" should this Court disturb the district court's decision. *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007). "Practically speaking, this means when" the Court "look[s] at likelihood of success on the merits, [it] independently appl[ies] the Constitution, but [it] still defer[s] to the district court's overall balancing of the four preliminary-injunction factors." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (quotation marks omitted).

## ARGUMENT

The district court acted well within its discretion in granting a preliminary injunction, and its order should be affirmed.  When reviewing a grant of a preliminary injunction, this Court "evaluate[s] the same four factors that the district court does." *Doe*, 872 F.3d at 399.  The Court asks: "whether the plaintiff[] will likely win down the road, whether an injunction would prevent the plaintiff[] from being irreparably harmed, whether an injunction would harm others, and how the injunction would impact the public interest." *McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 994 (6th Cir. 2019).  "[I]n the case of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Doe*, 872 F.3d at 399 (quotation marks omitted).

20

## I.       TwinSpires Is Likely To Succeed On The Merits.

The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2. "Accordingly, it has long been settled that state laws that conflict with" or otherwise interfere with federal law, *Mut. Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 479-80 (2013), are "without effect," *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). State statutes are displaced even when the federal statute lacks an express preemption clause.  *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621 (2011) ("The Supremacy Clause, on its face, makes federal law 'the supreme Law of the Land' even absent an express statement by Congress.").

TwinSpires is likely to succeed on its claim that the IHA preempts Michigan's licensing requirements.   Federal law impliedly preempts state law in two circumstances—when federal law occupies the relevant field, and when federal law and state law conflict.   Field and conflict preemption are not "rigidly distinct." *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021) (citation omitted).  Here, TwinSpires has demonstrated that it is likely to prove both field and conflict preemption.

### A.    The IHA Preempts The Field Of Interstate Off-Track Wagering On Horseraces.

By enacting the IHA, Congress occupied the field of interstate off-track wagering on horseraces.  If "Congress, acting within its proper authority, has determined" that an area "must be regulated by its exclusive governance," federal law preempts any state law in that area.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  In such cases, the "framework of regulation [is] so pervasive that Congress left no room for the States to supplement it," or Congress otherwise established that it considered the federal interest "so dominant" as to "preclude enforcement of state laws on the same subject."  *Id.*; *see also Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 641 (2012).

The beginning of any field preemption analysis is the text of the federal statute.  *See Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019).  As the district court correctly found, the IHA's plain language establishes that "Congress occupied the field of regulating interstate off-track wagering."  R.19, PageID.465.  The IHA provides a "comprehensive" "statutory framework" for such wagering.  *Arizona*, 567 U.S. at 401.  It expressly prohibits any person from "accept[ing] interstate off-track wager[s] except as provided in this chapter."  15 U.S.C. § 3003.  The IHA then provides that interstate off-track wagers "may be accepted by an off-track betting system *only if* consent is obtained" from three entities: (1) the racetrack

22

hosting the race, (2) the state racing authority governing the race, and (3) the off-track betting regulator in the state where the wager is accepted.  15 U.S.C. § 3004(a) (emphasis added).

"The plain language of [the IHA] makes clear that the IHA exclusively regulates interstate wagering."  R.19, PageID.466 (quotation marks omitted).  The IHA alone establishes the "absolute condition precedent to off-track wagering across state lines." *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*, 989 F.2d 1266, 1270-71 (1st Cir. 1993).  By setting out the "only" means for accepting interstate wagers (as Congress otherwise banned them, 15 U.S.C. § 3003), Congress "foreclose[d] any state regulation in th[is] area, even if it is parallel to federal standards." *Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (quoting *Arizona*, 567 U.S. at 401)).  Just as the Supreme Court explained in *Arizona*, when a federal statute "provide[s] a full set of standards" sufficient to "govern[]" a field, that "reflect[s] a congressional decision" to preempt state law—even without including an express preemption provision.  *Arizona*, 567 U.S. at 401; *see also Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 99 (2017) ("[W]e do not require Congress to employ a particular linguistic formulation when preempting state law.").  After all, "[i]f states could add additional consent requirements, it would defeat Congress's pronounced purpose to 'prevent interference by one State with the gambling policies of another.'"  R.19, PageID.460 (quoting 15 U.S.C. § 3001(a)).

The district court's conclusion mirrors the conclusion reached by the court in *Horsemen's Benevolent & Protective Ass'n, Inc. v. Zonak*, 2008 WL 11453695 (S.D. Ohio Sept. 23, 2008). There, the court concluded that "the IHA provisions that govern the procurement of consent from necessary parties leave no room for supplementation by the state," and it is "clear that Congress intended to occupy the entire field of interstate horserace wagering." *Id*. at *5. This Court affirmed on the alternative ground—conflict preemption—identified by the district court. *See Horseman's Benevolent & Protective Ass'n v. DeWine*, 666 F.3d 997 (6th Cir. 2012).

