No. 25-1235

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY, dba TwinSpires

Plaintiff - Appellee

v.

MICHIGAN GAMING CONTROL BOARD

Defendant

and

HENRY L. WILLIAMS JR., in his official capacity as Executive Director of the Michigan Gaming Control Board; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan

Defendants - Appellants

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Hala Y. Jarbou

**DEFENDANTS - APPELLANTS' REPLY BRIEF**

James P. Kennedy
Assistant Attorney General
Counsel of Record
Attorney for Defendants - Appellants
Alcohol & Gambling Enforc. Div
2860 Eyde Parkway
East Lansing, MI 48823
(517) 214-0210

Dated: July 31, 2025

# TABLE OF CONTENTS

Page

Table of Authorities...................................................................................ii

Introduction................................................................................................1

Argument....................................................................................................2

I.      The IHA applies only to "interstate off-track wagers," as that
        term is defined in the IHA..............................................................2

II.     The IHA does not exclusively regulate interstate off-track
        wagering. .........................................................................................7

III.    The common law of contracts does not support TwinSpires'
        position. .........................................................................................13

IV.     UIGEA undermines TwinSpires' preemption theory.....................18

V.      TwinSpires' prolonged delay in seeking relief undermines its
        claim of irreparable injury.............................................................20

Conclusion and Relief Requested ...........................................................21

Certificate of Compliance........................................................................23

Certificate of Service ..............................................................................24

i

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.,*
    511 F. App'x 398 (6th Cir. 2013)............................................................21

*Arizona v. United States,*
    567 U.S. 387 (2012) ........................................................................10

*Churchill Downs v. Thoroughbred Horsemen's Group, LLC,*
    605 F. Supp. 2d 870 (W.D. Ky. 2009) ....................................................10

*Horsemen's Benevolent & Protective Ass'n-Ohio Div., Inc. v. DeWine,*
    666 F.3d 997 (6th Cir. 1994) ..............................................................11

*Hudson v. Tex. Racing Comm'n,*
    455 F.3d 597 (5th Cir. 2006)............................................................4, 13

*Huron Mountain Club v. U.S. Army Corps of Eng'rs,*
    545 F. App'x 390 (6th Cir. 2013)..........................................................21

*Ky. Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.,*
    20 F.3d 1406 (6th Cir. 1994)......................................................3, 12, 13

*Michigan v. Lueth,*
    660 N.W.2d 322 (Mich. App. 2002).........................................................4

*Missouri v. Townsend,*
    ___ S.W. ___; 50 Mo. App. 690 (St. Louis Ct. App. 1892)..............16, 17

*Monarch Content Mgmt., LLC v. Ariz. Dep't of Gaming,*
    971 F.3d 1021 (9th Cir. 2020).............................................................3, 4

*Murphy v. NCAA,*
    584 U.S. 453 (2018) ......................................................................7, 8, 9

*Overstreet v. Lexington-Fayette Urban Ct'y Govt.*,
   305 F.3d 556 (6th Cir. 2022) ................................................................20

*People v. Weithoff*,
   16 N.W. 442 (Mich. 1883)............................................................16, 17

*Rohan v. Detroit Racing Ass'n*,
   22 N.W.2d 433 (Mich. 1946) ...................................................................4

*State ex. rel. Reading v. W. U. Telegraph Co.*,
   57 N.W.2d 537 (Mich. 1953) ........................................................passim

*Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n
   Inc.*,
   989 F.2d 1266 (1st Cir. 1993) ..........................................................7, 8

*United States v. Gatto*,
   299 F. Supp. 697 (E.D. Penn. 1969) ....................................................17

*United States v. McMenama*,
   403 F.2d 969 (6th Cir. 1968)................................................................17

*United States v. Truesdale*,
   152 F.3d 443 (5th Cir. 1998) .......................................................15, 16

*West Virginia v. Env't Prot. Agency*,
   597 U.S. 697 (2022) .................................................................................6