There can be no doubt as to the field Congress "ousted the States from regulating." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Congress defined the field in the IHA: "[I]n the limited area of interstate off-track wagering on horseraces, there is a need for Federal action." 15 U.S.C. § 3001(a)(3). In this "limited" field, Congress made the considered judgment that the consent of the three specified entities—two state authorities and one private association—would be both necessary and sufficient for wagering to occur. This is the approval process Congress designed "to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers." 15 U.S.C. § 3001(a)(3). Allowing the states themselves to regulate in this field would destroy the carefully-designed federal scheme.

The IHA occupies the field of interstate off-track wagering on horseraces. Michigan's licensing requirements—which provide that a wagering platform cannot

accept interstate off-track wagers on horseraces unless the platform partners with Michigan racetracks and horsemen's associations and obtains a license from the Michigan Gaming Control Board—are therefore preempted.

### B. Michigan's Licensing Requirements Are Also Preempted Because They Conflict With The IHA.

The IHA preempts Michigan's licensing requirements for an additional reason: Michigan's requirements conflict with federal law. A state law that "imposes restrictions that conflict with the federal law" is preempted. *Murphy*, 584 U.S. at 477. In other words, "federal law pre-empts state-law" when the "two are in logical contradiction." *Garcia*, 589 U.S. at 214 (Thomas, J., concurring) (citation omitted); *see also CTIA - The Wireless Ass'n v. Kentucky 911 Servs. Bd.*, 727 F. Supp. 3d 641, 654 (E.D. Ky. 2024) (applying logical contradiction test). State law can also be preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399, or "interferes with the methods by which the federal statute was designed to reach [its] goal," *Verizon North Inc. v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002) (quotation marks omitted).

As noted above, in *Horseman's Benevolent*, 666 F.3d at 1001, this Court held that an Ohio statute was preempted because it conflicted with the IHA. The statute "allow[ed] a host racing association to consent to interstate off-track betting in the

absence of a written agreement with the horsemen's group." *Id.* at 1000. Although the IHA provides that the host racing association's consent may only be given if it has "a written agreement with the horsemen's group," 15 U.S.C. § 3004(a), Ohio sought to superimpose its own law modifying the IHA's consent requirements. The Court noted that the Ohio statute provided for "consent to off-track wagering through a different process" and held that "Federal law preempts this alternative path." 666 F.3d at 1001.

The same is true here. Just as in *Horseman's Benevolent*, the state law conflicts with the IHA because it purports to establish an "alternative path" for obtaining the requisite consents to accept interstate wagers. Under well-settled standards for conflict preemption, Michigan's licensing requirements are preempted because they are in logical contradiction to the IHA, they stand as an obstacle to the congressional purpose, and they interfere with the methods by which the IHA was designed to reach its goal.

Michigan's licensing requirements are in logical contradiction to the IHA because they would impose a fourth consent requirement on platforms seeking to offer interstate pari-mutuel wagering on horseracing. The IHA says, "Once you have obtained the three consents, you may accept interstate wagers." Michigan says "Once you have obtained the three consents, you may *not* accept interstate wagers. You need to obtain our consent too." The two schemes are logically contradictory.

26

A fourth consent is "not the system Congress created." *Arizona*, 567 U.S. at 408; *see also* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 261 n.107 (2000) ("additional [state] conditions" must give way when "federally recognized conditions" are exclusive).

Michigan's licensing requirements also stand as an obstacle to the IHA's purpose and objective. Congress intended to set the rules under which off-track betting systems could accept interstate wagers, and designed a process in which two states (the state where the wager is accepted and the state that hosts the horserace) have a say. The congressional purpose of confining regulatory authority to these two states is frustrated if a third state (the state from which the wager is placed or the state where the wagerer resides)—*i.e.*, a state that Congress *declined* to give a say in the process—is permitted to interfere and prohibit the wager. Although the Attorney General points to the IHA's recognition that "States should have primary responsibility for determining what forms of gambling may legally take place within their borders," 15 U.S.C. § 3001(a)(1), that policy does not support the Attorney General's position here. The IHA recognizes, consistent with the common law, that gambling takes place in the state where the wager is accepted—in this case, Oregon, where TwinSpires' multijurisdictional hub is located and licensed—not the state from which the wager was placed.

27

Michigan's licensing requirements also "interfere[] with the methods by which the [IHA] was designed to reach [its] goal." *Verizon North Inc. v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002) (quotation marks omitted).  There can be no serious dispute that Michigan's licensing requirements interfere with the IHA's method of authorizing interstate wagering.  The licensing requirements purport to render the IHA's method *insufficient* for a platform to accept interstate wagers.  A platform that has obtained the three IHA consents would not be able to offer or accept interstate wagers in Michigan until it has contracted with in-state partners and obtained a Michigan license.  That is clear and indisputable "interference with the [IHA's] methods." *Id*.