**Statutes**

15 U.S.C. § 3001(a)..................................................................................11

15 U.S.C. § 3001(a)(3)...............................................................................5

15 U.S.C. § 3001(b)..................................................................................11

15 U.S.C. § 3002(3) .........................................................................passim

15 U.S.C. § 3004 ..............................................................................6, 8, 19

15 U.S.C. § 3004(a) .......................................................................7, 10, 12

15 U.S.C. § 3004(a)(2), (3) ................................................................10

18 U.S.C. § 1084(a) ...........................................................................14

18 U.S.C. § 1955 .................................................................................15

31 U.S.C. § 5361–5367 .........................................................................1

31 U.S.C. § 5361(a)(4) ........................................................................15

31 U.S.C. § 5362(10)(A) ................................................................14, 18

31 U.S.C. § 5362(10)(D)(i) ..................................................................19

31 U.S.C. § 5362(10)(D)(ii) .................................................................19

Mich. Comp. Laws § 324.99919 ............................................................4

Mich. Comp. Laws § 431.317(1), (8) .....................................................4

Mich. Comp. Laws § 431.318(1)–(3) ......................................................4

Mich. Comp. Laws § 431.318(2)(j) .........................................................4

Mich. Comp. Laws. § 750.331 ..............................................................14

## INTRODUCTION

TwinSpires' arguments fail for at least five reasons.

*First*, TwinSpires misconstrues the scope of the Interstate Horseracing Act (IHA), which applies only to wagers that are lawful in each state involved in the wager.  A wager placed by a person in Michigan that violates Michigan law is not an "interstate off-track wager" encompassed by the IHA.  *See* 15 U.S.C. § 3002(3).

*Second*, TwinSpires wrongly claims that the IHA exclusively regulates interstate pari-mutuel wagering on horseraces, but the statute neither occupies the field nor conflicts with Michigan's gambling regulations.

*Third*, TwinSpires' reliance on the common law and historical practice is selective and misrepresentative.  Long before the IHA, states regulated interstate horse wagering and prohibited gambling contracts.

*Fourth*, the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361–5367, (UIGEA) confirms that the IHA does not preempt state law.

*Fifth*, even if TwinSpires could show a likelihood of success, it has not shown irreparable injury.  TwinSpires voluntarily submitted to

1

Michigan's licensing regime for years, which undermines its claim that it faces the imminent threat of irreparable injury without an injunction.

Because TwinSpires' brief only reveals the weakness of its preemption theory, and for the reasons set forth in Defendants-Appellants' principal brief, this Court should reverse the preliminary injunction.

## ARGUMENT

### I.    The IHA applies only to "interstate off-track wagers," as that term is defined in the IHA.

TwinSpires' preemption theory rests on a threshold error. TwinSpires assumes that the IHA regulates all wagers on horse races that cross state lines, displacing any state laws that regulate interstate wagering on horse racing with its consent framework. This assumption does not withstand scrutiny. The IHA does not apply to every wager on a horse race that crosses state lines. Rather, it applies only to interstate off-track wagers that satisfy the definition in the IHA.

The IHA defines an "interstate off-track wager" as:

a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, *where lawful in each state involved*, placed or transmitted by an individual in one State

2

via telephone or electronic media and accepted by an off-
track betting system in the same or another State.

15 U.S.C. § 3002(3) (emphasis added).  For the reasons explained in

Defendants-Appellants' principal brief, a wager that is unlawful under

the law of the state where it is placed falls outside the IHA's scope.