The conflict between the IHA and Michigan's licensing requirements is further illustrated by the IHA provisions giving a cause of action to sue for IHA violations.  Congress provided that the "host State"—i.e., the state where the horserace is run—could "commence a civil action against any person" who "accept[s] any interstate off-track wager in violation of" the IHA.  15 U.S.C. §§ 3005, 3006.  Congress also gave the host racing association and the relevant horsemen's group a cause of action.  *Id*.  But Congress did *not* give the state where the wagerer resides, or the state from which the wager was placed, a cause of action.  This was deliberate, as "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Mik v. Fed.*

28

*Home Mortg. Corp.*, 743 F.3d 149, 160 (6th Cir. 2014) (quotation omitted).  If Congress contemplated that the wagerer's home state had a say in approving the wager, it would have given that state a cause of action under the IHA.  But it did not. This further demonstrates the conflict between the IHA scheme and Michigan's licensing requirements.

The Attorney General claims that two courts have supposedly "recognized" that there is no conflict between the IHA and "traditional state licensing and regulatory authority over gambling."  Defs' Br. 48.  But those cases—*Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1027 (9th Cir. 2020) and *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 479 F.3d 1310, 1312 (11th Cir. 2007)—addressed state laws concerning the simulcasting of races at locations within the relevant state, not state efforts to regulate interstate wagering. As this Court has explained, the IHA "regulates interstate wagering, not simulcasting" and "does not even mention simulcasting."  *Turfway*, 20 F.3d at 1412.

Amicus Arizona Department of Gaming misreads *Monarch*.  When the Ninth Circuit described the "off-track betting commission" as "the racing commission in the state where the off-track wager is placed," 971 F.3d at 1026, in that case the relevant wagers were both placed and accepted *in the same state* so the issue presented in this case—where wagers placed in Michigan are accepted in Oregon— did not even arise in that case.  The Ninth Circuit obviously was not intending to

rewrite the IHA contrary to the statutory text.  Likewise, when the court said "the IHA gives four statutory consents," 971 F.3d at 1028, it was counting the racetrack consent as two consents (rather than one) because a racetrack cannot provide consent without the "horsemen's group" agreeing as well.  *Id.*; *see* 15 U.S.C. § 3004(a)(1)(A) ("a written agreement with the horsemen's group" is a "condition precedent" to a racetrack's consent).  *Monarch* is fully consistent with the district court's decision below.

Finally, although state laws may also be preempted when compliance with both federal and state law is impossible, TwinSpires is not claiming impossibility preemption here.  Rather, TwinSpires is arguing that there is a conflict because it is engaging in conduct that is expressly authorized by federal law but purportedly prohibited under state law.  And when "federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior."  *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 319 (2019) (Thomas, J., concurring).

## C.    The Attorney General's Arguments Are Meritless.

The Attorney General's defense of the licensing requirements rests on a misreading of the IHA.

1.    **The IHA does not contain a hidden fourth consent requirement.**

The Attorney General's main argument is that Congress secretly embedded a *fourth* consent requirement—consent from the state where the wager is placed—within a subclause of the definition of "interstate off-track wager." Under the IHA, an "interstate off-track wager" is:

> a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools.

15 U.S.C. § 3002(3). The Attorney General says the phrase "lawful in each state involved" refers to the host track state, the off-track state—*and* the state from which the wager was placed. Defs' Br. 38-39. The phrase was added to the definition through an amendment in 2000. *See* Pub. L. 106–553.

The Attorney General's reading is not plausible because Congress would not have enacted a fourth consent requirement this way. It is a canon of statutory construction that Congress does not "alter[] fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Sackett v. EPA*, 598 U.S. 651, 677 (2023). If Congress wanted to add a fourth consent requirement, it would simply have included the requirement alongside the existing three consent requirements in section 3004. It would not have done so in such an obscure and elliptical manner,

31

especially in a statute specifying the precise steps a wagering platform must take to ensure it is complying with federal law.

The correct, common-sense reading of "lawful in each state involved" is that it refers to the states "involved" in providing the requisite consents under section 3004—that is, the state where the wager is accepted, and the state where the horserace is conducted. The IHA does not require the consent of the state from which the wager was placed, so that state is not "involved" within the meaning of section 3002(3). *See Pulsifer v. United States*, 601 U.S. 124, 141 (2024) (courts must "review[] text in context"). It is not in the definitional provisions of "host state" or "off-track state," § 3002; it is not in the enforcement provision, § 3006(a); and it is not in the venue provision, § 3007(b). All of these provisions specify the rights and roles of the states "involved" in the consent process, but Congress did not "involve[]" the state from which the wager is placed. The Attorney General suggests that by saying "each state involved" instead of "both states involved," Congress recognized that three states could be "involved," not just two. Defs' Br. 40. But by using "each" rather than "both," Congress recognized that lawfulness is a determination that each state makes individually, rather than a joint determination that both states make together.