The "IHA pointedly le[aves] intact the States' primary

responsibility for determining what forms of gambling may legally take

place within their borders, thus preserving their traditional police

powers." *Monarch Content Mgmt., LLC v. Ariz. Dep't of Gaming*,

971 F.3d 1021, 1028 (9th Cir. 2020) (cleaned up).  Thus, "[u]nder the

[IHA], each state may prohibit interstate off-track wagering within its

borders[] and may prohibit a resident racetrack from contracting with

an off-track wagering facility in another state." *Ky. Div., Horsemen's*

*Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*,

20 F.3d 1406, 1414 (6th Cir. 1994).  And because a State can altogether

prohibit wagering on horse races, it also has the power to allow it in a

limited manner by  "condition[ing] a license to engage in legalized

racing upon compliance with any regulation that is reasonably

appropriate . . . to protect the integrity of the sport, and to protect the

betting public[.]" *Hudson v. Tex. Racing Comm'n*, 455 F.3d 597, 601–02

3

(5th Cir. 2006); *see also Rohan v. Detroit Racing Ass'n*, 22 N.W.2d 433, 441 (Mich. 1946); *Michigan v. Lueth*, 660 N.W.2d 322, 330 (Mich. App. 2002). TwinSpires claims that *Monarch* does not apply because it "addressed state laws concerning the simulcasting of races . . . not state efforts to regulate interstate wagering[.]" (Pl. Br. 29.) Yet, the portion of Michigan's law that TwinSpires challenges governs simulcasting. *See* Mich. Comp. Laws § 431.318(1)–(3).

Under Michigan law, only a licensed race meeting may offer pari-mutuel wagering on horse races in Michigan. Mich. Comp. Laws § 431.317(1), (8). Michigan law also prohibits licensed race meetings from accepting off-track wagers on races outside of Michigan without permission from the Executive Director.[1] Mich. Comp. Laws § 431.318(1), (3). Not only is Michigan's regulatory structure consistent with the IHA, but Michigan also explicitly requires its licensees to comply with the IHA. Mich. Comp. Laws § 431.318(2)(j).

---

[1] As noted in Defendants-Appellants' principal brief, in 2009 all the functions and powers of the Racing Commissioner were reassigned to the Executive Director of the Michigan Gaming Control Board. *See* Mich. Comp. Laws § 324.99919. Also, although TwinSpires' brief primarily refers to the Appellants as "the Attorney General," the Executive Director is one of the Appellants and plays the primary role in licensing and regulating parimutuel wagering.

A wager does not qualify as an "interstate off-track wager" under the IHA if it violates the gambling laws of the state where it is placed because it is not "lawful in each State involved" in the wager. *See* 15 U.S.C. § 3002(3). Applying this statutory definition does not create a "fourth consent" requirement, as TwinSpires insists. Rather, the statutory definition constitutes a limit that Congress placed on the IHA's scope. Congress directly stated that it wanted to regulate only "the limited area of interstate off-track wagering" 15 U.S.C. § 3001(a)(3), which Congress defined as "pari-mutuel wagers . . . [that are] lawful in each State involved." 15 U.S.C. § 3002(3). If Congress had wanted to regulate every wager on a horse race where the wager is accepted in a state other than where the race is run, it could have simply said so. The fundamental definition of "interstate off-track wager" does not bury a detail in an ancillary statutory provision, as TwinSpires contends. Rather, recognizing the scope of "interstate off-track wager" provides the proper lens for interpreting the rest of the IHA.

TwinSpires has no real response to the broader threshold issue regarding the limited scope of the IHA, other than to assert that

Congress would have done things differently. But the limiting phrase "lawful in each State involved" is not obscure or elliptical. Just as Congress limited the original part of the definition to "a legal wager," Congress limited the second part of the definition to wagers that are "lawful in each State involved." TwinSpires' interpretation, that "each State involved" means only the states whose consent is required in 15 U.S.C. § 3004, ignores the phrase's context. *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) ("[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

Nothing in the definition suggests that Congress intended to limit the "States involved" to the states that consent under § 3004. The phrase "where lawful in each State involved" modifies "pari-mutuel wagers" ("and includes pari-mutuel wagers, where lawful in each State involved") and is followed by further description of the wagers. The logical conclusion is that "where lawful in each State involved" is referring to each State involved in the *wager*, not just the two states involved in the consents. TwinSpires is accepting wagers from people in Michigan. Michigan is clearly a state involved in the wager. Thus, for

6

those wagers to be affected by the IHA, the wagers must be legal in Michigan.  If the wager is not legal in Michigan because, for example, the party accepting it is not properly licensed, the wager is not encompassed by the IHA, and the IHA cannot be viewed as preempting the state law that prohibits the wager.

## II.    The IHA does not exclusively regulate interstate off-track wagering.

TwinSpires repeatedly contends that the IHA establishes "an exclusive and uniform national framework for interstate pari-mutuel wagering on horse races," and thereby prohibits a state from regulating any aspect of interstate wagering on horseracing.  (Pl. Br. 13.)  This flawed argument rests on a misreading of both *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n Inc.*, 989 F.2d 1266, 1270-71 (1st Cir. 1993), and *Murphy v. NCAA*, 584 U.S. 453, 479 (2018), as well as the IHA itself.