If Congress wanted to prohibit interstate wagers that are unlawful in the state from which the wager is placed, it knew how to do so. For example, in the Unlawful

Internet Gambling Enforcement Act of 2006 (UIGEA), "unlawful Internet gambling" includes wagers made unlawful "under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). But Congress did not include such a provision in the IHA. In fact, Congress expressly exempted IHA wagers from the restrictions imposed by UIGEA. *See id.* § 5362(10)(B)(iii).

The district court construed the "lawful in each state involved" language as meaning that the type of wager—i.e., a pari-mutuel wager placed on a horserace—must be lawful in the state from which the wager is placed. *See* R.19, Page ID.454-556. Even if this were the correct reading, the outcome in this case is the same because pari-mutuel wagers on horseraces are lawful in Michigan. *See infra*, at 42-43.

The Attorney General also relies on the definition of "parimutuel." Defs' Br. 37-38. The IHA defines "parimutuel" as "any system whereby wagers with respect to the outcome of a horserace are placed with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator." 15 U.S.C. § 3002(13). The Attorney General says the phrase "licensed or otherwise permitted to do so under State law" means the entity accepting the interstate wager must be licensed in all states from which it accepts wagers. But that is not correct. The

33

definition's reference to a singular "State law" tracks the third consent requirement in section 3004—that the off-track betting system must receive consent from the single state where the wager is accepted. *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 151 (2017) ("text, context, and structure" demonstrated that when Congress used a term in the "singular, it meant singular").

Congress "is understood to legislate against a background of common-law . . . principles," *Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010) (quotation marks omitted), and its approach in the IHA is consistent with the common law rule that wagers are deemed made in the state in which they are accepted—not the state from which they were placed. *See United States v. Truesdale*, 152 F.3d 443, 447 (5th Cir. 1998). As the Michigan Supreme Court has explained, "an offer to bet" in Michigan that is "accepted" in New York "takes effect" in New York, not Michigan. *State ex rel. Reading v. W.U. Tel. Co.*, 57 N.W.2d 537, 539 (Mich. 1953). The IHA retains the substance of the common law rule by giving the state in which the wager is accepted—but not the state from which the wager is placed—the prerogative to consent. Although the Attorney General notes this Court's statement that "[u]nder the Act, each state may prohibit interstate off-track wagering within its borders," this Court was referring to the undisputed consent right of the *host* state as the entity supervising racetracks *within* a state—not some new grant of authority to states like Michigan where a wager is placed, but not accepted. *Turfway*, 20 F.3d at 1414. That

34

decision thus offers no support for the Attorney General's interpretation, which goes against both the text of the IHA and the background common law principles that informed the congressional design.

Finding little support in the text of the statute or this Court's precedents, the Attorney General looks to legislative history. Of course, "legislative history is not the law. 'It is the business of Congress to sum up its own debates in its legislation,' and once it enacts a statute '[courts] do not inquire what the legislature meant; we ask only what the statute means.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (quoting *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring)). And the legislative history the Attorney General relies on is dubious at best. For instance, the Attorney General cites a floor statement from Representative Wolf during a debate over the 2000 amendments. But Representative Wolf voted against the 2000 amendments, so it is unclear why his comments would be a helpful interpretive guide to their meaning. *See Bryan v. United States*, 524 U.S. 184, 196 (1998) ("[t]he fears and doubts of the opposition are no authoritative guide to the construction of legislation." (quoting *Schwegmann*, 341 U.S. at 394)). In any event, "a statute's application to advancing technology is ultimately a question of the provisions of the law, not the concerns of the legislators who enacted it"—or in this case, voted against it. *United States v. Sammons*, 55 F.4th 1062, 1072 (6th Cir. 2022) (cleaned up).

Amici cite language from a 2000 Senate Conference Report.  But language placed in "[t]he Congressional Record or committee reports are used to make words appear to come from Congress's mouth which were spoken or written by others (individual Members of Congress, congressional aides, or even enterprising lobbyists)." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 73 (2004) (Scalia, J., dissenting).  Amici's heavy reliance on legislative history is exactly what the Supreme Court had in mind when it cautioned against such reliance as an "exercise in looking over a crowd and picking out your friends." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (quotation marks omitted).  For example, in his signing statement approving the 2000 amendments, President Clinton made no reference to the state from which the wager is placed.  *See* President William J. Clinton, Statement on Signing the Departments of Commerce, Justice, State, the Judiciary, and Related Agencies Appropriations Act, 2001 (Dec. 21, 2000), https://tinyurl.com/3nfucszu.  Neither the Attorney General nor amici cite this piece of legislative history.  This Court should reject their invitation to wade through isolated and cherry-picked snippets to divine meaning and instead focus on the enacted text.  *See Epic Sys. Corp.*, 584 U.S. at 523.