Contrary to TwinSpires' assertion, *Sterling Suffolk Racecourse* does not say that the IHA establishes "the 'absolute condition precedent to off-track wagering across state lines.' "  (Pl. Br. 23.)  Instead, *Sterling Suffolk* says that "Congress phrased [15 U.S.C. § 3004(a)] as *an*

absolute condition precedent to off-track wagering across state lines." *Sterling Suffolk*, 989 F.2d at 1270-71 (emphasis added). *Sterling Suffolk* says the required consents in § 3004 of the IHA are a necessary condition that an off-track betting system must satisfy to comply with the IHA. But if the wager does not come within the IHA's scope, the consents required in § 3004 are not applicable. *Sterling Suffolk* also does not address whether the IHA preempts state law or whether wagers that are illegal in the state from which they are transmitted constitute "interstate off-track wagers." 989 F.2d at 1267. Rather, *Sterling Suffolk* merely recognizes that a party not listed in § 3006 of the IHA does not have an implied cause of action based on alleged violations of the IHA. *Id*. at 1269.

*Murphy* also does not support TwinSpires' argument that the IHA exclusively regulates interstate wagering on horseracing. In *Murphy*, the Supreme Court struck down a federal law that prohibited states from authorizing or regulating gambling. 584 U.S. at 474. *Murphy* was not decided based on the Supremacy Clause or preemption but on the Tenth Amendment and the anticommandeering doctrine, which provides that Congress may not issue direct commands to State

8

legislatures.  *Id.*  Although *Murphy* briefly discusses preemption, nothing in the discussion supports TwinSpires' contention that the IHA exclusively regulates interstate pari-mutuel wagering or prohibits Michigan from regulating interstate pari-mutuel wagering.  Rather, *Murphy* reaffirmed that gambling regulation lies within the States' police powers and that Congress "respect[s] the policy choices of the people of each State on the controversial issue of gambling," largely leaving it to each State to decide the scope and limits of gambling within its jurisdiction.  *Id.* at 484.

Consistent with this long-standing federal policy, the IHA creates a minimal regulatory framework.  As Defendants-Appellants emphasized in their initial brief, the IHA does not regulate many important aspects of wagering, including the legal age for wagering and technical standards to ensure secure, accountable wagering.

The fact that the IHA takes no position on numerous significant regulatory issues shows that Congress chose to leave "regulation of the horse wagering industry . . . to the respective state racing commissions[,]" *Churchill Downs v. Thoroughbred Horsemen's Group,*

*LLC*, 605 F. Supp. 2d 870, 882 (W.D. Ky. 2009), rather than impose its own comprehensive regulatory scheme.

TwinSpires also misunderstands why it is significant that the IHA does not establish a federal agency to oversee the regulatory field. The lack of a federal regulator is not dispositive but supports that the IHA is not a comprehensive scheme that occupies the regulatory field. Congress does not occupy a regulatory field when it narrowly regulates only one aspect of an industry, especially when the statute expressly defers to state authority—both in defining the scope of what the law covers, 15 U.S.C. § 3002(3), and by allowing states to decide whether to allow activities that fall within this field, 15 U.S.C. § 3004(a)(2), (3).

To determine whether Congress has "pervasively regulated" a field, courts consider both the scope of regulation and the structure Congress created to enforce it. *See Arizona v. United States*, 567 U.S. 387, 401 (2012). The IHA is narrow in scope, silent on many core aspects of wagering, and lacks any mechanism for federal enforcement of its terms. If the IHA had displaced traditional State licensing and regulatory authority over gambling, Congress would have said so. It did not.

TwinSpires cannot overcome this hurdle by asserting that the "field" in question should be viewed as only "interstate off-track wagering on horseraces."  This convenient framing of the pervasiveness inquiry both ignores the IHA's definitions and begs the question whether any State law could survive a preemption analysis when the "field" is limited to precisely what Congress chose to regulate. Nevertheless, even if we zoom in as TwinSpires does, one cannot ignore that the IHA provides no limitations or protections for wagerers themselves.  Gambling regulation, even concerning only "interstate off-track wagering on horseraces," must concern more than protecting industries.  *See* 15 U.S.C. § 3001(b).  The States must be free to regulate, even within that confined field.  *See* 15 U.S.C. § 3001(a).