### 2.    The IHA respects and preserves state authority.

The Attorney General argues that the district court did not give sufficient weight to Michigan's interest in regulating gambling.  *See* Defs' Br. 24-30.  But

Congress respected the right of states to regulate *intra*state gambling—that is, gambling that occurs entirely within the state's borders. *See* 15 U.S.C. § 3001(a)(1) ("the States should have the primary responsibility . . . within their borders"). As to *inter*state gambling, Congress similarly respected state authority by giving a consent right to the state in which the wager was accepted, as well as to the state in which the horserace was conducted. *See id.* § 3004. Although Michigan believes a *third* state—the state from which the interstate wager was placed—should also be given a consent right, that is not the scheme Congress designed.

The Attorney General claims that the district court erred by not applying a presumption against preemption. Defs' Br. 24-27. But a presumption cannot override the statutory text. *See Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001) ("that presumption can be overcome where, as here, Congress has made clear its desire for pre-emption."); R.36, PageID.942 (Congress "explicitly establishe[d], in a clear and manifest manner, that the IHA's regulatory scheme supersedes state powers in the limited area of interstate off-track wagers").

Moreover, as the Attorney General acknowledges, the presumption against preemption has typically been applied "where Congress has legislated in a field the States have traditionally occupied." Defs' Br. 24. Here, however, the field in question is "the limited area of interstate off-track wagering on horseraces." 15 U.S.C. § 3001(a)(3). And that is not a field that has been traditionally occupied by

the states.  To the contrary, when Congress enacted the IHA in 1978, interstate off-track wagering on horseraces was *new*.  It began in 1971 with a New York track offering wagers on the Kentucky Derby.  *See supra*, at 5-6.  There is no tradition of state regulation of interstate off-track wagering on horseraces that could trigger application of a presumption against preemption.  Instead, Congress has been active in the field from the beginning.  *See United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n assumption of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence.").

The Attorney General contends that the IHA cannot preempt Michigan law when Congress neither created a federal regulatory agency to supervise interstate pari-mutuel wagering nor adopted specific regulations governing such wagering.  Defs' Br. 33.  But that is not the test for preemption.  Congress is not required to create a new federal agency and promulgate regulations any time it wishes to preempt state law.  Although the Attorney General suggests that interstate wagering might occur without any state input or oversight, *id*., that is not the case, as the IHA expressly *requires* state consent before such wagering may occur.  Indeed, the wagers must be "lawful" in the states involved.  *See* 15 U.S.C. § 3002(3).  This dispels the Attorney General's suggestion that unless Michigan can regulate here, there will be no "laws governing the actual wagering."  Defs' Br. 32.  The Attorney General's real complaint is not that Congress has offended principles of federalism

38

by cutting states out of the picture; it is that Congress did not design a different framework that gave consent rights to the state from which the wager was placed. That is an argument the Attorney General should present to Congress rather than the courts.

The Attorney General also argues that because TwinSpires accepts interstate wagers through its Oregon hub, "the question whether the wager may be legally placed from Michigan is left up to Oregon." Defs' Br. 35. But as the Attorney General admits, the Oregon Racing Commission respects applicable laws in other states in deciding whether certain wagers can be accepted. *Id*. (quoting Or. Admin. R. 462-220-0020). Moreover, Michigan retains full authority to regulate wagers placed on races occurring in Michigan. The IHA merely limits Michigan's ability to regulate wagers accepted in other states on horseraces occurring in other states. That a Michigander happened to place the wager in another state does not empower Michigan to extend its authority beyond its borders and regulate the transaction. That would amount to "interfer[ence] . . . with the gambling policies of" the other states. 15 U.S.C. § 3001(2).

Finally, the Attorney General quotes the observation from *Murphy*, 584 U.S. at 484 (2018), that there is a "coherent federal policy" of respecting state policy choices on sports betting. Defs' Br. 28. But pari-mutuel wagering on horseraces is not sports betting. *See* 31 U.S.C. § 5362(10)(B)(iii)(I) (exempting IHA wagers from

sports betting regulations); *see also* Pari-Mutuel Wagering & Off-Track Betting in Kentucky, Play Kentucky, https://www.playkentucky.com/pari-mutuel/.  With pari-mutuel wagering, the wagering system takes a fixed percentage of the pool of wagers, regardless of who wins or loses.  But in sports betting, the bookmaker or the "house" sets fixed odds and the house wins when a bettor loses, creating different incentives for the bookmakers and different regulatory risks.  It is not surprising that Congress would regulate these distinct industries in different ways.