TwinSpires' reliance on *Horsemen's Benevolent* is also misplaced. In that case, the Ohio law was preempted because it authorized conduct that the IHA expressly prohibited by creating a new process for consent that bypassed the horsemen's group.  *Horsemen's Benevolent & Protective Ass'n-Ohio Div., Inc. v. DeWine,* 666 F.3d 997, 1001 (6th Cir. 1994).  Here, by contrast, Michigan's law does not alter or contradict the IHA's consent framework.  It does not purport to authorize wagering

without the IHA's required consents, nor does it establish an alternative path to obtain these consents. Rather, Michigan law simply prohibits certain wagers. Because such wagers are not "interstate off-track wagers" under the IHA, they are not federally regulated, and neither field nor conflict preemption apply.

As TwinSpires itself has acknowledged, the IHA was a response to the New York legislature's decision to allow its state-run off-track betting system to accept wagers on the Kentucky Derby in 1971 without consent from Churchill Downs (the host racing association) or the Kentucky Horse Racing Commission (the host racing commission).

"When Congress enacted the IHA, off-track wagering was already in place as a legal alternative [e.g. off-track betting in New York] to betting at the track where the race was being run. Congress recognized that the unrestricted proliferation of off-track wagering would hurt the horseracing industry[.]" *Kentucky Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1414 (6th Cir. 1994). Congress initially considered "eliminat[ing] interstate off-track wagering in its entirety[,]" but instead "opted for the compromise found at 15 U.S.C. § 3004(a) which allows interstate off-track wagering

if, and only if, the interested parties consent." *Id.*  Importantly,

"[u]nder the [IHA], each state may prohibit interstate off-track

wagering within its borders[.]" *Id.*  Because States may prohibit

wagering on horse races outright, they may also regulate it by requiring

licensure.  *Hudson*, 455 F.3d at 601.  Thus, the IHA does not exclusively

regulate interstate off-track wagering.

## III.  The common law of contracts does not support TwinSpires' position.

TwinSpires' attempts to read the IHA as broadly preemptive

ignore important background principles of federal and state law.

Curiously, TwinSpires relies on Michigan law, even though it contends

that Michigan law has been overcome by the IHA.

More specifically, TwinSpires invokes *State ex. rel. Reading v. W.

U. Telegraph Co.*, 57 N.W.2d 537 (Mich. 1953), and a handful of other

cases to argue that "wagers are deemed made in the state in which they

are accepted—not the state from which they were placed[,]" and,

therefore, under the IHA, once it has obtained Oregon's consent,

TwinSpires may accept interstate wagers that are placed by persons in

Michigan (or presumably any other state).  (Pl. Br. 34.)  Yet this

argument falters when *gambling* law, instead of *contract* law, is considered.

*Reading* rests on the common law of contracts, not the common law of gambling. *Reading* begins by noting that a bet is a type of contract and, therefore a bet is formed by "offer" and "acceptance." *Reading*, 57 N.W.2d at 539. Importantly, *Reading* did not consider how this common law rule interacts with Michigan's prohibition against wagering on horse races or other prohibitions on gambling in Michigan's Penal Code.

TwinSpires ignores that *Reading*'s weight in this context is superseded by statutory law, specifically the Penal Code's prohibition on wagering on horse races, Mich. Comp. Laws. § 750.331; the IHA's requirement that a wager must be legal in each State involved, 15 U.S.C. § 3002(3); and gambling laws like the Wire Act and UIGEA. The Wire Act prohibits, among other things, using wire communication facilities to transmit a bet or wager on a sporting event or contest in interstate commerce. 18 U.S.C. § 1084(a). Meanwhile, UIGEA restricts using the internet to place or receive a bet that is unlawful in either the state where it is initiated or received. 31 U.S.C. § 5362(10)(A).

Allowing *Reading* to prevail over more specific statutes would create an inconsistent federal regulatory landscape.