In any event, whatever may have been the federal policy underlying the sports betting statute at issue in *Murphy*, in this case Congress has expressly identified the federal policy underlying the IHA: "It is the policy of the Congress in this chapter to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(b).  Congress found "a need for Federal action" to advance that policy by enacting the IHA and preempting state law.  *Id.* § 3001(a)(3).

### 3.    The IHA does not conflict with the Wire Act and UIGEA.

The Attorney General says the district court's ruling "create[s] a risk of conflict" with the Wire Act and the UIGEA.  *See* Defs' Br. 44-47.  Not so.

As to the Wire Act, the 2000 amendments to the IHA clarified that interstate pari-mutuel wagering on horseracing is lawful, so long as the necessary consents are obtained, thus putting beyond all doubt that transmitting such wagers, and

information enabling the wagers to be placed, are not prohibited by the Wire Act. *See* 15 U.S.C. § 3002(3). And even if there were a conflict between the two statutes, the IHA's more specific provisions would control. *See United States v. Hunter*, 12 F.4th 555, 567 (6th Cir. 2021) ("the specific provision is construed as an exception to the general one") (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)); *accord Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). In any event, the purported conflict over the transmission of information relating to wagers is not implicated by this case.

As to UIGEA, that statute expressly exempts interstate wagers under the IHA from its coverage. *See* 31 U.S.C. § 5362(10)(B)(iii)(I). The Attorney General points to subsection 5362(10)(D)(ii), but that provision says "nothing *in this subchapter* may be construed to preempt any State law prohibiting gambling" (emphasis added). Here, of course, the question is whether the IHA, not a subchapter of UIGEA, preempts Michigan's licensing requirements.

### 4. The district court correctly stated Michigan law.

The Attorney General claims the district court "incorrectly noted that Michigan does not have 'consumer-side prohibitions' on the act of placing a wager." Defs' Br. 42-44. The Attorney General never explains how this purported mistake

has any bearing on whether the IHA preempts Michigan's licensing requirements—and the claim is wrong in any event.  The district court correctly stated the law.

The district court correctly explained that "the Michigan legislature permits the pari-mutuel system of wagering on horse races."  R.19, PageID.454 (citing Mich. Comp. Laws § 431.317(1)).  Although the Attorney General faults the district court for not discussing Mich. Comp. Laws § 750.331, that provision is simply a general ban on gambling on horseraces subject to exceptions permitted under the Michigan Horse Racing Law.  Moreover, the provision only applies to horseraces held in Michigan and does not purport to ban interstate wagers on horseraces held in other states.  Applying this statute to out-of-state races or wagers would give Michigan law an impermissible extraterritorial reach.  *See Reading*, 57 N.W.2d at 539-40.  And as the district court explained, the Attorney General fails "to illustrate the 'clear legislative intent' of this extraterritorial application, as is required" by the Michigan Supreme Court.  R.36, PageID.948 (citing *Sexton v. Ryder Truck Rental, Inc.*, 320 N.W.2d 843, 854-55 (Mich. 1982)).

## II.    The Irreparable Harm And Public Interest Factors Strongly Support A Preliminary Injunction.

The district court correctly held that the remaining factors weigh in favor of a preliminary injunction.  Where, as here, the movant has demonstrated a substantial likelihood of success on the merits, its opponent "faces a high hurdle" to show that

injunctive relief is not warranted. *Kentucky*, 57 F.4th at 556. The Attorney General cannot surmount that high hurdle here. TwinSpires demonstrated that it will suffer irreparable harm absent a preliminary injunction, and the public interest further warrants such relief.

### A.    TwinSpires Will Suffer Irreparable Harm Absent A Preliminary Injunction.

The district court did not clearly err in holding that TwinSpires would suffer irreparable harm absent a preliminary injunction—indeed, it would be forced to immediately shut down its operations in Michigan, destroying its goodwill with customers and its market share. *See* R.19, PageID.470-71 (district court finding of irreparable harm); *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 504 (6th Cir. 2022) (reviewing district court's irreparable harm finding for clear error). Because TwinSpires has demonstrated a substantial likelihood of success on the merits, the Attorney General "faces a high hurdle" to show that injunctive relief is not warranted. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