TwinSpires also points to *United States v. Truesdale*, 152 F.3d 443 (5th Cir. 1998), arguing that it stands for the proposition that "wagers are deemed made in the state in which they are accepted—not the state from which they were placed." (Pl. Br. 34.) *Truesdale* is a Fifth Circuit case regarding an early illegal off-shore gambling operation that was conducted from Jamaica and the Dominican Republic which held that "[u]nder section 1955 [18 U.S.C. § 1955], the illegal gambling activity must violate the law of the state in which it is conducted." 152 F.3d 443, 447 (5th Cir. 1998). But this case is of limited value, because in response to countless illegal off-shore internet gambling operations like those in *Truesdale*, Congress adopted the Unlawful Internet Gambling Enforcement Act (UIGEA) in 2006. UIGEA, which is addressed in more detail below, specifically states that "new mechanisms for enforcing gambling laws on the Internet are necessary because traditional law enforcement mechanisms are often inadequate for enforcing gambling prohibitions or regulations on the Internet, especially where such gambling crosses State or national borders." 31 U.S.C. § 5361(a)(4).

15

Thus, TwinSpires cannot rely on a pre-Wire Act Michigan case (*Reading*) and a pre-UIGEA Federal case (*Truesdale*) because their relevance has largely been abrogated by the Wire Act and UIGEA.

TwinSpires' historical argument fares no better.  It claims that prior to the IHA, there was no tradition of state or federal regulation of interstate off-track wagering.  But that is flatly wrong.  In *People v. Weithoff*, the Michigan Supreme Court upheld the defendant's conviction for selling "pools on horse-races, commonly known as " 'Paris Mutuals' . . . upon horse-races which took place . . . in different parts of the United States[.]"  16 N.W. 442, 443 (Mich. 1883).  The Court explained that bettors need not be present at an out-of-state race or contest to fall within Michigan's anti-gambling laws.  *Id.* at 447.

The same principle appears in *Missouri v. Townsend*, ___ S.W. ___; 50 Mo. App. 690 (St. Louis Ct. App. 1892), where the Court upheld the defendant's conviction for transmitting bets on horse races held in New Jersey across state lines to Minnesota.  The defendant argued that transmitting money out of state to be bet elsewhere did not violate Missouri's law.  50 Mo. App. at 691.  The Court disagreed, holding that the defendant's conduct amounted to

"'bookmaking' on a race beyond the limits of this state" and emphasizing that courts must not allow defendants "to escape punishment by resorting to ingenious devices in defeating salutary statutory provisions." *Id.* at 699.

Both *Weithoff* and *Townsend* show that States were regulating interstate wagering on horse races for nearly a full century before the IHA and that *Reading* reflects a limited contract law principle that did not prevent the states from enforcing their laws prohibiting interstate wagering on horse races. Federal cases further demonstrate that the Federal government's consistent policy of respecting each State's policy choices on gambling has long extended to interstate wagering on horse races. *See United States v. McMenama*, 403 F.2d 969, 970–71 (6th Cir. 1968) (upholding a conviction for using interstate wires to conduct off-track betting prohibited by Kentucky law); *United States v. Gatto*, 299 F. Supp. 697, 699–70 (E.D. Penn. 1969) (upholding a conviction for crossing state lines to promote a horse betting operation prohibited by Pennsylvania law).

In short, neither the common law nor pre-IHA historical practice supports the broad safe harbor from state regulation that TwinSpires

now claims.  The Court should reject TwinSpires' reliance on contract-law formalism, which has been superseded by Congress in more recent gambling statutes.  Neither state common law nor historical racing regulation displace the federal and state laws that currently govern wagering.

## IV.  UIGEA undermines TwinSpires' preemption theory.

UIGEA was enacted nearly three decades after the IHA and directly addresses online wagering and the role of state law.  Its careful exceptions and anti-preemption clause confirm that the IHA does not displace state regulation.  UIGEA defines "unlawful Internet gambling" to include:

> [P]lac[ing], receiv[ing], or otherwise knowingly transmit[ting] a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

31 U.S.C. § 5362(10)(A).  In other words, under UIGEA, internet gambling is generally unlawful if it violates *any applicable Federal or State law* in the state where the bet is *initiated, received, or otherwise made.*

18

Following this broad general definition of unlawful internet gambling, UIGEA sets forth a number of specific exceptions including an exception for "any activity that is allowed under the Interstate Horseracing Act of 1978."  31 U.S.C. § 5362(10)(D)(i).