The Attorney General does not contest the district court's findings on irreparable harm. First, TwinSpires "has lost—and will continue to lose—customer goodwill" if it is forced to shut down in Michigan due to the suspension of its third-party facilitator license. R.19, PageID.471. Second, a shutdown order would irreparably damage the brand equity and competitive market share that TwinSpires

has steadily built in Michigan for more than a decade. *See* R.19, PageID.471. If forced to shut down, TwinSpires will lose access to its 18,000 Michigan users—and those users, in turn, will move their business to TwinSpires' competitors whose Michigan licenses remain active. *See id.* Third, the imminent enforcement of an unconstitutional law itself poses irreparable harm. *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). In short, as the district court found, TwinSpires faces irreparable harm that is "far from hypothetical." R.19, PageID.471. This Court has recognized that the types of harms found by the district court amount to irreparable harms sufficient to support a preliminary injunction. *See Overstreet*, 305 F.3d at 578 (violation of constitutional rights); *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (harm to goodwill and competitive position); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (shutdown of an "enterprise").

The Attorney General does not dispute any of this, but argues that TwinSpires waited too long before seeking a preliminary injunction. *See* Defs' Br. 50-53. The district court disagreed, *see* R.19, PageID.471-72, and its determination is entitled to deference. *See York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 308-09 (6th Cir. 2019) ("The length of a delay in seeking injunctive relief is a factual determination made by the district court that we review for clear error."). As the district court explained, TwinSpires moved for a preliminary injunction as soon as

the "harm was imminent and concrete," R.19, PageID.472—precisely when this Court has said it is appropriate to seek preliminary injunctive relief. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (party properly sought a preliminary injunction when its injury became "certain and immediate").

The Attorney General concedes that TwinSpires did not face certain and immediate injury until Michigan suspended its third-party facilitator license in January 2025. *See* Defs' Br. 11 ("*Although law-enforcement officials did not take action against TwinSpires*, the Executive Director consistently maintained that TwinSpires' acceptance of online pari-mutuel wagers from people in Michigan between 2010 and 2020 was unlawful." (emphasis added)). The disagreement over the constitutionality of Michigan's licensing requirements did not pose an existential threat to TwinSpires' operations in Michigan until the Board suspended its license and ordered it to shut down. TwinSpires moved for a preliminary injunction on an expedited basis just ten days later. *See* R.11, PageID.52. As the district court correctly observed, requiring TwinSpires to seek a preliminary injunction based on a "potentially harmful, hypothetical action"—rather than the *actual* suspension of its license—"would defeat the purpose of the imminent and concrete harm requirement." R.19, PageID.472.

Striving to ensure that no good deed goes unpunished, the Attorney General notes that TwinSpires worked cooperatively with Michigan regulators for many

years and obtained a third-party facilitator license.  TwinSpires did so out of a desire

to work with state regulators and support the Michigan horseracing industry.

Moreover, if TwinSpires wanted to accept wagers on races run in Michigan, it would

need Michigan's consent under the IHA.  *See* 15 U.S.C. § 3004(a)(1)-(2).  But

TwinSpires has consistently maintained its position with Michigan regulators that

the state's authority to regulate interstate pari-mutuel wagering is constrained.  *See*

R.11-1, PageID.103, 107.  Thus, the arguments presented in this lawsuit did not

come as a surprise or prejudice Defendants, as TwinSpires had long "alleg[ed]"

federal law violations."  *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545

F. App'x 390, 397 (6th Cir. 2013).

## B.    The Remaining Equitable Factors Favor a Preliminary Injunction.

"The two remaining preliminary injunction factors—whether issuing the

injunction would harm others and where the public interest lies—merge when the

government is the defendant."  *Kentucky*, 57 F.4th at 556.  These factors strongly

weigh in favor of a preliminary injunction.  The State has no "'valid' interest in

enforcing" its unconstitutional licensing requirements.  *Planned Parenthood Ass'n*

*of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).  Along

the same lines, an injunction would serve the public interest because it would respect

and enforce the Supremacy Clause of the United States Constitution.  *See Dahl v.*

46

*Bd. of Trustees v. W. Mich. Univ.*, 15 F.4th 728, 735-36 (6th Cir. 2021); *Ohio v. Becerra*, 87 F.4th 759, 783 (6th Cir. 2023) ("[T]he public interest lies in correctly applying the law."). And it is "entirely appropriate" for a court to find it in the public interest to permit a "successful" business operation "to continue performing [its] trade." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 970 (6th Cir. 2002).

The Attorney General begins with an overstatement: "the district court has enjoined Michigan from regulating gambling." Defs' Br. 54. Of course, the district court has done no such thing. Michigan retains its traditional authority to regulate gambling in Michigan other than wagering on interstate horseracing, and it retains consent rights under the IHA in cases where the horserace is run in Michigan or the wager is accepted in Michigan.