This carveout reflects Congress's recognition that, even if an internet-based wager is conducted with the consent of those identified in § 3004 of the IHA, the wager could still be considered "unlawful Internet gambling" under UIGEA if it violates state law.  That alone undermines TwinSpires' claim that IHA-compliant wagers are inherently lawful and insulated from state regulation.  But even more importantly, immediately following the IHA exception, Congress included a rule of construction that states: "Nothing in this subchapter may be construed to preempt any State law prohibiting gambling." 31 U.S.C. § 5362(10)(D)(ii).

The placement of this anti-preemption clause is critical.  Congress could have written a broad field-preemption clause affirming that IHA-authorized wagering overrides state law.  Instead, it did the opposite, expressly affirming that even "activities allowed under the IHA" may still be prohibited or regulated by states.  If Congress had believed the

IHA already preempted state regulation of interstate horse wagering, this language would have been redundant and contradictory. But it is not. UIGEA reflects the long-standing federal policy of letting States decide how to regulate gambling in their territory.

TwinSpires' argument fails when one considers both the purpose of this exception (to avoid criminalizing IHA-compliant activity under UIGEA), and the explicit anti-preemption clause that follows. UIGEA expressly affirms that States retain their authority to regulate, condition, or prohibit interstate pari-mutuel wagers, even when it passes federal muster under the IHA.

## V. TwinSpires' prolonged delay in seeking relief undermines its claim of irreparable injury.

Even if TwinSpires were correct about its likelihood of success on the merits, TwinSpires still fails to satisfy the other requirements for injunctive relief. In particular, TwinSpires fails to show that it faced an imminent threat of irreparable injury. The harm that results from the wrong TwinSpires asserts is the harm of being subjected to a licensing scheme that it believes is unconstitutional. *See Overstreet v. Lexington-Fayette Urban Ct'y Govt.*, 305 F.3d 556, 578 (6th Cir. 2022) (holding

that "a plaintiff can demonstrate . . . irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights.").

Yet TwinSpires voluntarily complied with Michigan's licensing regime for over four years before seeking judicial relief. (Compl., R. 1, Page ID # 13, ¶¶ 35–36.) In fact, it affirmatively sought and obtained a Michigan license in 2020, after having long claimed that such licensure was unconstitutional. (Mot. for P.I., R. 11, Page ID # 71; Decl. of Murr, R. 11-1, Page ID # 104, ¶ 29.) This prolonged and voluntary submission to Michigan's framework undermines any claim of imminent, irreparable injury *from the wrong it asserts*. *See Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013); *see also Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013). TwinSpires' belated challenge confirms the weakness of its claims and provides yet another reason for this Court to reverse the preliminary injunction.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, and in their principal brief, Defendants-Appellants Executive Director Henry L. Williams and Michigan Attorney General Dana Nessel respectfully request that this

Court reverse and vacate the district court's order granting a

preliminary injunction.

Respectfully submitted,


/s/ James P. Kennedy
Assistant Attorney General
Counsel of Record
Attorney for Defendants -
Appellants
Alcohol & Gambling Enforc. Div.
2860 Eyde Parkway
East Lansing, MI  48823
(517) 241-0210

Dated:  July 31, 2025

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This reply brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this reply brief contains no more than 6,500 words. This document contains 4,055 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

/s/ James P. Kennedy
Assistant Attorney General
Counsel of Record
Attorney for Defendants -
Appellants
Alcohol & Gambling Enforc. Div.
2860 Eyde Parkway
East Lansing, MI  48823
(517) 241-0210

# CERTIFICATE OF SERVICE

I certify that on July 31, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

/s/ James P. Kennedy
Assistant Attorney General
Counsel of Record
Attorney for Defendants -
Appellants
Alcohol & Gambling Enforc. Div.
2860 Eyde Parkway
East Lansing, MI  48823
(517) 241-0210