The Attorney General also cites alleged harm to the Michigan horseracing industry in the form of reduced revenue. Defs' Br. 57 ("The preliminary injunction cut off these revenues."). But any revenue cutoff resulted from the Board's triggering this dispute by ordering TwinSpires to shut down its Michigan operations. Indeed, if TwinSpires had surrendered and complied with the shutdown order, it would have eliminated entirely Michigan's revenues derived from TwinSpires's operations. It is peculiar, to say the least, for the Attorney General to argue that the Board's order, had it been complied with, would have inflicted "significant" harm on Michiganders. Defs' Br. 54.

47

The Attorney General also cites alleged harms to Michiganders from Oregon's supposedly "less robust . . . regulatory structure." Defs' Br. 55. But these concerns are speculative and unfounded and would put the Court in the untenable position of trying to compare the relative merits of states' regulatory regimes governing interstate pari-mutuel wagering. Perhaps Michiganders would *prefer* a less robust regulatory structure because it offers consumers greater choice in the marketplace. In any event, the Attorney General's sniping at Oregon law is, at heart, a policy disagreement with the IHA framework and the particular roles given to certain states. As such, the Attorney General's true complaint is not with the preliminary injunction or the district court. Rather, it is with Congress.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated:  July 11, 2025                                 Respectfully submitted,

|  |  |
|---|---|
| Patrick G. Seyferth | /s/ Thomas H. Dupree Jr. |
| Derek J. Linkous | Thomas H. Dupree Jr. |
| BUSH SEYFERTH PLLC | John W. Tienken |
| 100 West Big Beaver, Suite 400 | Abby H. Walters |
| Troy, MI 48084 | GIBSON, DUNN & CRUTCHER LLP |
| (248) 822-7800 | 1700 M St N.W. |
| seyferth@bsplaw.com | Washington, DC 20036 |
| linkous@bsplaw.com | (202) 955-8500 |
|  | TDupree@gibsondunn.com |
|  | JTienken@gibsondunn.com |
|  | AWalters@gibsondunn.com |
|  |  |
|  | Christine Demana |
|  | GIBSON, DUNN & CRUTCHER LLP |
|  | 2001 Ross Ave., Ste. 2100 |
|  | Dallas, TX 75201 |
|  | (214) 698-3246 |
|  | CDemana@gibsondunn.com |

*Attorneys for Appellee TwinSpires*

**CERTIFICATE OF COMPLIANCE**

Pursuant to 6th Cir. R. 32(a) and Fed. R. App. P. 32(g)(1), I certify that as required by Fed. R. App. P. 32(a)(7)(B)(i) the attached brief contains 11,241 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 2025.


Dated:  July 11, 2025                    /s/ Thomas H. Dupree Jr.
                                         Thomas H. Dupree Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2025, I caused a true and correct copy of this brief to be electronically filed through the Court's CM/ECF system, which will send a notice of filing to all registered users.


Dated:  July 11, 2025                         /s/ Thomas H. Dupree Jr.
                                              Thomas H. Dupree Jr.

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Per Sixth Circuit Rules 28 and 30(b), TwinSpires hereby designates the

following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Complaint | 1/12/2025 | 1 | 1-23 |
| Motion for Preliminary Injunction | 1/17/2025 | 11 | 52-94 |
| Declaration of Benjamin Murr | 1/17/2025 | 11-1 | 95-110 |
| Exhibit A – TwinSpires' 2023 10-K | 1/17/2025 | 11-2 | 111-229 |
| Exhibit B – Oregon License | 1/17/2025 | 11-3 | 230-231 |
| Exhibit C – Simulcast Agreement for Parx Racing | 1/17/2025 | 11-4 | 232-251 |
| Exhibit D – Conditional License | 1/17/2025 | 11-5 | 252-253 |
| Exhibit E – September 2024 Correspondence | 1/17/2025 | 11-6 | 254-259 |
| Exhibit F – December 23, 2024 Letter | 1/17/2025 | 11-7 | 260-261 |
| Exhibit G – December 31, 2024 Letter | 1/17/2025 | 11-8 | 262-263 |
| Exhibit H – January 3, 2025 Letter | 1/17/2025 | 11-9 | 268-270 |
| Proposed Order | 1/17/2025 | 11-10 | 271 |
| Preliminary Injunction Opinion | 2/19/2025 | 19 | 440-474 |
| Preliminary Injunction Order | 2/19/2025 | 20 | 475 |
| Notice of Appeal | 3/11/2025 | 23 | 801-802 |
| Opinion Denying Stay | 4/18/2025 | 36 | 941-954 |
| Order Denying Stay | 4/18/2025 | 37 | 955 |

| Opinion on Motion to Dismiss | 5/09/2025 | 43 | 973-983 |
|---|---|---|---|
| Order on Motion to Dismiss | 5/09/2025 | 44 | 984 |